**STATE OF NORTH CAROLINA**    **IN THE GENERAL COURT OF JUSTICE**
**WAKE COUNTY**    **FILED**    **SUPERIOR COURT DIVISION**

20 CvS _____

2020 NOV 13 A 8: 35

| | |
|---|---|
| DUKE UNIVERSITY    WAKE CO., C.S.C. | |
| Plaintiff,    BY_____ | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ENDURANCE RISK SOLUTIONS ASSURANCE COMPANY | |
| Defendant. | |

Plaintiff Duke University ("Duke" or the "University") files this Complaint against Defendant Endurance Risk Solutions Assurance Company ("Endurance") and alleges as follows:

## NATURE OF THE ACTION

1.    This dispute arises out of Endurance's reversal of position and refusal to provide coverage owed Duke for insured losses in connection with a claim comprised of two related antitrust class action lawsuits filed against the University. Endurance's failure to honor its coverage obligations, after initially yet falsely assuring Duke that it would cover relevant losses, has injured Duke. In this lawsuit, Duke seeks declaratory relief, compensatory damages, punitive damages, and statutory relief arising from Endurance's conduct.

## THE PARTIES

2.    Plaintiff Duke is a North Carolina not-for-profit corporation with its principal place of business in Durham, North Carolina.

3.    Defendant Endurance is a Delaware corporation with its principal place of business in Purchase, New York.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to

N.C.G.S. §§ 7A-240 and 7A-243, as the amount in controversy exceeds $25,000.

5.     Certain claims asserted in this Complaint arise under the Declaratory Judgment

Act, N.C.G.S. §§ 1-253 and 1-254, et seq.  This Court may declare the rights and other legal

relations of the parties under the Declaratory Judgment Act as this is a case of actual and

justiciable controversy within the Court's jurisdiction.

6.     This Court has personal jurisdiction over Endurance under North Carolina's long-

arm statute, N.C.G.S. § 1-75.4, and the Due Process Clause of the Fourteenth Amendment of the

U.S. Constitution.  Endurance is licensed as an insurer to transact business in North Carolina and

has purposefully availed itself of the privilege of transacting business in this state with respect to

the matters alleged in this Complaint.  The relevant liability insurance contracts in this dispute

were delivered in North Carolina, were sold to a policyholder incorporated and headquartered in

this state, and include North Carolina endorsements.  Additionally, the instant coverage dispute

arises out of Endurance's refusal to cover Duke's losses relating to lawsuits that were filed and

were, or are being, litigated in North Carolina, and that, in turn, center on alleged conduct that

occurred and purportedly caused injury in this state in that they involve faculty members at Duke

and the University of North Carolina ("UNC").

7.     Venue is proper in this Court pursuant to N.C.G.S. § 1-79(a)(3) because

Endurance is a domesticated foreign corporation that resides in Wake County for purposes of

venue.  Although Endurance has no registered or principal office or place of business in North

Carolina, Endurance regularly engages in carrying on business in Wake County, including

without limitation by registering as an insurer with the North Carolina Department of Insurance

in Raleigh, North Carolina.  On information and belief, Endurance has also engaged in business

2

in Wake County through advertising in the county, selling insurance policies to residents of the county, covering persons, entities, risks, and losses that are located in or arise in the county, and/or litigating coverage disputes in the courts of this county.

## FACTUAL ALLEGATIONS

### A. Duke's 2015 Liability Insurance Coverage

8. To guard against serious financial loss, Duke purchased a top-shelf management liability insurance program, with five coverage layers together providing $80 million in limits, for the policy period January 1, 2015 to January 1, 2016. The policies in this program provide "claims-made" coverage for management liability risks and are designed to provide both defense and indemnity coverage for claims first made or deemed made against Duke during the policy period.

9. Westchester Fire Insurance Company sold Duke the primary-layer policy in the 2015 program (the "Westchester Fire Policy"). Said policy provides Duke with an applicable limit of $10 million, subject to a $1 million retention borne by Duke. A true and correct copy of the Westchester Fire Policy is attached hereto as **Exhibit 1**.

10. Three additional insurers (the "Non-Party Excess Insurers") sold Duke excess policies that collectively provide $45 million in coverage above Westchester Fire's layer.

11. Endurance sold Duke its top-layer excess policy (the "Endurance Policy"), which covers a further and final $25 million above the $55 million in underlying insurance layers. A true and correct copy of the Endurance Policy is attached hereto as **Exhibit 2**.

12. The four excess policies all "follow form" to the Westchester Fire Policy, meaning that they afford coverage on the same terms as that policy unless and to the extent the subject excess policy specifically provides otherwise.

13. The Westchester Fire Policy includes coverage sections for both "Employment

3

Practices Liability" and "Insured Persons and Organization," which are commonly described as the EPL and D&O sections, respectively. Although this lawsuit is brought under the policy as a whole, the claims here are governed by the D&O section, not the EPL section. Duke has at all relevant times sought recovery for its subject antitrust-related losses under the D&O section, which is the only section that (a) defines "Anti-Trust Claims" and (b) imposes a co-payment obligation on Duke that Westchester Fire, Endurance, and the Non-Party Excess Insurers have consistently invoked.

14. The Westchester Fire Policy's D&O section insures "Loss" that Duke becomes legally obligated to pay by reason of a "Claim" for a "Wrongful Act" that is asserted against Duke and reported to its insurers during the 2015 policy period.

15. "Loss" is defined in the Westchester Fire Policy to include "damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court," as well as "Costs, Charges and Expenses" incurred by Duke.

16. "Costs, Charges and Expenses" are defined in the Westchester Fire Policy to include "reasonable and necessary legal costs, charges, fees and expenses." That policy also provides that "the Insurer shall advance on a quarterly basis" all covered "Costs, Charges and Expenses." Accordingly, the carriers in Duke's 2015 insurance program, including Endurance, owe Duke a duty to advance defense costs.

17. "Claim" is defined in the Westchester Fire Policy to include "a written demand" against Duke "for monetary damages," as well as "a civil proceeding" against Duke "seeking monetary damages."

18. "Wrongful Act" is defined in the Westchester Fire Policy to include "any actual or alleged error, omission, misleading statement, misstatement, neglect, [or] breach of duty" by

4

Duke.

19.     The Westchester Fire Policy's D&O section expressly batches into a single Claim and into a single policy period subsequent lawsuits arising out of the same or related Wrongful Acts as an initial 2015 lawsuit, regardless of whether such subsequent lawsuits were filed in 2015 or in a later year: "All Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at . . . the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made."

20.     By endorsement to the Westchester Fire Policy's D&O section, "Anti-Trust Claim" is expressly defined and covered, with a requirement that "the Insureds shall bear uninsured and at their own risk 20% of all Loss incurred in a Claim alleging or arising out of an Anti-Trust Claim." At all relevant times in connection with this dispute, Duke's insurers (including Endurance) have insisted that Duke satisfy the co-payment obligation and Duke, in turn, has fulfilled this 20% co-payment requirement.

21.     The Endurance Policy includes a "Claims Made Coverage Endorsement."

22.     Endurance's claims made endorsement begins with a follow-form clause (the "Claims Made Follow-Form Clause") that provides:

> It is agreed that the insurance afforded by this policy is subject to the same terms, conditions, definitions, exclusions and warranties as contained in the [Westchester Fire Policy].
>
> The foregoing shall not apply to:
>
> 1. The Retroactive Date of the underlying claims made policy(ies).
> 2. The Extended Reporting Period of the underlying claims made policy(ies).

23.     All premiums due under Duke's 2015 insurance program have been paid, and all conditions to coverage have been performed, have occurred, or have otherwise been satisfied,

5

excused, or waived.

**B. The *Seaman* Lawsuit**

24.     On June 9, 2015, Dr. Danielle Seaman, by and through counsel, filed an antitrust

class action lawsuit against Duke in North Carolina federal court.  *See Seaman v. Duke*

*University, et al.*, No. 1:15-cv-462 (M.D.N.C.).  Dr. Seaman, then an Assistant Professor of

Radiology at Duke, sued on her own behalf and on behalf of Duke and UNC medical faculty and

other skilled medical employees.

25.     The *Seaman* lawsuit alleged that Duke and UNC had been conspiring to suppress

wages for the class by declining to compete for each other's medical faculty.  The lawsuit also

alleged that Dr. Seaman was deprived of an opportunity in 2015 to obtain employment at the

UNC School of Medicine because of this conspiracy.  The *Seaman* complaint sought treble

damages, attorneys' fees, and various other remedies.

26.     The *Seaman* plaintiffs were represented by experienced class counsel, with Dean

Harvey, Esq. and other lawyers from the law firm Lieff Cabraser Heiman & Bernstein, LLP

acting as lead counsel, and Robert M. Elliott and the North Carolina law firm Elliott Morgan

Parsonage, PLLC serving as co-counsel.

27.     The *Seaman* case was litigated thoroughly over a four-year period.  The case

included motions to dismiss, an interlocutory appeal to the U.S. Court of Appeals for the Fourth

Circuit, class certification proceedings, extensive fact discovery, expert reports and discovery,

summary judgment motions, intervention by the U.S. Department of Justice, and lengthy

settlement approval proceedings.

28.     During the litigation, experts for the *Seaman* class estimated damages ranging

from $125 million to $315 million, not accounting for fee shifting, treble damages, and other

relief.

29. In March 2019, the parties, with the consent of Duke's insurers, agreed in principle to settle *Seaman* for $54.5 million, subject to documentation and court approval.

30. On or around September 25, 2019, after months of settlement documentation, approval briefing, notice to the class members, and related proceedings, the court in *Seaman* approved the settlement agreement. That same day, the court awarded *Seaman* class counsel $18,166,666.67 in attorneys' fees and $3,320,066.35 for reimbursement of expenses. This sum amounted to nearly 40% of, and was paid out of, the $54.5 million *Seaman* settlement.

31. Duke incurred more than $15.4 million in defense costs in connection with the litigation and settlement of *Seaman*. The attorneys' fees comprising the *Seaman* defense costs reflected discounted billing rates by the law firms defending Duke, and were the subject of a rigorous review and audit process by Duke.

## C. Duke's Insurers, Including Endurance, Participate in Settling *Seaman*

32. Duke reported the *Seaman* claim to its 2015 management liability insurers, namely Westchester Fire, the Non-Party Excess Insurers, and Endurance.

33. Duke provided its 2015 insurers (including Endurance) extensive updates and briefings regarding *Seaman*, and kept the insurers closely involved in the defense and resolution of the lawsuit.

34. Prior to making settlement offers or proposals in *Seaman*, Duke sought input and consent from all of its carriers, including Endurance. Subject to ongoing confidentiality undertakings, Duke also provided multiple telephonic and in-person defense counsel briefings to all its carriers.

35. In March 2019, Endurance claims executive Robert Darish consented to the settlement of *Seaman* for $54.5 million. Mr. Darish also committed to Duke's Vice President and General Counsel and other Duke representatives that Endurance would pay any *Seaman*

7

defense costs that reached into Endurance's layer.

36.     After the *Seaman* parties settled for $54.5 million, the carriers underlying Endurance (i.e., Westchester Fire and the Non-Party Excess Insurers) all paid out their limits in full — without any discount — toward defense costs and/or the settlement.

37.     Because of the need to document and secure court approval of the settlement, the total amounts of *Seaman* defense costs were continuing and thus uncertain in the months following the March 2019 agreement on the *Seaman* settlement amount. Accordingly, Duke kept Endurance updated on the status of underlying exhaustion and on whether *Seaman* defense costs would ultimately exhaust the underlying limits and reach into Endurance's layer. During this entire period, Endurance never raised a coverage objection or defense, nor did Endurance ever suggest that it had a right or basis to second-guess the coverage decisions or payments of the underlying insurers.

38.     After the *Seaman* settlement was agreed to, Endurance re-confirmed, in writing, the commitment it had made to Duke to fund any residual *Seaman* defense costs that exceeded the underlying insurance layer. Endurance did so through, among other things, a July 2019 email exchange wherein Mr. Darish confirmed to Duke Endurance's agreement to pay *Seaman*-related expenses that reached into its layer.

39.     On February 18, 2020, Duke advised Endurance that the Non-Party Excess Insurer immediately underlying Endurance's policy would be paying out the remaining balance of its policy limits, leaving a likely five-figure amount of unpaid *Seaman* defense costs to be paid in Endurance's layer.

40.     Endurance has subsequently failed to provide any reimbursement of *Seaman* defense costs.

8

### D. The *Binotti* Lawsuit

41.    Following the *Seaman* settlement, Duke was met with another antitrust lawsuit that was closely related to *Seaman* but that involved a broader putative class.

42.    On January 3, 2020, lead counsel for the *Seaman* class emailed Duke's outside counsel a draft antitrust class action complaint, which identified Professor Lucia Binotti of UNC as the proposed named plaintiff. The draft *Binotti* complaint arose out of the same alleged wrongful act and/or set of interrelated wrongful acts that the 2015 *Seaman* lawsuit arose out of.

43.    Duke provided Endurance with a copy of the draft *Binotti* complaint on January 9, 2020.

44.    On May 27, 2020, Professor Binotti — by and through the same class counsel as in *Seaman* — filed suit in North Carolina. *See Binotti v. Duke University*, No. 1:20-cv-470 (M.D.N.C.). The next day, Duke provided Endurance's counsel with a copy of the *Binotti* complaint.

45.    The *Binotti* complaint described the same course of alleged misconduct at issue in *Seaman* — namely, a no-poach understanding between Duke and UNC. Whereas *Seaman* focused on medical faculty, *Binotti* centered on the alleged anticompetitive impact on all other faculty at Duke and UNC.

46.    The *Binotti* complaint drew heavily on evidence that the 2015-based *Seaman* litigation uncovered and cited the *Seaman* case and discovery.

47.    The *Binotti* complaint includes the following proposed class, generally encompassing all faculty at Duke and UNC:

> All natural persons employed by Duke University or the University of North Carolina, Chapel Hill from the start of the No-Poach Understanding (to be determined from further discovery) through February 5, 2018, as a faculty member. Excluded from the Class are: members of the boards of directors and boards of trustees, boards of governors, and senior administrators of Duke and UNC; and any and all judges and justices, and chambers' staff,

9

assigned to hear or adjudicate any aspect of this litigation.

48.    Duke has incurred and expects to continue to incur attorneys' fees and other defense-related costs in defending against the *Binotti* case.

49.    Endurance has not provided Duke any financial support in defending against *Binotti*.

**E. Endurance Improperly Denies Coverage for *Seaman* and *Binotti***

50.    On January 9, 2020, Duke provided the draft *Binotti* complaint to Endurance, the sole insurer in Duke's 2015 insurance tower whose limits are not already fully exhausted by Duke's *Seaman*-related losses.  Since then, Duke has corresponded at length with Endurance and its counsel (original and replacement), provided extensive disclosures and updates, and demanded that Endurance confirm coverage for the costs of defending *Binotti*.

51.    Additionally and under confidentiality restrictions, Duke has provided Endurance copies of *Seaman* defense cost invoices, and has sought coverage for any such costs to the extent that they exceed Endurance's $55 million attachment point and Duke's $1 million retention.

52.    However, and despite Endurance's assurances to Duke in 2019 that it would cover costs related to *Seaman*, Endurance now refuses to cover Duke's losses relating to *Seaman* and the related *Binotti* matter.

53.    On March 3, 2020, nearly two months after receiving notice of *Binotti*, Endurance, by and through coverage counsel at Teague Campbell, wrote to Duke communicating a "full reservation of rights" as to *Binotti* and asserted various objections to coverage that Endurance had never before raised in the related *Seaman* matter.  Among other things, Endurance questioned whether Duke had exhausted what Endurance incorrectly stated was $95 million in underlying coverage, and incorrectly referred Duke to the terms and exclusions of the EPL section of the 2015 coverage program.

10

54.    On March 13, 2020, Duke, by and through counsel, responded by clarifying that Endurance's attachment point was $55 million, not $95 million. Additionally, Duke objected to Endurance's belated assertion of coverage defenses in *Binotti* that had never been raised in the related *Seaman* matter, and also objected to Endurance's reference to the EPL section when Endurance and the 2015 insurance tower had treated *Seaman* as a D&O claim and benefitted from an attendant 20% Duke co-payment obligation.

55.    Over the next few weeks, Duke provided Endurance with updates regarding *Binotti* and also hosted a detailed confidential telephonic *Binotti* defense briefing for Endurance.

56.    On May 4, 2020, Endurance, by and through new coverage counsel at Locke Lord, sent Duke a list of seven information requests, much of which sought materials that Endurance had previously been provided. The next day Duke replied by providing, in confidence, detailed answers and several responsive documents and referred by date to numerous other documents already in Endurance's files — all of which were responsive to the requests Endurance had made a day earlier. Between May 11 and 13, 2020 Duke provided Endurance with copies of the *Seaman* defense invoices processed to date, plus certain *Binotti* defense invoices.

57.    In a letter dated May 15, 2020, Endurance refused to commit to funding for *Binotti* and, for the first time, suggested that even *Seaman* may not be covered.

58.    After further correspondence, Endurance, on May 21, 2020, wrote to Duke advising that it "preliminarily think[s] that no coverage for either Seaman or Binotti will be available." Endurance promised to "provide [its] final decision on coverage in the near future."

59.    Endurance has not since communicated to Duke any change in its initial position that coverage is unavailable for Duke's losses. However, Endurance has failed to provide a

11

definitive coverage determination on the record, despite Duke's continued demands for coverage.

60. On June 1, 2020, Duke wrote to Endurance, pursuant to Section J of the General Terms and Conditions of the underlying Westchester Fire Policy, to call for non-binding mediation, which is a predicate to any litigation under Duke's coverage program.

61. On September 14, 2020, Duke and Endurance participated in a mediation regarding Endurance's coverage obligations for *Seaman* and *Binotti*. The mediator concluded the mediation on that day. On September 15, 2020, the mediator confirmed in writing that the mediation process had concluded on September 14, 2020.

**F. The Endurance Policy Covers Duke's *Seaman* and *Binotti* Losses**

62. The Endurance Policy covers Duke's *Seaman* and *Binotti* losses, including any costs to defend and resolve those lawsuits.

63. The Westchester Fire Policy, to which the Endurance Policy follows form, insures against "the Loss of [Duke] which [Duke] becomes legally obligated to pay by reason of a Claim first made against [Duke] during the [January 1, 2015 to January 1, 2016] Policy Period" for "any Wrongful Act taking place prior to the end of the Policy Period." Covered claims expressly include "Anti-Trust Claim[s]."

64. *Seaman* is a covered Claim. Duke's legal defense costs and settlement obligations in *Seaman* constitute "Loss" that Duke became legally obligated to pay by reason of a "Claim," namely the June 9, 2015 *Seaman* complaint, that was filed against Duke and timely reported to its insurers during the 2015 policy period. Further, the *Seaman* complaint is an "Anti-Trust Claim" under the coverage program's D&O section, as it alleges that Duke participated in restraints of trade, including an alleged no-poach understanding with UNC that purportedly reduced faculty wages.

12

65.     Duke's *Seaman*-related losses and the underlying insurers' payments of $55 million exhausted the $55 million in coverage underlying the Endurance Policy. Specifically, Duke was legally obligated to pay $54.5 million in connection with the *Seaman* settlement, and was also obligated to pay more than $15.4 million in connection with the defense of *Seaman*. Duke's *Seaman*-related losses of more than $69.9 million, after accounting for Duke's $1 million retention and 20% antitrust co-payment obligation, exceeded $55 million.

66.     In 2018 and 2019, Endurance actively participated in the *Seaman* litigation and resolution process, consented to the $54.5 million settlement in *Seaman*, raised no objections or defenses to coverage for *Seaman*, and affirmatively represented that Endurance would pay for *Seaman*-related losses that exceeded Endurance's $55 million attachment point.

67.     Duke reasonably relied on Endurance's representations, including its unconditional participation in the *Seaman* settlement process and its assurances of coverage, to resolve *Seaman* in the manner and on the terms in which it did. Duke proceeded to settle *Seaman* at $54.5 million, with the justified expectation that Endurance would cover *Seaman*-related defense costs that reached into Endurance's layer.

68.     Endurance's course of dealing and/or performance in relation to *Seaman* further confirm that *Seaman* is fully covered under the terms of the Endurance Policy, and in the alternative, precludes or estops Endurance from belatedly asserting otherwise.

69.     Under Duke's 2015 insurance program, the *Binotti* lawsuit is part of the same "Claim" as *Seaman* and, like *Seaman*, is also covered in full.

70.     The Westchester Fire Policy's batching clause (the "Batching Clause") states: "All Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at . . . the time at

13

which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made." The Endurance Policy follows form and incorporates this clause.

71.     *Binotti* arises out of alleged wrongful acts that are the same as or related to the alleged wrongful acts out of which *Seaman* arises, including without limitation a no-poach understanding between Duke and UNC that purportedly reduced faculty wages. By operation of the Batching Clause, the Endurance Policy deems *Binotti* to constitute a single Claim with *Seaman*, and deems *Binotti* to have been made on June 9, 2015 — i.e., the date *Seaman* was first made.

72.     Endurance is contractually obligated to cover (i) Duke's *Seaman* and *Binotti*-related defense costs not reimbursed by the underlying insurers or subject to Duke's self-insured retention, and (ii) any potential liability Duke may face as a result of the *Binotti* litigation. The only applicable deduction for such losses is Duke's 20% antitrust co-payment requirement.

## CAUSES OF ACTION

### COUNT I -
### DECLARATORY RELIEF

73.     Duke repeats and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows.

74.     Duke seeks a declaration of the parties' rights and duties under the Endurance Policy in accordance with the Declaratory Judgment Act, N.C.G.S. §§ 1-253 and 1-254, et seq.

75.     Endurance agreed in its insurance contract to provide coverage for losses that Duke becomes legally obligated to pay by reason of a claim for relief first made or deemed to have been made against Duke during the 2015 policy period, including without limitation defense costs and any settlement amounts, damages, or adverse judgments.

76.     Duke has and will continue to suffer actual losses in connection with the defense

14

of the *Seaman* lawsuit and the defense of the *Binotti* lawsuit, both of which comprise a claim for relief first made or deemed to have been made against Duke during the 2015 policy period.

77.     Duke could also potentially suffer further losses if *Binotti* were to be resolved by settlement and/or adverse judgment.

78.     Endurance's coverage obligation attaches once the coverage layers that underlie the Endurance Policy pay out their $55 million in limits. The coverage layers underlying Endurance have exhausted their collective $55 million in coverage obligations to Duke.

79.     Subject only to Duke's 20% co-payment, Endurance is contractually obligated under the Endurance Policy to indemnify Duke for the full amount of Duke's losses in excess of $55 million and Duke's underlying $1 million retention. The Endurance Policy's $25 million limits do not restrict Duke's recovery, because Endurance has failed to act in good faith under that policy.

80.     Despite the foregoing obligation, Endurance has entirely withheld payment for Duke's defense costs in *Seaman* and *Binotti* that exceed the underlying limits. Endurance has also refused to confirm that it would provide coverage in that event that there were to be a settlement or adverse judgment in *Binotti*.

81.     An actual and justiciable controversy therefore exists between Duke and Endurance concerning Endurance's contractual duty to fund the costs of defending the *Seaman* and *Binotti* lawsuits.

82.     An actual and justiciable controversy also exists between Duke and Endurance concerning Endurance's contractual duty to indemnify Duke for liability costs that it may potentially incur in *Binotti*.

83.     The foregoing controversies are of sufficient immediacy to justify the issuance of

15

declaratory relief.

84.     Duke accordingly seeks declarations from the Court that (i) the Endurance Policy covers Duke's defense costs in relation to *Seaman* not funded by the underlying insurers and all of Duke's defense costs in *Binotti*, and (ii) the Endurance Policy covers any liabilities and/or costs Duke may potentially incur in resolving *Binotti*. Duke also seeks a declaration that Endurance is obligated to provide coverage for the full amount of each set of costs — subject only to Duke's 20% co-payment — in excess of Endurance's $55 million attachment point and an underlying $1 million retention. Duke further seeks any other appropriate declaration so as to settle the legal relationship, rights, and obligations between Duke and Endurance.

## COUNT II -
## BREACH OF CONTRACT

85.     Duke repeats and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows.

86.     The Endurance Policy is a valid and enforceable contract between Duke and Endurance.

87.     Duke has paid, and Endurance has received, all premiums due under the Endurance Policy. Further, Duke has complied with or has been excused from complying with, or Endurance has waived or is estopped or otherwise precluded from raising, all other terms, provisions, and conditions of the Endurance Policy.

88.     Endurance agreed in its insurance contract to provide coverage for losses that Duke becomes legally obligated to pay by reason of a claim for relief first made or deemed to have been made against Duke during the 2015 policy period, including without limitation defense costs and any damages, settlement amounts, and adverse judgments.

89.     Duke has and will continue to suffer actual losses in connection with the defense

16

of the *Seaman* lawsuit and the defense of the *Binotti* lawsuit, both of which comprise a claim for relief first made or deemed to have been made against Duke during the 2015 policy period.

90.     Endurance's coverage obligation attaches once the coverage layers that underlie the Endurance Policy pay out their $55 million in limits. The coverage layers underlying Endurance have exhausted their collective $55 million in coverage obligations to Duke.

91.     Subject only to Duke's 20% co-payment, Endurance is contractually obligated under the Endurance Policy to fund the full amount of Duke's losses in excess of $55 million, including without limitation defense costs that Duke has incurred or will be required to incur in defense of *Seaman* and *Binotti*. The Endurance Policy's $25 million limits do not restrict Duke's recovery, because Endurance has failed to act in good faith under that policy.

92.     Despite the foregoing obligation, Endurance has refused to advance or pay for any of Duke's *Seaman* or *Binotti* defense costs — in breach of the Endurance Policy and Endurance's defense obligations.

93.     As a direct and proximate result of its breach of contract, Endurance has deprived Duke of the benefits of its insurance coverage, which entitles Duke to money damages, including interest according to law.

94.     Duke's losses as a result of Endurance's breach of contract are continuing, and Duke reserves the right to seek the full and exact amount of its damages at the time of trial.

## COUNT III -
## BAD FAITH REFUSAL TO SETTLE COVERAGE CLAIM

95.     Duke repeats and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows.

96.     Endurance has an obligation to deal fairly, diligently, and in good faith with its policyholders.

17

97.     Endurance refused to settle Duke's claim for *Seaman*-related defense costs, even
after previously acknowledging the validity of that coverage claim.  Endurance further refused to
settle Duke's claim for *Binotti*-related defense costs, even after having received notice of the
validity of that coverage claim.

98.  ·  As detailed above, Endurance evinced bad faith by pressing belated and
unjustified excuses to coverage based not on honest disagreement or innocent mistake, but on
evasion of Endurance's coverage obligations.

99.     Endurance has engaged and is continuing to engage in a pattern of aggravating or
outrageous conduct, reflecting malicious, wanton and/or reckless disregard for Duke's rights as a
policyholder.  Among other wrongful acts, Endurance:

> (a) participated in the *Seaman* settlement process and made false assurances of defense
> cost coverage in *Seaman*, and then reversed course on its *Seaman* defense cost
> commitment;
>
> (b) insisted on Duke absorbing 20% of its *Seaman* losses pursuant to the antitrust co-
> payment provision of the D&O section — which Duke did, to its detriment — and then
> reserved rights based in part on the purported applicability of the EPL section of the
> coverage;
>
> (c) misrepresented the attachment point for its coverage layer as $95 million instead of
> $55 million, even though Duke relied on Endurance's assurances of coverage for costs
> exceeding $55 million to resolve *Seaman* in the manner and on the terms on which it did;
>
> (d) refused to reasonably evaluate the information before it and pay out on a well-
> supported claim for defense cost coverage; and
>
> (e) failed to definitively and on the record affirm or deny coverage for the *Binotti* matter
> that was reported more than ten months ago.

100.     Endurance's acts of bad faith have injured Duke, including without limitation by
unreasonably depriving Duke of the coverage owed it under the Endurance Policy and forcing
Duke to bear in full its own defense costs in defending against *Binotti*.  Duke is entitled to
recover from Endurance the full extent of its losses arising out of Endurance's bad faith.

18

101.    Having failed to resolve Duke's claim for defense cost coverage in good faith under the Endurance Policy, Endurance cannot now rely on its policy limits to restrict Duke's recovery. Duke is entitled to recover from Endurance for covered losses in excess of Endurance's $25 million coverage limits.

102.    As a result of Endurance's bad faith refusal to settle Duke's claim for defense cost coverage, Endurance is liable for punitive damages above and beyond Duke's compensatory damages. Pursuant to N.C.G.S. § 1D-25, Duke is eligible to recover in punitive damages up to three times the amount of its compensatory damages.

103.    Duke's damages as a result of Endurance's bad faith refusal to settle Duke's claims for defense cost coverage are continuing, and Duke reserves the right to seek the full and exact amount of its damages at the time of trial.

## COUNT IV –
## UNFAIR AND DECEPTIVE TRADE PRACTICES

104.    Duke repeats and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges as follows.

105.    Pursuant to N.C.G.S. § 75-1.1, Endurance had a statutory duty to avoid unfair and deceptive trade practices.

106.    Endurance has breached and is continuing to breach this statutory duty by engaging in unfair claim settlement practices proscribed by N.C.G.S. § 58-63-15(11). Among other wrongful acts, Endurance:

(a) misrepresented to Duke its intention to pay *Seaman*-related defense costs under the coverages at issue, *see* N.C.G.S. § 58-63-15(11)(a);

(b) failed to attempt to, in good faith, effectuate the prompt, fair and equitable resolution of Duke's claims for *Seaman* and *Binotti* defense costs, even though Endurance's liability is reasonably clear, *see* N.C.G.S. § 58-63-15(11)(f);

(c) misrepresented provisions of its insurance policy, including the attachment point for

19

its coverage layer and the applicability of the EPL section in lieu of the D&O section, *see* N.C.G.S. § 58-63-15(11)(a);

(d) refused to reasonably evaluate the information before it and pay out on a well-supported claim, *see* N.C.G.S. § 58-63-15(11)(d);

(e) failed to definitively affirm or deny coverage for the *Binotti* matter that was reported more than ten months ago, *see* N.C.G.S. § 58-63-15(11)(e); and

(f) failed to provide a reasonable and timely explanation for its refusal to grant coverage, *see* N.C.G.S. § 58-63-15(11)(n).

107.    The foregoing acts arise out of the insurance relationship between Duke and Endurance, and are thus acts in or affecting commerce.

108.    Duke detrimentally relied upon misrepresentations made by Endurance.

109.    Endurance's wrongful acts, as set forth in this Complaint, proximately caused injury to Duke, including without limitation by unreasonably depriving Duke of the coverage owed it under the Endurance Policy and forcing Duke to bear in full its own defense costs in defending against *Binotti*. Pursuant to N.C.G.S. § 75–16, Endurance is liable for three times the amount of the losses proximately caused by its statutory violations.

110.    Endurance willfully engaged in the foregoing acts and unwarrantedly refused to fully resolve the matter underlying this civil lawsuit. Duke is therefore entitled, under N.C.G.S. § 75–16.1, to recover from Endurance an award of attorneys' fees incurred and to be incurred in prosecuting this lawsuit.

111.    Duke's damages as a result of Endurance's breach of its statutory duty to avoid unfair and deceptive trade practices are continuing, and Duke reserves the right to seek the full and exact amount of its damages at the time of trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Duke prays for relief as follows:

1.    On Count I, a judgment declaring that (i) the Endurance Policy covers Duke's

20

defense costs in relation to *Seaman* and *Binotti*, and (ii) the Endurance Policy covers any liabilities and/or costs Duke may potentially incur in resolving *Binotti*. Duke also seeks a declaration that Endurance is obligated to provide coverage for the full amount of each set of costs — subject only to Duke's 20% co-payment — in excess of Endurance's $55 million attachment point and an underlying $1 million retention. Duke further seeks any other appropriate declaration so as to settle the legal relationship, rights, and obligations between Duke and Endurance.

2.        On each of Counts II through IV, a money judgment against Endurance in an amount exceeding $25,000, the exact amount for each to be determined at trial.

3.        On all claims for relief, pre-judgment and post-judgment interest at the maximum legal rate.

4.        On all claims for relief, attorneys' fees and costs of suit.

5.        On all claims for relief, such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Duke requests a trial by jury for all issues so triable.

**RESPECTFULLY SUBMITTED.**

Dated: November 13, 2020

By: *James P. Cooney III M/p. by ERA*
       James P. Cooney III

James P. Cooney III
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center
Suite 3500
301 South College Street
Charlotte, NC 28202-6037
(704) 331-4980
jim.cooney@wbd-us.com

Mitchell Dolin (*pro hac vice* forthcoming)
Benjamin J. Razi (*pro hac vice* forthcoming)
Jad H. Khazem (*pro hac vice* forthcoming)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000
mdolin@cov.com
brazi@cov.com
jkhazem@cov.com

*Attorneys for Plaintiff Duke University*

# EXHIBIT 1

# EPL Assist



Employers today face a dizzying array of employment laws, regulations and ongoing employment issues. Whether it involves employee discipline or termination, wage and hour, disability accommodation, or even the new frontier of social media, failure to comply with the ever-changing legal requirements can have a devastating impact on employee morale and the company's bottom line. ACE recognizes the unique burdens faced by employers today, and is pleased to announce that it has partnered with the nation's foremost employment and labor law firm, Littler Mendelson (Littler), to create a cutting edge employment practices risk management tool for ACE insureds, called EPL Assist™. With over 975 attorneys in 56 offices, Littler has both the expertise and the capacity to handle any employment matter, big or small. Through EPL Assist™, insureds have an unlimited ability to seek out expert advice and counsel as a benefit of the program.

## What is EPL Assist™?

EPL Assist™ is a cutting edge risk management program providing policyholders with a wide variety of legal content, forms and analysis, combined with the ability to interface directly with Littler lawyers dedicated to assisting ACE insureds in navigating what has become an employment law minefield. Through a secure web portal containing essential employment law resources and tools, as well as a toll free hotline service, ACE insureds with primary EPL coverage policies now have access to the content and advice necessary to compete in today's challenging legal environment.

## Insureds are provided:

- No cost, online and live access to the legal experts at Littler, the largest employment and labor firm in the U.S.

- Employment law updates, newsletters and related publications

- A compendium of online employment law resources through a secure website, including unlimited access to such content as:

  o Employment policies and practices

  o Human Resources forms library

  o Sample employee handbooks, including supplement information for all 50 states

  o State and national employment law summaries and reference materials

  o 50 state surveys on various employment law essentials, including such things as minimum wage and overtime requirements, protected classifications, new hire reporting requirements, meal and rest break requirements, and voting rights requirements

- Free harassment training webinars for up to 10 supervisors or managers

- Complimentary registration to Littler's nationwide breakfast briefing series

- Complimentary access to Littler's webinars and podcasts

- Discounted rates for various Littler events

## How do I access EPL Assist™?

Policyholders can simply visit www.EPLAssist.com to register or take a tour. Should you have a question on an employment situation please call 1-888-244-3844 or visit www.EPLAssist.com.

Littler Mendelson P.C. is an independent law firm that is not an agent nor an affiliate of the ACE Group of Companies ("ACE Group"), and Littler Mendelson P.C. is solely responsible for the advice and guidance provided directly, or through the EPL Assist website. ACE Group and Littler Mendelson P.C. cannot guarantee that there will be fewer or less serious claims as a result of using the program. Littler Mendelson P.C. directly, or through the EPL Assist website may help an insured with risk assessment and improvement but it is not intended to supplant any duty to provide a workplace that is safe and complies with the law. ACE Group does not engage in giving legal advice and therefore encourages policyholders to seek the advice from their own legal counsel when implementing any and all employment practices. Please note that communication with Littler Mendelson P.C, either directly, or through the EPL Assist website is not notice to the ACE Group issuing company of a claim or an act or situation that may give rise to a claim. Nothing herein alters or amends in any way the insurance policy contract between the underwriting company and the policyholder.

 Westchester Fire Insurance Company

# ACE EXPRESS Not-For-Profit Organization Management Indemnity Package
#### Declarations

**This Policy is issued by the stock insurance company listed above ("Insurer").**

THE EMPLOYMENT PRACTICES LIABILITY, INSURED PERSONS AND ORGANIZATION, AND FIDUCIARY COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES, UNLESS OTHERWISE SET FORTH IN THE POLICY ONLY TO LOSS SUSTAINED AND DISCOVERED DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES UNLESS OTHERWISE PROVIDED HEREIN. AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.

TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.

**Policy Number:** G27543406 001       **Renewal of:** G24050117 006

Item A.    **Parent Organization:**    Duke University
         **Principal Address:**       PO Box 104143
                            Durham, NC 27708

Item B.    **Policy Period:**      From 01/01/2015 to 01/01/2016
                 12:01 a.m. local time at the Principal Address shown in Item A.

Item C.    Coverage Section(s):
             Aggregate Limit of Liability (all coverages other than Crime): $11,000,000

### EMPLOYMENT PRACTICES LIABILITY

   1. Limit of Liability
      a. $10,000,000 aggregate for all **Loss**, subject to 1b and 1c immediately below,

      b. $0 additional aggregate for all **Costs, Charges and Expenses**, subject to 1c immediately below,
      c. $10,000,000 maximum aggregate for this Coverage Section

   2. Retention:   $1,000,000 each **Employment Practices Claim**
                  $1,000,000 each **Third Party Claim**

   3. **Continuity Date:**   12/04/1997

   4. **Third Party** Coverage:    [X] Yes    [ ] No

### INSURED PERSONS AND ORGANIZATION



Case 5:20-cv-00672-BO    Document 1-1    Filed 12/14/20    Page 25 of 111

1. Limit of Liability
   a. $10,000,000 aggregate for all **Loss**, subject to 1b and 1c immediately below,
   b. $1,000,000 additional aggregate for all **Loss** under Insuring Clause A1, subject to 1c immediately below,
   c. $11,000,000 maximum aggregate for this Coverage Section

2. Retentions:
   $0 each **Claim** under Insuring Clause 1
   $1,000,000 each **Claim** under Insuring Clause 2
   $1,000,000 each **Claim** under Insuring Clause 3

3. **Continuity Date:**      12/04/1997

## Crime Coverage

| Insurance Agreements | Limit Of Insurance Per Occurrence | Deductible Amount Per Occurrence |
|---|---|---|
| 1.a. Employee Theft | N/A | N/A |
| b. Employee Benefit Plan | N/A | N/A |
| c. Client Property | N/A | N/A |
| 2. Forgery Or Alteration | N/A | N/A |
| 3. Inside The Premises – Theft Of Money And Securities | N/A | N/A |
| 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property | N/A | N/A |
| 5. Outside The Premises | N/A | N/A |
| 6. Computer Fraud | N/A | N/A |
| 7. Funds Transfer Fraud | N/A | N/A |
| 8. Money Orders And Counterfeit Money | N/A | N/A |
| Coverage is provided only if an amount is shown opposite an Insuring Agreement. If the amount is left blank or "Not Covered" is inserted, such Insuring Agreement and any other reference thereto in this **Policy** is deleted. | | |
| Total Premium Due | $0 | |

Item D.      Premium: $404,876
               Taxes & Surcharges Amount: $0.00
               Total Amount Due: $404,876.00

Item E.      **Discovery Period**

| | |
|---|---|
| 1. One (1) year | 100% of the premium set forth in Item D of the Declarations |
| 2. Two (2) years | TBD of the premium set forth in Item D of the Declarations |
| 3. Three (3) years | TBD of the premium set forth in Item D of the Declarations |

As provided in subsection H of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased.

Item F.      **Run-Off Period**

| | |
|---|---|
| 1. One (1) year | TBD |
| 2. Two (2) years | TBD |
| 3. Three (3) years | TBD |
| 4. Four (4) years | TBD |
| 5. Five (5) years | TBD |
| 6. Six (6) years | TBD |

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 26 of 111

As provided in subsection I of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased.

Item G.        Notice under this **Policy** shall be given to:

    **A. Notice of Claim, Wrongful Act or Loss:**

        ACE USA
        P.O. Box 5105
        Scranton, PA 18505-0518
        Fax: 888-844-9073

        Email address for submitting Private and NonProfit Claims,
           ACEClaimsFirstNotice@acegroup.com
        Email address for all other correspondence,
           ApolloProRskACEIncoming@acegroup.com

    **B. All other notices:**

        ACE USA, Professional Risk
        Attention: Chief Underwriting Officer
        1133 Avenue of the Americas, 32nd Fl
        New York, NY 10036

Item H.    **Special Event Fund:**      $25,000

Item I.    Forms attached at **Policy** issuance:

- EPLA-P (01/13) - EPL Assist
- CC-1K11h (03/14) - Signatures
- PF-28101 (09/09) - ACE Express Not-For-Profit Organization Management Indemnity Package General Terms and Conditions
- PF-28103 (09/09) - ACE Express Not-For-Profit Organization Management Indemnity Package Employment Practices Liability Coverage Section
- PF-28102 (09/09) - ACE Express Not-For-Profit Organization Management Indemnity Package Insured Persons and Organization Coverage Section
- PF-15026c (01-08) - Cap On Losses From Certified Acts of Terrorism
- PF-18490 (09/09) - Professional Services Errors and Omissions Exclusions
- PF-28129 (09/09) - Amendatory Endorsement - North Carolina
- PF-28920 (02/10) - Failure To Maintain Insurance Exclusion
- PF-29474 (04/10) - Captive Exclusion
- PF-34337a (06/12) - Wage and Hour - Costs, Charges and Expenses Sublimit Coverage Only with Separate Retention
- PF-39255 (10/12) - Specified Matter Exclusion
- PF-38943 (08/12) - Amend Conduct Exclusion - Final - Non-Appealable - D&O/EPL
- PF-39068 (09/12) - Notice - GC/RM - 60 Days - D&O/EPL
- PF-38330a (04/13) - Optional Duty to Defend - D&O and EPL
- MS-35924 (01/15) - Specified Party Exclusion
- MS-35925 (01/15) - Additional Affiliates
- MS-35926 (01/15) - Employed Lawyers Professional Liability
- MS-35927 (01/15) - Human Clinical Trail Exclusion With A-Side Carveback - D&O
- MS-35928 (01/15) - Outside Entity Exclusion - Amended - D&O
- MS-35929 (01/15) - Definition of Claim - Amended - D&O/EPL
- MS-35930 (01/15) - Health Care / Education Coverage Extension - Anti-Trust Co-Insurance
- TRIA12b (01-08) - Disclosure Pursuant To Terrorism Risk Insurance Act

- All-20887 (10-06) - ACE Producer Compensation Practices & Policies
- All-21101 (11-06) - Trade or Economic Sanctions Endorsement
- ILP 001 01 04 - U.S. Treasury Departments' Office of Foreign Assets Control ("OFAC") Advisory Notice to Policyholders

IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be signed by its President and Secretary, and countersigned by a duly authorized representative of the **Insurer**.

DATE:     01/01/2015

JOHN J. LUPICA, President
Authorized Representative

# SIGNATURES

| Named Insured<br>Duke University | | | Endorsement Number<br>001 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to  01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA (A stock company)**
**BANKERS STANDARD FIRE AND MARINE COMPANY (A stock company)**
**BANKERS STANDARD INSURANCE COMPANY (A stock company)**
**ACE AMERICAN INSURANCE COMPANY (A stock company)**
**ACE PROPERTY AND CASUALTY INSURANCE COMPANY (A stock company)**
**INSURANCE COMPANY OF NORTH AMERICA (A stock company)**
**PACIFIC EMPLOYERS INSURANCE COMPANY (A stock company)**
**ACE FIRE UNDERWRITERS INSURANCE COMPANY (A stock company)**
**WESTCHESTER FIRE INSURANCE COMPANY (A stock company)**

436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106-3703

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

_____
Authorized Representative

CC-1K11h (03/14)


In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows:

## A. SEVERABILITY OF GENERAL TERMS AND CONDITIONS

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

## B. DEFINITIONS

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions section of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions section and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy with an inception date within thirty-six months prior to the inception date of this **Policy**, of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2. **Discovery Period** means one of the periods described in Item E of the Declarations which is elected and purchased pursuant to section H below.

3. **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Organization**.

4. **Extended Period** means the **Discovery Period** or the **Run-Off Period**, if such provision is elected and purchased pursuant to section H or I, respectively, below.

5. **Insurer** means the insurance company providing this insurance.

6. **Organization** means:

   a) the **Parent Organization**; and

   b) any **Subsidiary**;

   and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

7. **Parent Organization** means the entity first named in Item A of the Declarations.

8. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.


Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 30 of 111

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item B of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item F of the Declarations, which is elected and purchased pursuant to section I below.

11. **Subsidiary** means:

    a) any entity of which the **Parent Organization** holds more than 50% of the present voting interest, either directly, or indirectly through one or more of its **Subsidiaries**, or has the right to elect or appoint more than 50% of the voting directors or trustees, either directly, or indirectly through one or more of its **Subsidiaries** ("**Control**"), if such entity:

        (i)  was so **Controlled** on or prior to the inception date of this **Policy**; or

        (ii) becomes so **Controlled** after the inception date of this **Policy**; and

    b) any joint venture entity in which the **Parent Organization**, or an entity described in a) above, has an exact 50% ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Organization** or entity described in a) above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

    a) the acquisition by any person or entity of all or substantially all of the **Parent Organization's** assets, or of the **Control** of the **Parent Organization**; or

    b) the merger or consolidation of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

## C. LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES

1. If a single Aggregate Limit of Liability is granted as provided in Item C of the Declarations, the amount stated in Item C of the Declarations shall be the maximum aggregate liability of the **Insurer** for all **Loss** resulting from all **Claims** first made during the **Policy Period**, regardless of Coverage Section. The Limit(s) of Liability of each Coverage Section is part of, and not in addition to, the Aggregate Limit of Liability set forth in Item C of the Declarations and in no way shall be deemed to increase the Aggregate Limit of Liability as set forth therein. This paragraph 1 shall not apply to the Crime Coverage Section.

2. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. Subject to paragraph 1 above, the application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

3. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim**.

## D. WARRANTY AND NON-RESCINDABILITY

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section. By acceptance of this **Policy**, the **Insureds** agree that the statements in the **Application** are their representations,

that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations.

For purposes of this section, the knowledge of a natural person **Insured** shall not be imputed to any other natural person **Insured**, and the knowledge of only the chief executive officer, chief financial officer, and general counsel (and additionally, with respect to the Fiduciary Coverage Section, the **Application** signatory), or equivalent positions, shall be imputed to an entity **Insured**.

This **Policy** and any Coverage Sections shall not be rescinded by the **Insurer** in whole or in part for any reason.

### E. CANCELLATION

1. By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Organization** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Organization** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy Period** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2. This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Organization** stating when such cancellation shall be effective, such date to be not less than 30 days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3. If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

### F. ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

### G. AUTHORIZATION CLAUSE

By acceptance of this **Policy**, the **Parent Organization** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Organization** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

### H. DISCOVERY PERIOD

1. If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium, or if the **Parent Organization** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Organization** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item E of the Declarations of the total premium for this

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 32 of 111

**Policy**, or the total premium for the cancelled or not renewed Coverage Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item E of the Declarations, after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Organization** shall have the right to elect only one of the **Discovery Periods** set forth in Item E of the Declarations.

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in section H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

3. In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4. The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

**I.   RUN-OFF COVERAGE AND TERMINATION OF A SUBSIDIARY**

1. In the event of a **Takeover**:

   a) The **Parent Organization** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item F of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item F of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "**Run-Off Coverage**"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the **Run-Off Coverage**, whichever is later, through the expiration date set forth in Item B of the Declarations.

   b) The **Parent Organization** shall have the right to elect only one of the periods designated in Item F of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

   c) If a **Run-off Period** is elected and purchased:

      (i) Section E, above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

      (ii) Section H, above, is deleted in its entirety; and

      (iii) the Limit(s) of Liability of the **Insurer** for **Run-Off Coverage** for each Coverage Section purchased, and in the aggregate, shall be part of, and not in addition to, the Limit(s) of Liability shown in the Declarations. The purchase of the **Run-Off Coverage** shall not increase or reinstate the Limit(s) of Liability, which shall be the maximum Limit(s) of Liability of the **Insurer** for the **Policy Period** and the **Run-off Coverage**, combined.

2. If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to the **Subsidiary** and its natural person **Insureds** shall continue until termination of this **Policy**. Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts**, or **Employment Practices Wrongful Acts**, taking place prior to the date such organization ceased to be a **Subsidiary**.

**J.   ALTERNATIVE DISPUTE RESOLUTION**

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an **Insured** or the **Insurer** may elect the type of **ADR** process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of **ADR** process at any time prior to its commencement, in which case the choice by the **Insured** of **ADR** process shall control.

There shall be two choices of **ADR** process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) non-binding arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of either mediation or arbitration, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the conclusion of the arbitration, or in the event of mediation, at least 60 days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the **ADR** process.

Either **ADR** process may be commenced in New York, New York or in the state indicated in Item A of the Declarations as the principal address of the **Parent Organization**. The **Parent Organization** shall act on behalf of each and every **Insured** in connection with any **ADR** process under this section.

## K. TERRITORY

Where legally permissible, coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

## L. ASSISTANCE, COOPERATION AND SUBROGATION

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require.

## M. ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT

Except as provided in section J above, Alternative Dispute Resolution, no action shall lie against **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this **Policy**. No person or organization shall have any right under this **Policy** to join **Insurer** as a party to any action against the **Insureds** to determine their liability, nor shall **Insurer** be impleaded by the **Insureds** or their legal representative. No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

## N. BANKRUPTCY

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the **Insurer** of its obligations nor deprive the **Insurer** of its rights or defenses under this **Policy**. The insurance provided by this **Policy** is intended as a matter of priority to protect and benefit the natural person **Insureds** such that, in the event of bankruptcy of the **Organization**, the **Insurer** shall first pay **Loss** covered under Insuring Clause A1 of the **Insured Persons** and **Organization** Coverage Section, and under the Employment Practices Liability Coverage Section for which the **Organization** is not permitted or required to indemnify the natural person **Insured**, prior to paying **Loss** under any other Insuring Clause. If a liquidation or reorganization proceeding is

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 34 of 111

commenced by the **Parent Organization** or any other **Organization** (whether voluntary or involuntary) under Title 11 of the United States Code (as amended), or any similar state, local or foreign law (collectively, "**Bankruptcy Law**") then, in regard to a covered **Claim** under this **Policy**, the **Insureds** hereby waive and release any automatic stay or injunction ("**Stay**") to the extent such **Stay** may apply to the proceeds of this **Policy** under such **Bankruptcy Law**, and agree not to oppose or object to any efforts by the **Insurer** or any **Insured** to obtain relief from the **Stay** applicable to the proceeds of this **Policy** as a result of such **Bankruptcy Law**.

## O. ENTIRE AGREEMENT

By acceptance of this **Policy**, the **Insureds** agree that this **Policy** embodies all agreements existing between them and **Insurer** or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop **Insurer** from asserting any right under the terms of this **Policy** or otherwise, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by **Insurer** to form part of this **Policy**.

 Westchester Fire Insurance Company

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

## A. INSURING CLAUSES

1. **Employee** Insuring Clause

   **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of an **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1 herein, for an **Employment Practices Wrongful Act** taking place prior to the end of the **Policy Period**.

2. **Third Party** Insuring Clause

   In the event **Third Party** Coverage is affirmatively designated in Item C of the Declarations relating to this Coverage Section, the **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Third Party Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1 herein, for a **Third Party Wrongful Act** taking place prior to the end of the **Policy Period**.

## B. DEFINITIONS

1. **Claim** means any:

   a) **Employment Practices Claim**; or

   b) **Third Party Claim.**

2. **Continuity Date** means the Continuity Date set forth in Item C of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by the **Insurer**, or by any **Insured** with the **Insurer's** consent, in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments; but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Organization**.

4. **Employee** means any person who was, now is, or shall become:

   a) a full-time or part-time employee of the **Organization**, including seasonal and temporary employees;

   b) an applicant for employment with the **Organization**;

   c) any natural person who is a leased employee or contracted to perform work for the **Organization**, or is an independent contractor for the **Organization**, but only to the extent such individual performs work or services for or on behalf of the **Organization**; and,

   d) a volunteer whose labor or service is engaged and directed by the **Organization**, but only while that person is acting in the capacity as such.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 36 of 111

5. **Employment Practices Claim** means:

   a) a written demand against an **Insured** for damages or other relief;

   b) a civil, judicial, administrative, regulatory or arbitration proceeding against an **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

   c) a civil proceeding against an **Insured** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document;

   d) a criminal proceeding brought for an **Employment Practices Wrongful Act** against any **Insured,** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   e) a civil, criminal, administrative or regulatory investigation commenced by:

       (i)    the service upon or other receipt by any natural person **Insured** of a written notice, investigative order, or subpoena; or

       (ii)   the service upon or other receipt by any **Organization** of a written notice or investigative order;

   from the investigating authority identifying such natural person **Insured** as an individual; or such **Organization** as an entity, respectively, against whom a proceeding described in paragraphs b, c or d immediately above may be commenced; or

   f) a written request of the **Insured** to toll or waive a statute of limitations relating to a **Claim** described in paragraphs a through e immediately above;

   brought by or on behalf of an **Employee** in his or her capacity as such. **Employment Practices Claim** does not include a labor or grievance proceeding, which is pursuant to a collective bargaining agreement.

6. **Employment Practices Wrongful Act** means any actual or alleged:

   a) violation of any common or statutory federal, state, or local law prohibiting any kind of employment related discrimination;

   b) harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

   c) abusive or hostile work environment;

   d) wrongful discharge or termination of employment, whether actual or constructive;

   e) breach of an actual or implied employment contract;

   f) wrongful deprivation of a career opportunity, wrongful failure or refusal to employ, promote, or grant tenure, or wrongful demotion;

   g) employment-related defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy, or the giving of negative or defamatory statements in connection with an employee reference;

   h) wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures;

   i) wrongful discipline;

   j) employment-related wrongful infliction of emotional distress, mental anguish, or humiliation;

k) **Retaliation;**

l) negligent evaluation; or

m) negligent hiring, supervision, retention or training of others, but only if employment-related and claimed by or on behalf of any **Employee** and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

7. **Insured Persons** means all persons who were, now are or shall become:

   a) a director, officer, trustee, trustee emeritus, governor, executive director, department head or committee member (of a duly constituted committee of the **Organization**) of the **Organization**;

   b) an **Employee**;

   c) an **Outside Entity Executive**; and,.

   d) the functional equivalent of a director, officer or **Employee** in the event the **Organization** is incorporated or domiciled outside the United States.

8. **Insureds** means the **Organization** and any **Insured Persons**.

9. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

10. **Loss** means the damages, judgments, settlements, front pay and back pay, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds**. **Loss** does not include:

    a) taxes, fines or penalties;

    b) matters uninsurable under the laws pursuant to which this **Policy** is construed;

    c) punitive or exemplary damages, liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act or the Family Medical Leave Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law, or the multiple portion of any multiplied damage award, except to the extent that such punitive, exemplary, or liquidated damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds, Insurer**, this **Policy** or the **Claim** giving rise to such damages;

    d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

    e) amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

    f) disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

    g) the costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any person;

    h) any amount owed as wages, compensation or commission to any **Employee**, other than front pay or back pay; or

    i) any amount for which the **Insured** is not financially liable or legally obligated to pay.

11. **Outside Entity** means:

    a) any non-profit company in which any **Insured Person** as defined in Section B, Definitions, subsection 7, paragraph (a), is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

    b) any other company specifically identified by endorsement to this **Policy**.

12. **Retaliation** means any actual or alleged response of any of the **Insureds** to:

    a) the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by any of the **Insureds** where such act is alleged to be a violation of any federal, state, local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

    b) the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

    c) the filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law;

    d) any legally-protected **Employee** work stoppage or slowdown; or

    e) an **Employee** assisting, cooperating or testifying in any proceeding or investigation into whether an **Insured** violated any federal, state, local or foreign law, common or statutory, or any rule or regulation promulgated thereunder.

13. **Third Party** means any natural person who is a customer, vendor, service provider, client, or other business invitee of the **Organization**, or any other natural person or group of natural persons; provided, however, **Third Party** shall not include any **Employee**.

14. **Third Party Claim** means:

    a) any written demand for damages or other relief against an **Insured**;

    b) a civil, judicial, administrative or arbitration proceeding against an **Insured** seeking damages or other relief, including any appeal therefrom; or

    c) a criminal proceeding brought for an **Employment Practices Wrongful Act** in a court outside of the United States against any **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

brought by or on behalf of a **Third Party** in their capacity as such.

15. **Third Party Wrongful Act** means any actual or alleged:

    a) harassment of a **Third Party**, including but not limited to any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment; or

    b) discrimination against a **Third Party**, including but not limited to any such discrimination on account of race, color, religion, age, disability or national origin.

16. **Wrongful Act** means any:

    a) **Employment Practices Wrongful Act**; or

    b) **Third Party Wrongful Act**.

## C. EXCLUSIONS

    **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

1. for actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured; provided, however, this exclusion shall not apply to mental anguish, emotional distress or humiliation;

2. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   a) any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

   b) any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** which has been the subject of such notice, would constitute **Interrelated Wrongful Acts**;

3. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: (i) improper payroll deductions, unpaid wages, misclassification of exempt or non-exempt employee status, compensation earned by or due to the claimant but not paid by the **Insured** (including but not limited to commission, vacation and sick days, retirement benefits, and severance pay), overtime pay for hours actually worked or labor actually performed by any **Employee** of a **Organization**, or any employee of an **Outside Entity**, or any violation of any federal, state, local or foreign statutory law or common law that governs the same topic or subject, or any rules, regulations or amendments thereto; or (ii) any violation of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act), as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state, local or foreign law. Provided, however, this exclusion does not apply to any back pay or front pay allegedly due as the result of discrimination, or that part of any such **Claim** alleging **Retaliation**;

4. for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state or local law. Provided, however, this exclusion does not apply to that part of any such **Claim** alleging violations of the Equal Pay Act or **Retaliation**;

5. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any deliberately fraudulent or criminal act; provided, however this exclusion shall not apply unless and until there is a final adjudication against such **Insured** as to such conduct. If such excluded conduct is established through a final adjudication, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges and Expenses**;

6. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   a) any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including without limitation any investigation by the U.S. Department of Labor or the U.S. Equal Employment Opportunity Commission, filed or pending on or before the **Continuity Date**; or

   b) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry, including any investigation by the U.S. Department of Labor or the U.S. Equal Employment Opportunity Commission;

7. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged responsibility, obligation or duty of any **Insured** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or pension benefits or similar law; provided, however, this exclusion shall not apply to that part of any such **Claim** alleging **Retaliation**;

8. for a **Wrongful Act** actually or allegedly committed or attempted by any **Insured Person** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 40 of 111

a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Organization**; provided, however, that this exclusion shall not apply to **Loss** resulting from any such **Employment Practices Claim** to the extent that:

a)           such **Employment Practices Claim** is based on the service of any **Insured Person** as defined in Section B, Definitions, subsection 7, paragraph (a), as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Organization**; and

b)  such **Outside Entity** is not permitted or required by law to provide indemnification to such **Insured Person**; and

c)  such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

9. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**; or

10. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

## D. LIMIT OF LIABILITY AND RETENTIONS

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item C of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item C.1 of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

a)  The amount set forth in Item C.1.a of the Declarations relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss**, subject to additional payments for **Costs, Charges and Expenses** as further described in paragraph 2b) immediately below.

b)  The amount set forth in Item C.1.b of the Declarations relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Costs, Charges and Expenses** in addition to the limit described in paragraph 2a) immediately above; provided, all payments for **Costs, Charges and Expenses** under the additional limit described in this paragraph 2b) shall be excess of the limit described in paragraph 2a) above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limit described in this paragraph 2b).

c)  The amount set forth in Item C.1.c of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability under this Coverage Section, and the limit of liability set forth in C.1.a and C.1.b of the Declarations relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item C.1.c of the Declarations for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim**, and such **Claim** shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

a)  the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 41 of 111

b) the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2 below.

4. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limit(s) of Liability, and payment of **Costs, Charges and Expenses** reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

## E. NOTIFICATION

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give to **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable after the **Organization's** general counsel, risk manager, human resources director, chief executive officer or chief financial officer (or equivalent positions) first becomes aware of such **Claim**, but in no event later than: (a) 60 days after such individual first becomes aware of such **Claim**; or (b) the expiration of the **Policy Period** or **Extended Period**, if purchased, whichever is later.

2. If, during the **Policy Period** or the **Discovery Period**, any of the **Insureds** first becomes aware of facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a) a description of the **Wrongful Act** allegations anticipated;

    b) the identity of the potential claimants;

    c) the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

    d) the identity of the **Insureds** allegedly involved;

    e) the consequences which have resulted or may result; and

    f) the nature of the potential monetary damages and non-monetary relief;

    then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such written notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3. Notice to **Insurer** shall be given to the address specified in Item G of the Declarations for this **Policy**.

## F. SETTLEMENT AND DEFENSE

1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2. The **Insurer** may make any investigation it deems necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Organization**, such consent not to be unreasonably withheld.

3. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

© 2009

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 42 of 111

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

5. If the **Insurer** recommends a settlement within the **Policy** Limit of Liability which is agreed to by the claimant ("**Settlement Opportunity**"), and:

   a) the **Insureds** consent to such settlement within 30 days of the date the **Insureds** are first made aware of the **Settlement Opportunity**;

   b) such consent occurs within the first 90 days after the **Claim** is first reported; and

   c) such **Claim** is reported within the first 30 days after it is made,

   then, in the event the **Claim** settles as a result of such **Settlement Opportunity**, the Retention applicable to such **Claim** shall be retroactively reduced by 10% for such **Loss**. It shall be a condition to such reduction that all **Insureds** must consent to such settlement.

## G. OTHER INSURANCE

1. Except as set forth in Exclusion 8, for any **Employment Practices Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall be primary insurance; provided that with respect to that portion of an **Employment Practice Claim** made against any leased, temporary or independently contracted **Employee**, **Loss**, including **Costs, Charges and Expenses**, payable on behalf of such **Employee** under this Coverage Section will be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such insurance is specifically stated to be in excess over the Limit of Liability of this Coverage Section.

2. For any **Third Party Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be specifically excess of and will not contribute with such other insurance, including but not limited to any such other insurance under which there is a duty to defend, unless such other insurance is specifically stated to be excess over the Limit of Liability of this Coverage Section.

## H. ALLOCATION

If a **Claim** includes both **Loss** that is covered under this **Policy** and loss that is not covered under this **Policy**, either because the **Claim** is made against both **Insureds** and others, or the **Claim** includes both covered allegations and allegations that are not covered, the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** (except for **Costs, Charges and Expenses**) and loss that is not covered based upon the relative legal and financial exposures and the relative benefits obtained by the parties. The **Insurer** shall not be liable under this **Policy** for the portion of such amount allocated to non-covered **Loss**.

 Westchester Fire Insurance Company

**ACE EXPRESS Not-For-Profit
Organization Management Indemnity
Package**

Insured Persons and Organization
Coverage Section

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

### A. INSURING CLAUSES

1. The **Insurer** shall pay the **Loss** of the **Insured Persons** for which the **Insured Persons** are not indemnified by the **Organization** and which the **Insured Persons** have become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to section E.1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

2. The **Insurer** shall pay the **Loss** of the **Organization** for which the **Organization** has indemnified the **Insured Persons** and which the **Insured Persons** have become legally obligated to pay by reason of a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to section E.1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3. The **Insurer** shall pay the **Loss** of the **Organization** which the **Organization** becomes legally obligated to pay by reason of a **Claim** first made against the **Organization** during the **Policy Period** or, if applicable, the **Extended Period**, and reported to the **Insurer** pursuant to section E.1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

4. **Special Event** Management Coverage

   The **Insurer** shall pay the **Special Event Management Expense** for which the **Organization** becomes legally obligated to pay by reason of a **Special Event** first occurring during the **Policy Period**, but only up to the limit of liability for the **Special Event Management Fund**.

### B. DEFINITIONS

1. **Adverse Publicity** means the publication of unfavorable information regarding the **Organization** which can reasonably be considered to materially reduce public confidence in the competence, integrity or viability of the **Organization** to conduct business. Such publication must occur in a report about an **Insured** appearing in:

   a) a daily newspaper of general circulation; or

   b) a radio or television news program.

2. **Claim** means:

   a) a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

   b) a written demand by one or more of the securities holders of the **Organization** upon the board of directors or the management board of the **Organization** to bring a civil proceeding against any of the **Insured Persons** on behalf of the **Organization**;

   c) a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   d) a criminal proceeding against any **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

PF-28102 (09/09)

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 44 of 111

e) an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief;

f) a civil, administrative or regulatory proceeding against any **Insured** commenced by the filing of a notice of charges or similar document;

g) a civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by any natural person **Insured** of a written notice, investigative order, or subpoena from the investigating authority identifying such natural person **Insured** as an individual, against whom a proceeding described in paragraphs c, d or f immediately above may be commenced; or

h) a written request of the **Insured** to toll or waive a statute of limitations relating to a **Claim** described in paragraphs a through g immediately above.

3. **Continuity Date** means the date set forth in Item C of the Declarations relating to this Coverage Section.

4. **Costs, Charges and Expenses** means:

   a) reasonable and necessary legal costs, charges, fees and expenses incurred by the **Insurer**, or by any **Insured** with the **Insurer's** consent, in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability; and

   b) reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Organization** upon the board of directors or the management board of the **Organization,** to bring a civil proceeding against any of the **Insured Persons** on behalf of the **Organization**.

   **Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Organization** or **Special Event Management Expenses.**

5. **Employee** means any past, present or future:

   a) full-time, part-time, seasonal, or temporary employee of the **Organization**, other than an **Executive**, but only while that person is acting in the capacity as such;

   b) person leased to the **Organization** so long as such person is working solely for the **Organization** and only for conduct within his or her duties, but only if the **Organization** indemnifies such leased person in the same manner as the **Organization's** employees; and

   c) volunteer whose labor or services is engaged and directed by the **Organization**, but only while that person is acting in the capacity as such.

6. **Executive** means any past, present or future:

   a) duly elected or appointed director, officer, trustee, trustee emeritus, executive director, department head or committee member (of a duly constituted committee) of the **Organization**;

   b) the functional equivalent of an **Executive** listed in paragraph a above in the event the **Organization** is incorporated or domiciled outside the United States; or

   c) General Counsel and Risk Manager (or equivalent position) of the **Parent Organization**.

7. **Excess Benefit** means an excess benefit as defined in the Taxpayer Bill of Rights Act 2, 26 U.S.C. 4958.

8. **Insured** means the **Organization** and any Insured Person.

9. **Insured Person** means any:

   a) **Executive** of an **Organization**;

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 45 of 111

b) **Employee** of an **Organization**; or

c) **Outside Entity Executive**.

10. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

11. **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Insured Persons** under Insuring Clauses 1 or 2, or the **Organization** under Insuring Clause 3.

**Loss** also means any **Excess Benefits** penalty assessed in the amount of 10% by the Internal Revenue Service (herein known as the "IRS") against any **Insured** for management's involvement in the award of an **Excess Benefit** and **Costs, Charges and Expenses** attributable thereto. Provided, however, **Loss** shall not include:

i) any 25% penalty assessed by the IRS against an **Insured** deemed to have received an **Excess Benefit**;

ii) **Costs, Charges or Expenses** incurred to defend an **Insured Person** if it has been determined in fact that such **Insured Person** received an **Excess Benefit**; or

iii) any 200% penalty assessed by the IRS for failure to correct the award of an **Excess Benefit**.

**Loss** does not include:

a) taxes, fines or penalties, except an **Excess Benefits** penalty as set forth above;

b) matters uninsurable under the laws pursuant to which this **Policy** is construed;

c) punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

e) any amount for which the **Insured** is not financially liable or legally obligated to pay;

f) the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any person; or,

g) **Special Event Management Expense**.

Subject to the other terms, conditions and exclusions of this **Policy**, **Loss** shall also include **Costs, Charges and Expenses** for items specifically excluded from **Loss** pursuant to (a) through (f) above, including, but not limited to, **Costs, Charges and Expenses** incurred in connection with a **Tax Claim**.

12. **Outside Entity** means:

a) any non-profit company in which any **Insured Person** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

b) any other company specifically identified by endorsement to this **Policy**.

13. **Personal Injury Offense** means:

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 46 of 111

a) libel, slander, defamation or publication or utterance in violation of an individual's right of privacy;

b) wrongful entry or eviction or other invasion of the right of occupancy; or,

c) false arrest or wrongful detention.

14. **Publisher's Liability** means any actual or alleged infringement of trademark or copyright, unauthorized use of title, plagiarism, or misappropriation of ideas.

15. **Special Event** means one of the following, except where coverage is otherwise excluded under Exclusions 1(b) or (k) of this Coverage Section:

a) The incapacity, death or state or federal criminal indictment of an **Insured Person** for whom the **Organization** has purchased and continues to maintain key individual life insurance;

b) The cancellation, withdrawal or revocation of $100,000 or more in funding, donation(s), grant(s) or bequest(s) by a non-government entity or person to the **Organization**;

c) The disclosure by the **Organization** of (1) its intention to file or its actual filing for protection under federal bankruptcy laws; or, (2) a third-party's intention to file or its actual filing of an involuntary bankruptcy petition under federal bankruptcy laws with respect to the **Organization**;

d) The disclosure by the **Organization** of the threatened or actual commencement by a third-party of an action, audit or investigation alleging a **Wrongful Employment Practice** (as defined in the Employment Practices Coverage Section) by the **Organization** which has caused or is reasonably likely to cause **Adverse Publicity**;

e) The commencement or threat of litigation or other proceedings by any governmental or regulatory agency against an **Organization**;

f) An accusation that an **Insured Person**, or an individual for whom an **Insured** is legally responsible for, has intentionally caused bodily injury to, or death of, or has sexually abused any person in the performance of his or her duties with the **Organization**;

g) An **Employee** of the **Organization** was the victim of a violent crime while on the premises of the **Organization**;

h) A child was abducted or kidnapped while under the care or supervision of the **Organization**; or

i) Any other material event which, in the good faith opinion of the **Organization**, has caused or is reasonably likely to result in **Adverse Publicity**, but only if such material event is scheduled for coverage by written endorsement to this **Policy**.

16. **Special Event Management Expense** means the following expenses incurred by the **Organization** during a period beginning 90 days prior to and in reasonable anticipation of a **Special Event** and ending 90 days after an actual or reasonably anticipated **Special Event**, irrespective of whether a **Claim** is actually made with respect to the subject **Special Event**; provided, however, that the **Insurer** must have been notified of the **Special Event Management Expense** within 30 days of the date the **Organization** first incurs the subject **Special Event Management Expense**:

a) The reasonable and necessary expenses directly resulting from a **Special Event** which the **Organization** incurs for **Special Event Management Services** provided to the **Organization** by a **Special Event Management Firm**, and

b) The reasonable and necessary expenses directly resulting from a **Special Event** which the **Organization** incurs for: (a) advertising, printing, or the mailing of matter relevant to the **Special Event**, and (b) out of pocket travel expenses incurred by or on behalf of the **Organization** or the **Special Event Management Firm**; provided, however, **Special Event Management Expense** does not include those amounts which otherwise would constitute compensation, benefits, fees, overhead, charges or expenses of an **Insured** or any of the **Insured's Employees**.

17. **Special Event Management Firm** means a marketing firm, public relations firm, law firm, or other professional services entity retained by the **Insurer**, or by the **Organization** with the **Insurer's** prior written consent, to perform **Special Event Management Services** arising from a **Special Event**.

18. **Special Event Management Fund** means the amount set forth in Item H of the Declarations.

19. **Special Event Management Services** means the professional services provided by a **Special Event Management Firm** in counseling or assisting the **Organization** in reducing or minimizing the potential harm to the **Organization** caused by the public disclosure of a **Special Event**.

20. **Tax Claim** means a **Claim** seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

    a) Section 4911 (tax on excess expenditures to influence legislation);

    b) Section 4940 (a) (tax on net investment income of tax-exempt foundations);

    c) Section 4941 (taxes on self-dealing);

    d) Section 4942 (taxes on failure to distribute income);

    e) Section 4943 (taxes on excess business holding);

    f) Section 4944 (taxes on investments which jeopardize charitable purpose);

    g) Section 4945 (taxes on taxable expenditures);

    h) Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);

    i) Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and

    j) Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

21. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty, **Publishers' Liability** or **Personal Injury Offense** allegedly committed or attempted by:

    a) any `Insured Person`, while acting in the capacity as such, or any matter claimed against any `Insured Person` solely by reason of his or her serving in such capacity;

    b) any `Insured Person`, while acting in the capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Organization**;

    c) the **Organization**, but only with respect to Insuring Clause 3 of this Coverage Section;

    d) with respect to all **Insureds**, subject to 21 a), b) and c) above, **Wrongful Act** shall specifically include violations of the Sherman Antitrust Act or similar federal, state or local statutes or rules.

## C. EXCLUSIONS

1. Exclusions Applicable To All Insuring Clauses

   Except as limited under Insuring Agreement 4, **Special Event** Management Coverage, the **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

   a) for actual or alleged bodily injury, sickness, disease, death, false imprisonment, mental anguish, emotional distress, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 48 of 111

b) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

    (ii) any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

c) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

    (ii) any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more members of the **Organization** in their capacity as such, or, except as to **Clean Up Costs**, to any **Non-Indemnifiable Loss** of an **Insured Person**, or Loss of an **Insured Person** for which the **Organization** does not indemnify such **Insured Person** because of either the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Organization**, or because of the **Organization** becoming a debtor-in-possession.

For purposes of this exclusion:

**Clean Up Costs** means expenses, including but not limited to legal and professional fees, incurred in testing for, monitoring, cleaning up, removing, containing, treating, neutralizing, detoxifying or assessing the effects of **Pollutants**;

**Non-Indemnifiable Loss** means **Loss** for which a **Organization** has not indemnified, and is not permitted or required to indemnify, an Insured Person pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of a **Organization**;

**Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

d) for any actual or alleged violation of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

e) brought by or on behalf of the **Organization** against any **Insured Person**; provided, however, this exclusion shall not apply to any derivative **Claim** made on behalf of the **Organization** by a member, an attorney general or any other such representative party if such action is brought and maintained totally independently of and totally without the solicitation, assistance, active participation or intervention of any **Insured Person** or the **Organization**; provided, however, that **Whistleblower Conduct** by an **Insured Person**, other than a director or equivalent position, shall not be considered solicitation, assistance, active participation, or intervention of an **Insured Person**.

Provided further that this exclusion shall not apply to any **Claim** that is brought or maintained by any bankruptcy or insolvency trustee or bankruptcy appointed representative of the **Organization**, or receiver, examiner, liquidator or similar official for the **Organization**.

For purposes of this exclusion, **Whistleblower Conduct** means any of the activity set forth in 18 U.S.C. Sec. 1514A(a), engaged in by a whistleblower with a federal regulatory or law enforcement agency, Member of Congress or any committee of Congress, or person with supervisory authority over the whistleblower, or an enforcement action by the whistleblower set forth in 18 U.S.C. Sec. 1514A (b).

f) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) any deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f)(i) shall not apply unless and until there is a final adjudication against such **Insured** as to such conduct; or

    (ii) the gaining of any profit, remuneration or financial advantage to which any **Insured Person** was not legally entitled; provided, however this exclusion f)(ii) shall not apply unless and until there is a final adjudication against such **Insured Person** as to such conduct.

g) for the return by any **Insured Person** of any remuneration paid to him or her without the previous approval of the appropriate governing body of the **Organization** or **Outside Entity**, which payment without such previous approval shall be held to be in violation of law;

h) against any **Insured Person** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Insured Person** thereof, before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**;

i) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

j) for a **Wrongful Act** actually or allegedly committed or attempted by any **Insured Person** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Organization**; provided, however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

    (i) such **Claim** is based on the service of any **Insured Person** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Organization**; and

    (ii) such **Outside Entity** is not permitted or required by law to provide indemnification to such **Insured Person**; and

    (iii) such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

k) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

    (i) any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

    (ii) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

l) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

     (i)    improper payroll deductions, unpaid wages or other compensation, misclassification of employee status, or any violation of any law, rule or regulation, or amendments thereto, that governs the same topic or subject; or

    · (ii)   any other employment or employment–related matters brought by or on behalf of or in the right of an applicant for employment with the **Organization,** or any **Insured Person,** including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Organization;**

   m) alleging, arising out of, or in any way relating to any purchase or sale of securities by the **Parent Organization, Subsidiary,** or **Outside Entity** or **Claims** brought by securities holders of an **Organization** or **Outside Entity** in their capacity as such; provided, however, this exclusion shall not apply to the issuance by an **Organization** of bond debt or **Claims** brought by bond debt holders;

   n) for that portion of **Loss** which is covered under any other Coverage Section of this **Policy.**

2.   Exclusions Applicable Only To Insuring Clause A3

   **Insurer** shall not be liable for **Loss** on account of any **Claim:**

   a)  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Organization** would have been liable in the absence of such contract or agreement; or

   b)  alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any infringement, misappropriation or violation of any patent, service marks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

## D.  LIMIT OF LIABILITY AND RETENTIONS

1.   The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item C of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss,** but the sum of such Retentions shall not exceed the largest applicable Retention.

2.   As shown in Item C.1 of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

   a)  The amount set forth in Item C.1.a relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A1 as further described in paragraph 2b) immediately below.

   b)  The amount set forth in Item C.1.b of the Declarations relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under Insuring Clause A1 in addition to the limit described in paragraph 2a) immediately above; provided, all payments for **Loss** under the additional limit described in this paragraph 2b) shall be excess of the limit described in paragraph 2a) above, and excess of any other available insurance that is specifically excess to this **Policy.** Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limit described in this paragraph 2b).

   c)  The amount set forth in Item C.1.c of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The limits of liability set forth in C.1.a and C.1.b relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item C.1.c for this Coverage Section.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 51 of 111

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

   a) the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

   b) the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2, below.

4. The Retention applicable to Insuring Clause A.2 shall apply to **Loss** resulting from any **Claim** if indemnification for the **Claim** by the **Organization** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Organization** is made, except and to the extent such indemnification is not made by the **Organization** solely by reason of the **Organization's** financial insolvency.

5. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limits of Liability and payment of **Costs, Charges and Expenses** reduces the Limits of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

6. The **Special Event Management Fund** is the **Insurer's** maximum liability for all **Special Event Management Expenses** arising from any and all **Special Events** occurring during the **Policy Period**. This limit shall be the **Insurer's** maximum liability under this **Policy** regardless of the number of **Special Events** reported during the **Policy Period**. The **Insurer's** obligation to pay **Special Event Management Expenses** terminates and ends upon the exhaustion of the **Special Event Management Fund**. The **Special Event Management Fund** shall be in addition to the aggregate Limit of Liability set forth in Item H of the Declarations.

## E. SPECIAL EVENT MANAGEMENT COVERAGE PROVISIONS

1. There shall be no Retention applicable to **Special Event Management Expenses** and the **Insurer** shall pay such **Special Event Management Expenses** from the first dollar subject to all other terms and conditions of this **Policy**, including the **Policy** limit.

2. An actual or anticipated **Special Event** shall be reported to the **Insurer** as soon as practicable, but in no event later than 30 days after the **Organization** first incurs **Special Event Management Expenses** for which coverage will be requested under this **Policy**.

## F. NOTIFICATION

For coverage under this **Policy** (other than coverage for a **Special Event**):

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable after the **Organization's** general counsel, risk manager, chief executive officer or chief financial officer (or equivalent positions) first becomes aware of such **Claim**, but in no event later than 60 days after the end of the **Policy Period**, or respecting any **Claim** first made against the **Insureds** during the **Extended Period**, if purchased, 60 days after the end of the **Extended Period**.

2. If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a) a description of the **Wrongful Act** allegations anticipated;

   b) the identity of the potential claimants;

   c) the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 52 of 111

d) the identity of the **Insureds** allegedly involved;

e) the consequences which have resulted or may result; and

f) the nature of the potential monetary damages and non-monetary relief;

then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3. Notice to **Insurer** shall be given to the address shown under Item G of the Declarations for this **Policy**.

## G. SETTLEMENT AND DEFENSE

1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2. The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Organization**, such consent not to be unreasonably withheld.

3. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

5. If the **Insurer** recommends a settlement within the **Policy** Limit of Liability which is agreed to by the claimant ("**Settlement Opportunity**"), and:

a) the **Insureds** consent to such settlement within 30 days of the date the **Insureds** are first made aware of the **Settlement Opportunity**; and
b) such consent occurs within the first 90 days after the **Claim** is first reported; and
c) such **Claim** is reported within the first 30 days after it is made,

then, in the event the **Claim** settles as a result of such **Settlement Opportunity**, the Retention applicable to such **Claim** shall be reduced by 10% for such **Claim**. It shall be a condition to such reduction that all **Insureds** must consent to such settlement.

## H. OTHER INSURANCE

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 53 of 111

## I. PAYMENT PRIORITY

1. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then-remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss**, subject to such Limit of Liability, in the following priority:

   a) first, the **Insurer** shall pay any **Loss** covered under Insuring Clause A1, in excess of any applicable Retention shown in Item C of the Declarations; and

   b) second, only if and to the extent the payment under paragraph 1.a above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item C of the Declarations covered under any other applicable Insuring Clause.

   c) Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Organization**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Organization** until such time as the Chief Executive Officer of the **Parent Organization** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

## J. ALLOCATION

If a **Claim** includes both **Loss** that is covered under this **Policy** and loss that is not covered under this **Policy**, either because the **Claim** is made against both **Insureds** and others, or the **Claim** includes both covered allegations and allegations that are not covered, the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** (except for **Costs, Charges and Expenses**) and loss that is not covered based upon the relative legal and financial exposures and the relative benefits obtained by the parties. The **Insurer** shall not be liable under this **Policy** for the portion of such amount allocated to non-covered **Loss**.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 54 of 111

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Duke University | | | 002 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| DON | G27543406 001 | 01/01/2015 to 01/01/2016 | 01/01/2015 |

| Issued By (Name of Insurance Company) |
|---|
| Westchester Fire Insurance Company |

### Cap On Losses From Certified Acts Of Terrorism

It is agreed that the Limit(s) of Liability section is amended by adding the following:

- Notwithstanding anything in this **Policy** to the contrary, if aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and the **Insurer** has met its deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

  1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

  2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

PF-15026c (01/08)

© 2003, 2004, 2006, 2008

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 1 of 1

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 55 of 111

**PROFESSIONAL SERVICES ERRORS AND OMISSIONS EXCLUSIONS**

| Named Insured | | Endorsement Number |
|---|---|---|
| Duke University | | 003 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| DON | G27543406 001 | 01/01/2015 to 01/01/2016 | 01/01/2015 |

| Issued By (Name of Insurance Company) |
|---|
| Westchester Fire Insurance Company |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that Section C, Exclusions, of the Insured Persons and Organization Coverage Section, subsection 1, Exclusions Applicable To All Insuring Clauses, is amended to add the following:

- alleging, based upon, arising out of, or attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failure to render professional services.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative



| Named Insured<br>Duke University | | | Endorsement Number<br>004 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY PACKAGE**

IF THERE IS ANY CONFLICT BETWEEN THE **POLICY**, OTHER ENDORSEMENTS TO THE **POLICY** AND THIS ENDORSEMENT, THE TERMS PROVIDING THE BROADEST COVERAGE INSURABLE UNDER APPLICABLE LAW SHALL PREVAIL.

It is agreed that:

1.  The definition of **Application** in Section B, **DEFINITIONS**, of the General Terms and Conditions, is amended by deleting the last sentence in its entirety and inserting the following:

    The **Application** shall be physically attached to the **Policy** and is deemed incorporated into this **Policy**.

2.  Section D, **WARRANTY AND NON-RESCINDABILITY**, of the General Terms and Conditions, is deleted in its entirety and the following is inserted:

    **D.  REPRESENTATIONS AND NON-RESCINDABILITY**

    It is represented that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section. By acceptance of this **Policy**, the **Insureds** agree that the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations.

    For purposes of this Section, the knowledge of a natural person **Insured** shall not be imputed to any other natural person **Insured**, and the knowledge of only the chief executive officer, chief financial officer, and general counsel (and additionally, with respect to the Fiduciary Coverage Section, the **Application** signatory), or equivalent positions, shall be imputed to an entity **Insured**.

    This **Policy** and any Coverage Sections shall not be rescinded by the **Insurer** in whole or in part for any reason.

3.  Section E, **CANCELLATION**, of the General Terms and Conditions, is amended to add the following:

    *   Notice of cancellation from the **Insurer** will state the effective date of cancellation and the reason(s) for cancellation, and will be mailed by certified mail to the **Parent Organization**, and by first-class mail to the agent or broker of record, at the last mailing addresses known to the **Insurer**. Proof of mailing will be sufficient proof of notice.

4.  Section H, **DISCOVERY PERIOD**, of the General Terms and Conditions, is amended as follows:

    1.  The phrase "for reasons other than non-payment of premium" is deleted from the first sentence.

    2.  Paragraph 4 is deleted in its entirety and the following is inserted:

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 57 of 111

4. The **Discovery Period,** if purchased, shall reinstate the full amount of the Limit of Liability shown in Item C of the Declarations for the immediately preceding **Policy Period** for the time purchased (hereinafter referred to as "**Discovery Period Limit**"). The **Discovery Period Limit** shall only be available to pay **Loss** for **Claims** first made against the **Insured** and reported to the **Insurer** during the **Discovery Period** and only for **Wrongful Acts** that occurred prior to the end of the preceding **Policy Period** (hereinafter referred to as "**Discovery Period Loss**"). The maximum liability for all **Discovery Period Loss** is the **Discovery Period Limit.**

5. Section J, **ALTERNATIVE DISPUTE RESOLUTION,** of the General Terms and Conditions, is amended by deleting the last paragraph in its entirety and inserting following:

Either **ADR** process will take place in the county and state in which the **Insured** is located unless an alternate location is mutually agreed upon by the **Insured** and the **Insurer.** The **Parent Organization** shall act of behalf of each and every **Insured** in connection with any **ADR** process under this section.

6. The following section is added to the **Policy:**

- **NONRENEWAL**

    1. If the **Insurer** decides not to renew this **Policy,** it will mail to the **Parent Organization** shown in the Declarations written notice of the nonrenewal at least 45 days before the:
        - expiration of the **Policy,** if this **Policy** has been written for 1 year or less; or
        - anniversary date of the **Policy,** if this **Policy** has been written for more than 1 year or for an indefinite term.

    2. The **Insurer** need not mail the notice of nonrenewal if the **Insured** has:
        - insured elsewhere;
        - accepted replacement coverage; or
        - requested or agreed to nonrenewal of this **Policy.**

    3. The written notice of termination or nonrenewal will state the reasons for nonrenewal and will be mailed to the **Parent Organization** and any designated mortgagee or loss payee at their addresses shown in the **Policy,** or if not indicated in the **Policy,** at their last known addresses. Proof of mailing will be sufficient proof of notice.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

# FAILURE TO MAINTAIN INSURANCE EXCLUSION

| Named Insured<br>Duke University | | | Endorsement Number<br>005 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY PACKAGE

It is agreed that Section C, Exclusions, subsection 1, Exclusions Applicable to All Insuring Clauses, of the Insured Persons and Organization Coverage Section, Section C, Exclusions, of the Employment Practices Liability Coverage Section; and Section C, Exclusions, subsection 1, of the Fiduciary Coverage Section, is amended to add the following:

- alleging, based upon, arising out of, or attributable to the failure or omission of any **Insured** to obtain, effect or maintain any or adequate insurance or an adequate bond, or to comply with the terms of any insurance policy or bond. Provided, however, this exclusion shall not apply to **Costs, Charges and Expenses**.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

PF-28920 (02/10)
N

© 2010

Page 1 of 1

# CAPTIVE EXCLUSION

| Named Insured<br>Duke University | | | Endorsement Number<br>006 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that Section C, Exclusions, subsection 1, Exclusions Applicable to All Insuring Clauses, of the Insured Persons and Organization Coverage Section, is amended to add the following:

- Captive Insurance Company

     alleging, based upon, arising out of, or attributable to any actual or alleged ownership, management, maintenance, operation and/or control by the **Insured** of any captive insurance company or entity, including but not limited to any **Claims** alleging the insolvency or bankruptcy of the **Insured** as a result of such ownership, operation, management and control.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

# WAGE AND HOUR – COSTS, CHARGES AND EXPENSES
## SUBLIMIT COVERAGE ONLY WITH SEPARATE RETENTION

| Named Insured<br>Duke University | | | Endorsement Number<br>007 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to  01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that the Employment Practices Liability Coverage Section is amended as follows:

1. Item C of the Declarations, section 2, Retention, of the portion entitled Employment Practices Liability, is deleted in its entirety and the following is inserted:

   2. Retention:

      $1,000,000 each **Employment Practices Claim** not alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving **Wage and Hour Claim**

      $1,000,000 each **Employment Practices Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part, a **Wage and Hour Claim**

      $1,000,000 each **Third Party Claim**

2. Section A, Insuring Clauses, subsection 1, **Employee** Insuring Clause, is amended to add the following:

   The **Insurer** shall pay the **Costs, Charges and Expenses** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Wage and Hour Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E1 herein, for any **Employment Practices Wrongful Act** taking place prior to the end of the **Policy Period**. The maximum limit of the **Insurer's** liability for all **Costs, Charges and Expenses** in the aggregate arising from all such **Wage and Hour Claims** shall be $100,000 ("**Wage and Hour Claim Sub-Limit of Liability**"). The **Wage and Hour Claim Sub-Limit of Liability** shall be part of and not in addition to the applicable aggregate Limit of Liability stated in the Declarations, and will in no way serve to increase such Limit of Liability.

   This **Policy** shall not afford any coverage for **Loss** arising out of any **Wage and Hour Claim**, or attributable solely to any actual or alleged violation of any **Wage and Hour Law(s)**, other than **Costs, Charges and Expenses**.

3. Section B, Definitions, subsection 6, **Employment Practices Wrongful Act**, is amended to add the following:

   Solely with respect to a **Wage and Hour Claim**, **Employment Practices Wrongful Act** also means (i) violation of any **Wage and Hour Law**; or (ii) improper payroll deductions, failure to pay wages, misclassification of exempt or non-exempt employee status, failure to pay compensation earned by or due to the claimant (including but not limited to commission, vacation and sick days, retirement benefits, and severance pay), failure to pay overtime pay for hours actually worked or labor actually performed, or any violation of any law, rule or regulation, or amendments thereto (whether statutory or common law, or otherwise), that governs the same topic or subject.

4.  The last sentence of Section C, Exclusions, subsection 3, is deleted in its entirety and the following is inserted:

    Provided, however, this exclusion does not apply to:

    1.  any back-pay or front-pay allegedly due as the result of discrimination, or
    2.  that part of any such **Claim** alleging **Retaliation**, or,
    3.  **Costs, Charges and Expenses** arising from a **Wage and Hour Claim**, subject to the **Wage and Hour Claim Sub-Limit of Liability**, except for: (i) any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any violation of any California or Florida state or local **Wage and Hour Law**; or (ii) any **Claim** which is brought or made in California or Florida alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any violation of any **Wage and Hour Law**.

5.  Section B, Definitions, is amended to add the following:

    *   **Wage and Hour Claim** means any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: (i) any violation of any **Wage and Hour Law**; and/or (ii) improper payroll deductions, unpaid wages, misclassification of exempt or non-exempt employee status, compensation earned by or due to the claimant but not paid (including but not limited to commission, vacation and sick days, retirement benefits, and severance pay), overtime pay for hours actually worked or labor actually performed, or any violation of any law, rule or regulation, or amendments thereto (whether statutory or common law, or otherwise), that governs the same topic or subject.

    *   **Wage and Hour Law** means: (i) the Fair Labor Standards Act (except the Equal Pay Act), as amended, or any rules or regulations promulgated thereunder, or similar provisions of any common or statutory federal, state, local or foreign law, or amendments thereto; and/or (ii) any law, rule or regulation, or amendments thereto (whether statutory or common law, or otherwise) governing or relating to: (a) the payment of wages, including payment of unpaid salary, hourly pay, on-call time and overtime pay; and/or (b) the classification of employees for purposes of determining employees' eligibility for compensation under such law, rules or regulations.

6.  Solely with respect to a **Wage and Hour Claim**, Section F, Settlement and Defense, subsections 1 and 5, are each deleted in their entirety and the following is inserted:

    1.  It shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any **Claim**. The **Insurer** shall have the right and shall be given the opportunity to effectively associate with the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

    5.  If the **Insurer** recommends a settlement within the **Policy** Limit of Liability which is acceptable to the claimant, but the **Insureds** do not consent to such settlement within thirty (30) days of the date the **Insureds** are first made aware of the potential settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed: (i) the amount for which the **Insurer** could have settled such **Claim** plus **Costs, Charges and Expenses** incurred as of the date the potential settlement was proposed in writing by the **Insurer** to the **Insureds**; and (ii) 80% of all subsequent covered **Loss** in excess of such amount, the remaining 20% of which shall be borne by the **Insureds** uninsured and at their own risk.

7. Solely with respect to a **Wage and Hour Claim**, Section H, Allocation, is deleted in its entirety and the following is inserted:

> If a **Claim** includes both **Loss** that is covered under this **Policy** and loss that is not covered under this **Policy**, either because the **Claim** is made against both **Insureds** and others, or the **Claim** includes both covered allegations and allegations that are not covered, the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** and loss that is not covered based upon the relative legal and financial exposures and the relative benefits obtained by the parties. The **Insurer** shall not be liable under this **Policy** for the portion of such amount allocated to non-covered **Loss**.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 63 of 111

# SPECIFIED MATTER EXCLUSION

| Named Insured<br>Duke University | | | Endorsement Number<br>008 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS PRIVATE COMPANY MANAGEMENT INDEMNITY POLICY**

It is agreed that Section C, Exclusions, subsection 1, Exclusions Applicable to All Insuring Clauses, of the Directors & Officers and Company Coverage Section (if purchased), Section C, Exclusions, of the Employment Practices Coverage Section (if purchased), and Section C, Exclusions, of the Fiduciary Coverage Section (if purchased), are each amended to add the following:

The **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

1. any **Wrongful Act**, fact, circumstance, or situation underlying or alleged in the following specified matter(s), or

2. any other **Wrongful Act** whenever occurring which, together with a **Wrongful Act** underlying or alleged in the following specified matter(s), would constitute **Interrelated Wrongful Acts**:

<u>Specified Matter(s)</u>

Prior claims excluded under AIG Policy #310-57-90

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

# AMEND CONDUCT EXCLUSION – FINAL – NON-APPEALABLE – DO EPL

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Duke University | | | 009 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| DON | G27543406 001 | 01/01/2015 **to** 01/01/2016 | 01/01/2015 |

| Issued By (Name of Insurance Company) |
|---|
| Westchester Fire Insurance Company |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY

It is agreed that the **Policy** is amended to add the following:

1. Section C, Exclusions, subsection 1, Exclusions Applicable to All Insuring Clauses, paragraph (f), of the Insured Persons & Organization Coverage Section, is deleted in its entirety and the following is inserted:

   f) alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   (i) any deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f)(i) shall not apply unless and until there is a final, non-appealable adjudication in an underlying action against such **Insured** as to such conduct, or

   (ii) the gaining of any profit, remuneration or financial advantage to which any **Insured Persons** were not legally entitled; provided, however this exclusion f)(ii) shall not apply unless and until there is a final, non-appealable adjudication in an underlying action against such **Insured Persons** as to such conduct.

2. Section C, Exclusions, subsection 5, of the Employment Practices Liability Coverage Section, is deleted in its entirety and the following is inserted:

   5. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any deliberately fraudulent or criminal act; provided, however, this exclusion shall not apply unless and until there is a final, non-appealable adjudication in an underlying action against such **Insured** as to such conduct.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

## NOTICE – GC/RM – 60 DAYS – D&O/EPL

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Duke University | | | 010 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| DON | G27543406 001 | 01/01/2015  to  01/01/2016 | 01/01/2015 |

| Issued By (Name of Insurance Company) |
|---|
| Westchester Fire Insurance Company |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that Section F, Notification, subsection 1, of the Insured Persons and Organization Coverage Section and Section E, Notification, subsection 1, of the Employment Practices Liability Coverage Sections, are each deleted in their entirety and the following is inserted:

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give to **Insurer** written notice of any **Claim** made against the **Insureds** as soon as practicable after the **Organization's** general counsel or risk manager (or equivalent positions) first becomes aware of such **Claim**, but in no event later than sixty (60) days after the end of the **Policy Period**, or respecting any **Claim** first made against the **Insureds** during the **Extended Period**, if purchased, sixty (60) days after the end of the **Extended Period**.

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 66 of 111

# OPTIONAL DUTY TO DEFEND – D&O AND EPL

| Named Insured<br>Duke University | | | Endorsement Number<br>011 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS® NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that the **Policy** is amended as follows:

1.  Section G, Settlement And Defense, of the Insured Persons and Organization Coverage Section and Section F, Settlement And Defense, of the Employment Practices Liability Coverage Sections, are deleted in their entirety and the following is inserted:

    **SETTLEMENT AND DEFENSE**

    1.  It shall be the duty of the **Insureds** and not the duty of the **Insurer** to defend any **Claim**. However, the **Insureds** shall have the right to tender the defense of a covered **Claim** to the **Insurer**. The **Insureds**, as a condition precedent to their right to tender the defense of a covered **Claim**, must provide written notice of the exercise of this right to the **Insurer** within thirty (30) days of the date such **Claim** is first made against the **Insureds**. The right to exercise this tender of defense shall terminate if written notice to the **Insurer** is not given within such period. Provided that the foregoing notice provision has been satisfied, the **Insurer** shall assume the defense of such **Claim** even if the any of the allegations are groundless, false or fraudulent.

    2.  The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

    3.  The **Insurer** shall have the right and shall be given the opportunity to effectively associate with, and shall be consulted in advance by, the **Insureds** regarding the defense and negotiation of any settlement of any **Claim**.

    4.  The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery. The **Insurer** may make any investigation it deems necessary.

2.  Section F, Settlement And Defense, of the Employment Practices Liability Coverage Section, is amended to add the following:

    5.  If the **Insurer** recommends a settlement within the **Policy** Limit of Liability which is acceptable to the claimant, but the **Insureds** do not consent to such settlement within 30 days of the date the **Insureds** are first made aware of the potential settlement, the **Insurer's** liability for all **Loss** on

Case 5:20-cv-00672-BO    Document 1-1    Filed 12/14/20    Page 67 of 111

account of such **Claim** shall not exceed: (i) the amount for which the **Insurer** could have settled such **Claim** plus **Costs, Charges and Expenses**, incurred as of the date the potential settlement was proposed in writing by the **Insurer** to the **Insureds**; and, (ii) 80% of all subsequent covered **Loss** in excess of such amount, the remaining 20% of which shall be borne by the **Insureds** uninsured and at their own risk.

3.  Section J, Allocation, of the Insured Persons and Organization Coverage Section and Section H, Allocation of the Employment Practices Liability Coverage Section, are deleted in their entirety and the following is inserted:

**ALLOCATION**

<u>If the **Insured** has the duty to defend a **Claim**:</u>

If an **Insured** who is afforded coverage for a **Claim** includes both **Loss** that is covered under this **Policy** and loss that is not covered under this **Policy**, because the **Claim** includes both covered allegations and allegations that are not covered, the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** and loss that is not covered based upon the relative legal and financial exposures and the relative benefits obtained by the parties. The **Insurer** shall not be liable under this **Policy** for the portion of such amount allocated to non-covered **Loss**.

If there is an agreement on an allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance, on a quarterly basis, **Costs, Charges and Expenses** allocated to **Loss**. If there can be no agreement on an allocation of **Costs, Charges and Expenses**, the **Insurer** shall advance on a quarterly basis **Costs, Charges and Expenses** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Costs, Charges and Expenses** on account of any **Claim** shall be applied retroactively to all **Costs, Charges and Expenses** on account of the **Claim**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Costs, Charges and Expenses** on account of any **Claim** shall not apply to or create any presumption with respect to the allocation of other **Loss** on account of the **Claim** or any other **Claim**.

<u>If the **Insurer** has the duty to defend a **Claim**:</u>

If an **Insured** who is afforded coverage for a **Claim** includes both **Loss** that is covered under this **Policy** and loss that is not covered under this **Policy**, because the **Claim** includes both covered allegations and allegations that are not covered, the **Insureds** and the **Insurer** shall allocate such amount between covered **Loss** (except for **Costs, Charges and Expenses**) and loss that is not covered based upon the relative legal and financial exposures and the relative benefits obtained by the parties. The **Insurer** shall not be liable under this **Policy** for the portion of such amount allocated to non-covered **Loss**.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

# SPECIFIED PARTY EXCLUSION

| Named Insured<br>Duke University | | | Endorsement Number<br>012 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that Section C, Exclusions, subsection 1, Exclusions Applicable to All Insuring Clauses, of the Insured Persons and Organization Coverage Section and Section C, Exclusions, of the Employment Practices Liability Coverage Section, are each amended to add the following:

- alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, in any way involving any **Wrongful Act** of, or any fact, circumstance, or situation relating or pertaining to, brought or maintained by, or on behalf of, or in the name or right of, or against the following in any capacity:

  <u>Duke Endowment including any subsidiary or affiliate thereof</u>

All other terms and conditions of this **Policy** remain unchanged.

Authorized Representative

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 69 of 111

# ADDITIONAL AFFILIATES

| Named Insured<br>Duke University | | | Endorsement Number<br>013 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 **to** 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that the **Policy** is amended as follows:

1. The General Terms and Conditions section is amended as follows:

    a. Section B, Definitions, is amended to include the following:

    **Affiliate** means any organization, other than a **Subsidiary** that, on or before the inception date of the **Policy**, the **Parent Organization** or any **Subsidiary** thereof both controls or otherwise has the ability to direct the financial or managerial decisions of such entity, whether through operation of law, stock ownership or membership, charter, by-laws, articles of incorporation, contract or agreement and has agreed to indemnify the **Insured Persons** of such **Affiliate**. The **Organization** shall be conclusively deemed to have indemnified the **Insured Persons** of such **Affiliate** to the maximum extent that the **Organization** is permitted or required to provide such indemnification pursuant to law, common or statutory, or contract or by the charter, by-laws, operating agreement or similar documents of the **Organization** which are hereby deemed to incorporate, for the purposes of this **Policy**, the broadest provisions of the law which determines or defines such rights of indemnity. The **Organization** hereby agrees to indemnify the **Insured Persons** of such **Affiliate** to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

    b. Section B, Definitions, subsection 6, **Organization**, is amended by adding the following at the end thereof:

    **Organization** also means any **Affiliate**.

    c. Section I, Run-Off Coverage and Termination of a Subsidiary, subsection 2, is deleted in its entirety and the following is inserted:

    2. If before or during the **Policy Period** an organization ceases to be a **Subsidiary** or an **Affiliate**, coverage with respect to such **Subsidiary** and its natural person **Insureds** thereof, or to such **Affiliate** and its natural person **Insureds** thereof, shall continue until termination of this **Policy**. Such coverage continuation shall apply only with respect to **Claims** for **Wrongful Acts**, or **Employment Practices Wrongful Acts**, taking place prior to the date such organization ceased to be a **Subsidiary** or an **Affiliate**.

2. Section C, Exclusions, subsection 1, Exclusions Applicable to All Insuring Clauses, of the Insured Persons and Organization Coverage Section, is amended to add the following:
    - alleging, arising out of, or in any way relating to any purchase or sale of securities by an **Affiliate** or **Claims** brought by securities holders of an **Affiliate** in their capacity as such;

- against any **Insured Person** of any **Affiliate**, or against any **Affiliate**, alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by an **Affiliate** or **Insured Person** thereof, before the date such entity became an **Affiliate** or after the date such entity ceased to be an **Affiliate**;

3. Section C, Exclusions, of the Employment Practices Liability Coverage Section, is amended to add the following:

- against any **Insured Person** of any **Affiliate**, or against any **Affiliate**, alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by an **Affiliate** or **Insured Person** thereof, before the date such entity became an **Affiliate** or after the date such entity ceased to be an **Affiliate**;

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

MS-35925 (01/15)                    © 2015                    Page 2 of 2

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 71 of 111

# EMPLOYED LAWYERS PROFESSIONAL LIABILITY

| Named Insured<br>Duke University | | Endorsement Number<br>014 |
|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015  to    01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that Insured Persons and Organization Coverage Section is amended as follows:

1. Section A, Insuring Clauses, is amended to add the following:

   5.  Employed Lawyers Professional Liability (Individual)

   The **Insurer** shall pay the **Loss** of the **Employed Lawyer** for which the **Employed Lawyer** is legally obligated to pay by reason of a **Claim** first made against the **Employed Lawyer** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection F1 herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.  Coverage as is afforded under this Insuring Agreement 5 shall apply only if one or more **Insureds**, other than an **Employed Lawyer**, remain a co-defendant in the **Claim** with the **Employed Lawyer**.  However:

   1.  The **Organization** agrees to indemnify the **Employed Lawyer** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Organization**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Organization** or the execution of any contract.  The **Organization** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any **Employed Lawyer** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Employed Lawyer** to indemnification, where permitted by law to do so.  The financial ability of any **Employed Lawyer** to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right.  The agreements contained in this paragraph are binding upon the **Organization** and enforceable by the **Insurer** or the **Employed Lawyer**.

   2.  Coverage as is afforded under this Insuring Agreement 5 is specifically excess over any other valid or collectible lawyers' professional liability insurance, legal malpractice or errors and omissions insurance, including, but not limited to: Atlantic Specialty Insurance Co. (One Beacon) policy number EML-00757-14; EML-00961-15, and shall only drop down and be primary insurance only in the event of exhaustion of such other insurance due to losses paid hereunder.

2. Subsection B, Definitions, is amended to add the following:

   • **Employed Lawyer** means any employee of the **Organization** who is admitted to practice law and who is employed, or was employed at the time of the alleged **Wrongful Act**, as a lawyer full-time for and salaried by the **Organization**.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 72 of 111

3. Subsection B, Definitions, is amended as follows:

a. Subsection 3, **Continuity Date**, is amended to add the following:

**Continuity Date** means for each **Employed Lawyer** the later of 12/04/2006 or the first date such person became an **Employed Lawyer** for the **Organization**;

b. Subsection 6, **Executive**, subsection c, is deleted in its entirety and the following is inserted

**Executive**, solely for purposes of coverage under Insuring Agreement 5, means only any **Employed Lawyer**, but only for **Wrongful Acts** in such **Employed Lawyer's** capacity as such.

c. Subsection 21, **Wrongful Act**, is amended to add the following:

**Wrongful Act**, solely for purposes of coverage under Insuring Agreement 5, means only any act, error or omission of an **Employed Lawyer** in rendering or failure to render professional legal services for the **Organization**, but solely in his or her capacity as such. Provided, however, the term **Wrongful Act** shall not mean any act, error or omission in connection with any activities by such **Employed Lawyer**: (a) which are not related to such **Employed Lawyer's** employment with the **Organization**, (b) which are not rendered on the behalf of the **Organization** at the **Organization's** written request, or (c) which are performed by the **Employed Lawyer** for others for a fee.

4. Section C, Exclusions, is amended to add the following:

Exclusions Applicable to Insuring Clause 5:

- alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** occurring, in whole or in part, at a time when the **Employed Lawyer** was not employed as a lawyer by the **Organization**;

- alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** if, as of the **Continuity Date**, an **Employed Lawyer** knew or could have reasonably foreseen that any part of such **Wrongful Act** could give rise to a **Claim**;

- alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any activities by an **Employed Lawyer** for, on behalf of, or as an officer or director of any entity other than the **Organization**.

5. That portion of Item C of the Declarations, subsection 2, of the portion entitled Insured Persons and Organization is amended to add the following:

$250,000 each **Claim** under Insuring Clause 5

6. Section D, Limit Of Liability And Retentions, is amended to add the following:

- The maximum aggregate liability of the **Insurer** for all **Loss** resulting from all **Claims**, combined, covered under Insuring Clause 5, **Employed Lawyers** Professional Liability, shall be $2,000,000 (hereinafter known as the **Employed Lawyers Sub-limit of Liability**). The **Employed Lawyers Sub-limit of Liability** shall be part of and not in addition to the Limit(s) of Liability stated in the Declarations and will in no way serve to increase the **Insurer's** Limit(s) of Liability as therein provided.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 73 of 111

## HUMAN CLINICAL TRIAL EXCLUSION WITH A-SIDE CARVEBACK – D&O

| Named Insured Duke University | | | Endorsement Number 015 |
|---|---|---|---|
| Policy Symbol DON | Policy Number G27543406 001 | Policy Period 01/01/2015   to   01/01/2016 | Effective Date of Endorsement 01/01/2015 |
| Issued By (Name of Insurance Company) Westchester Fire Insurance Company | | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### NOT-FOR-PROFIT COMPANY MANAGEMENT LIABILITY POLICY

It is agreed that Section C, Exclusions, subsection 1, Exclusions Applicable To All Insuring Clauses, of the Insured Persons and Organization Coverage Section, is amended to add the following:

- alleging, based upon, arising out of, or attributable to any **Human Clinical Trial**; provided, however that the foregoing exclusion shall not apply to any **Non-Indemnifiable Loss** of any **Insured Person**, other than **Non-Indemnifiable Loss** arising out of any **Claim**, or that portion of any **Claim**, for bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property, including the loss of use thereof.

  Any coverage afforded by the carve-back to the foregoing exclusion is subject to all the terms, conditions and exclusions of the **Policy**, and shall be specifically excess of any professional liability or errors and omissions insurance or any other insurance providing coverage for such **Claims**, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability provided by this **Policy**.

  Solely for purposes of this exclusion endorsement, the following definitions shall apply:

  1. **Human Clinical Trial** shall mean any study utilizing humans to provide clinical data for the assessment of a medical treatment, procedure or pharmaceutical.

  2. **Non-Indemnifiable Loss** means **Loss** for which the **Company** has neither indemnified nor is permitted or required to indemnify an **Insured Person,** pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of the **Company**.

  For the purposes of determining whether **Loss** constitutes **Non-Indemnifiable Loss,** the **Company** will be conclusively deemed to have indemnified the **Insured Person** to the maximum extent that the **Company** is permitted or required to grant such indemnification pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of the **Company**, which are hereby deemed to adopt the broadest provisions of the law which determines or defines such rights of indemnity. The **Company** hereby agrees to indemnify the **Insured Person** to the fullest extent permitted by law including the making in good faith of any required application for court approval.

All other terms and conditions of this **Policy** remain unchanged.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 74 of 111

# OUTSIDE ENTITY EXCLUSION – AMENDED – D&O

| Named Insured | | | | Endorsement Number |
|---|---|---|---|---|
| Duke University | | | | 016 |

| Policy Symbol | Policy Number | Policy Period | | Effective Date of Endorsement |
|---|---|---|---|---|
| DON | G27543406 001 | 01/01/2015    to    01/01/2016 | | 01/01/2015 |

| Issued By (Name of Insurance Company) |
|---|
| Westchester Fire Insurance Company |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

### ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY

It is agreed that Section C., Exclusions, subsection 1,- Exclusions Applicable To All Insuring Clauses, paragraph j) (i), of the Insured Persons and Organization Coverage Section, is deleted in its entirety and replaced with the following:

(i)     Such Claim is based on the service of any **Insured Person** as a di rector, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the Organization. In the event of a dispute between the **Organization** and **Insured Person** over whether the **Organization** requested or directed such service, the **Insurer** shall act in accordance with the decision of the **Organization**.

All other terms and conditions of this **Policy** remain unchanged.

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 75 of 111

# DEFINITION OF CLAIM – AMENDED – D&O/EPL

| Named Insured<br>Duke University | | | Endorsement Number<br>017 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that the **Policy** is amended as follows:

1. Section B, Definitions, subsection 2, **Claim**, of the Insured Persons and Organization Coverage Section, is amended to add following:

   - **Claim** also means a written demand from, or on behalf of, a potential claimant that states such claimant's intention to bring a civil or criminal proceeding against an **Insured** and requests that an **Insured** take a specified measure or measures in anticipation of such proceeding, including retaining or preserving documents or emails.

2. Section B, Definitions, subsection 5, **Employment Practices Claim**, of the Employment Practice Liability Coverage Section, is amended to add the following:

   - **Employment Practices Claim** also means a written demand from, or on behalf of, a potential claimant that states such claimant's intention to bring a civil or criminal proceeding against an **Insured** and requests that an **Insured** take a specified measure or measures in anticipation of such proceeding, including retaining or preserving documents or emails.

3. Section B, Definitions, subsection 14, **Third Party Claim**, of the Employment Practice Liability Coverage Section, is amended to add the following:

   - **Third Party Claim** also means a written demand from, or on behalf of, a potential claimant that states such claimant's intention to bring a civil or criminal proceeding against an **Insured** and requests that an **Insured** take a specified measure or measures in anticipation of such proceeding, including retaining or preserving documents or emails.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

# HEALTH CARE / EDUCATION COVERAGE EXTENSION
## ANTI-TRUST CO-INSURANCE

| Named Insured<br>Duke University | | Endorsement Number<br>018 |
|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 **to** 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:**

**ACE EXPRESS NOT-FOR-PROFIT ORGANIZATION MANAGEMENT INDEMNITY POLICY**

It is agreed that the **Policy** is amended as follows:

A. The Insured Persons And Organization Coverage Section is amended as follows:

    1.  Section B, Definitions, subsection 2, **Claim**, is amended to add the following:

        **Claim** also means a civil lawsuit alleging a violation pursuant to the Emergency Medical Treatment and Active Labor Act ("**EMTALA**"), 42 U.S.C., 1396dd et seq., and any similar state or local statute ("**EMTALA Claim**").

    2.  Section B, Definitions, subsection 9, **Insured Person**, is amended to add the following:

        **Insured Person** also means any person who was, now is or shall become any member of the faculty, student teacher or teaching assistant; any **Employee** or **Executive** who is a representative of an educational association of which the **Organization** is a member; any president, regent, chancellor, provost, treasurer, vice-president, dean, personnel director, governor, executive director, risk manager, university counsel, or other comparable senior administrator of the **Organization**, regardless of whether they are considered an employee of the **Organization** or as an independent contractor; any administrator, sub-board member, association member, member manager or alumni council member of the **Organization**; students working on behalf of the **Parent Organization** while serving in a supervised internship program in satisfaction of course requirements, or while acting at the direction of, or performing services for or on behalf of the **Parent Organization**; any member of any duly constituted committee of the **Organization**; any individual person engaged by a duly constituted committee of the **Organization** for purposes of providing an expert opinion with regard to a peer review or credentialing decision concerning an individual physician; any individual in charge of any operational department of the **Organization**; or, any medical director, staff physician or faculty member of the **Organization**, regardless of whether or not such person is directly employed by the **Organization** or is considered an independent contractor for the **Organization**.

    3.  Section B, Definitions, subsection 11, **Loss**, is amended to add the following:

        **Loss** also means the following:

        <u>**EMTALA** Coverage</u>

        Notwithstanding any other provisions in this definition of **Loss** to the contrary, **Loss** shall also include civil fines and penalties assessed pursuant to an **EMTALA Claim**. However, a sublimit of

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 77 of 111

liability in the amount of <u>$250,000</u> shall apply to all **EMTALA Claims** made and reported during the **Policy Period** or **Extended Reporting Period** (if applicable) combined ("**EMTALA Sublimit of Liability**"). The **EMTALA Sublimit of Liability** shall be part of and n ot in addition to the aggregate Limit of Liability stated in Item C, and the aggregate Limit of Liability stated in Item C.1.c. of the Declarations for this Coverage Section.

**Government Funding Defense Costs**

**Loss** shall not include the return of funds which were received directly or indirectly from any federal, state or local governmental agency and any interest, fines or penalties arising out of the return of such funds. Provided, however, that with regard to **Claims** for any actual or alleged violation of the Federal False Claims Act or any similar federal, state, or local statutory law or common law anywhere in the world, this **Policy** shall pay **Costs, Charges, and Expenses** up to an amount not to exceed $1,000,000 ("**Government Funding Sublimit of Liability**"). The **Government Funding Sublimit of Liability** shall be part of and not in addition to the applicable aggregate Limit of Liability set forth in the Declarations. However, it is agreed that the **Insurer** shall pay 50% of such **Costs, Charges, and Expenses**, excess of a retention in the amount of $1,000,000, up to the **Government Funding Sublimit of Liability**, and subject to the applicable aggregate Limit of Liability set forth in the Declarations. T he remaining 50% of such **Costs, Charges, and Expenses** shall be borne by the **Insureds** uninsured and at their own risk.

4.  Section B, Definitions, subsection 21, **Wrongful Act**, paragraph d, is deleted in its entirety and the following is inserted:

    **Wrongful Act** shall also include any defects in peer review, credentialing or the tenure process, including the denial or removal of tenure, educational malpractice or failure to educate, negligent instruction, failure to supervise, inadequate or negligent academic guidance or counseling, improper or inappropriate academic placement or discipline, failure to grant due process, invasion of privacy or humiliation, including violation of the Buckley Amendment or the "Uniform Student Freedom of Expression Act" if adopted by any applicable jurisdiction, or the publication of defamatory material in a book, newspaper or other publication of the **Organization**, or the broadcast of defamatory material over a radio, cable or television station owned or operated by the **Organization.**

5.  Section B, Definitions, is amended to add the following:

    *   **Anti-Trust Claim** means any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving price fixing, restraint of trade, monopolization, unfair trade practices or other violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes, or any similar provision of any federal, state, or local statutory law or common law anywhere in the world.

6.  Section C, Exclusions, subsection 1, Exclusions Applicable To All Insuring Clauses, paragraph (a), is deleted in its entirety and the following is inserted:

    *   alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving bodily injury, sickness, disease, death, mental anguish, emotional distress, invasion of privacy, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured,

    *   alleging, based upon, arising out of, or attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the **Insured's** performance or rendering of or failure to

Case 5:20-cv-00672-BO    Document 1-1    Filed 12/14/20    Page 78 of 111

perform or render any medical or other professional services or treatments for others, including the improper billing or collection of fees for such services or treatments. However, this exclusion shall not apply to the provision of or failure to provide educational services by an **Insured**;

- alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

  o .the failure by the **Insured** to properly handle, manage, store, destroy or otherwise control confidential corporate or personally identifiable information, or any violation of a state, federal, and foreign identity theft and privacy protection legislation that requires commercial entities that collect personal information to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that personal information has potentially been compromised;

  o a failure in network security; including but not limited to activities performed by the **Insured** to protect against unauthorized access to, unauthorized use of, a denial of service attack directed against, or transmission of malicious code to the **Insured's** computer system; or

  o the unauthorized or surreptitious collection of information by the **Organization** or the failure to provide adequate notice that such information is being collected.

7. The following is added:

   ### Anti-Trust Coverage Co-Insurance

   After satisfaction of the applicable retention, the **Insureds** shall bear uninsured and at their own risk <u>20</u>% of all **Loss** incurred in a **Claim** alleging or arising out of an **Anti-Trust Claim**, and the **Insurer's** liability hereunder shall apply only to the remaining <u>80</u>% of such **Loss**.

B. The Employment Practices Liability Coverage Section is amended as follows:

   1. Section B, Definitions, subsection 4, **Employee**, is amended to add the following:

      **Employee** also means any person who was, now is or shall become any member of the faculty, student teacher or teaching assistant; any employee or executive who is a representative of an educational association of which the **Organization** is a member; any president, regent, chancellor, provost, treasurer, vice-president, dean, personnel director, governor, executive director, risk manager, university counsel, or other comparable senior administrator of the **Organization**, regardless of whether they are considered an employee of the **Organization** or as an independent contractor; any administrator, association member, member manager or alumni council member of the **Organization**; students working on behalf of the **Parent Organization** while serving in a supervised internship program in satisfaction of course requirements, or while acting at the direction of, or performing services for or on behalf of the **Parent Organization**; any member of any duly constituted committee of the **Organization**; any individual person engaged by a duly constituted committee of the **Organization** for purposes of providing an expert opinion with regard to a peer review or credentialing decision concerning an individual physician; any individual in charge of any operational department of the **Organization**; or, any medical director, staff physician or faculty member of the **Organization**, regardless of whether or not such person is directly employed by the **Organization** or is considered an independent contractor for the **Organization**.

   2. Section B, Definitions, subsection 6, **Employment Practices Wrongful Act**, is amended to add the following:

**Employment Practices Wrongful Act** shall also include any defects in physician credentialing, peer review, or tenure process, including the denial or removal of tenure, failure to grant due process, invasion of privacy or humiliation.

3. Section C, Exclusions, subsection 1, is deleted in its entirety and the following is inserted:

   1. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving bodily injury, sickness, disease, death, invasion of privacy, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured,

C. Section C, Limits of Liability, Retentions And Deductibles, subsection 3, of the General Terms and Conditions, is deleted in its entirety and the following is inserted:

   3. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible and such Retention or Deductible shall apply to all **Loss** covered under this **Policy**.

All other terms and conditions of this **Policy** remain unchanged.

_____
Authorized Representative

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

| Named Insured<br>Duke University | | | Endorsement Number<br>019 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to  01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in this endorsement or in the policy Declarations.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

We are providing you with the terrorism coverage required by the Act.  We have not established a separate price for this coverage; however the portion of your annual premium that is reasonably attributable to such coverage is: $0.

_____

Authorized Agent

TRIA12b (01/08)

Includes copyrighted material of Insurance Services office, Inc., with its permission



**ACE Producer Compensation**
**Practices & Policies**

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents. You can obtain that information by accessing our website at http://www.aceproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

ALL-20887 (10/06)

# TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured<br>Duke University | | | Endorsement Number<br>020 |
|---|---|---|---|
| Policy Symbol<br>DON | Policy Number<br>G27543406 001 | Policy Period<br>01/01/2015 to 01/01/2016 | Effective Date of Endorsement<br>01/01/2015 |
| Issued By (Name of Insurance Company)<br>Westchester Fire Insurance Company | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of policy remain unchanged.

_____
Authorized Agent

ALL-21101 (11/06) Ptd. in U.S.A.

Page 1 of 1

# U. S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# EXHIBIT 2



### ENDURANCE RISK SOLUTIONS ASSURANCE CO.

**Policy No.** EXC10006230100
**Renewal of:** New

# COMMERCIAL EXCESS LIABILITY DECLARATIONS PAGE

**I. NAMED INSURED AND ADDRESS:**
Duke University - 440
(Per Underlying Insurance)
324 Blackwell Street
Durham, NC 27710

**2. POLICY PERIOD:**
12:01 a.m. Standard Time at the address of the
Insured shown at the left
**From:** 01/01/2015  **To:** 01/01/2016

**IN RETURN FOR PAYMENT OF THE
PREMIUM AND SUBJECT TO ALL TERMS
OF THIS POLICY, WE AGREE WITH YOU
TO PROVIDE THE INSURANCE AS STATED
IN THIS POLICY.**

**PRODUCER'S NAME AND ADDRESS:**
Risk PlacServ-CA-Los Angeles
5670 Wilshire Blvd, Suite 1200
Los Angeles, CA 90036

**3. PREMIUM:**

| | | |
|---|---|---|
| Total Advance Premium | $ 50,000 |
| Service Charge | $ |
| Surcharge/Taxes | $ |
| Total | $ 50,000 |

**BASIS OF PREMIUM:** Non-Auditable

In the event of cancellation by the Named Insured, the company will receive and retain no less than $0.00 as a policy minimum premium.

**4. LIMITS OF INSURANCE:**

| | |
|---|---|
| $ 25,000,000 | EACH OCCURRENCE |
| $ 25,000,000 | AGGREGATE LIMIT (Where Applicable) |

These Limits of Insurance apply in excess of the "underlying limits of insurance" indicated in Item 5. of the Declarations.

**5. UNDERLYING INSURANCE:**     See attached schedule

**6. FORMS AND ENDORSEMENTS** applicable to all Coverage Forms and made part of this policy at time of issue are listed on the attached Forms and Endorsements Schedule, EXL 0101.

_____
Authorized Representative

**ISSUING OFFICE:**
725 South Figueroa St.
Suite 2100
Los Angeles CA 90017

Endurance Risk Solutions Assurance Co.                                    EXL 0001 0110

# FORMS AND ENDORSEMENT SCHEDULE

It is hereby understood and agreed the following forms and endorsements are attached to and are a part of this policy:

| Form Number | Form Name |
|---|---|
| EXL 0001 0110 | Excess Declarations |
| EXL 1302 0610 | Claim Notice |
| EXL 0102 0110 | Schedule of Underlying Policies |
| EXL 6001 0813 | Absolute Asbestos Exclusion |
| EXL 6066 0813 | Nuclear Energy Liability Exclusion |
| EXL 0516 0610 | Exclusion - Violation of Information Statutes |
| EXL 0562 0110 | War Liability Exclusion |
| EXL 0538 0813 | Following Form Pollution Exclusion |
| EXL 0513 0110 | Lead Exclusion |
| EXL 0509 0110 | Mold Exclusion |
| EXL 6088 0813 | Silica or Mixed Dust Exclusion |
| EXL 1323 0610 | Sub-Limited Coverage Exclusion |
| EXL 0537 0110 | Uninsured / Underinsured Motorist Exclusion |
| EXL 1121 0710 | North Carolina Changes |
| EXL 0910 0813 | North Carolina Changes - Cancellation Non-Renewal |
| EXL 1001 0606 | Claims Made Coverage Endorsement (As Respects Educators Legal Liability) |
| EXL 0203 0813 | Excess Liability Coverage Follow Form (Short Form) |
| IL 1007 0114 | Signature Page |
| PN 0001 0407 | OFAC Policyholder Notice |

# CLAIM NOTICE

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.**

In the event of claim to which this policy may apply, please give immediate notice in any of the following ways, to:

U.S. Insurance – Claims
750 Third Avenue
New York, NY 10017
E-Mail addressed to: eclaims@enhinsurance.com

E-mail is the preferred method of receiving claim notice information, but any of the above methods of notification will generate an acknowledgement of receipt of claim with a claim number and all of the claim adjusters' contact information.

# SCHEDULE OF UNDERLYING POLICIES

| Carrier, Policy Number and Period | Type of Coverage | Limits of Insurance |
|---|---|---|
| United Educators Insurance Company<br>Policy No.: On File with Company<br>01/01/2015 - 01/01/2016 | Excess | $40,000,000 Each Occurrence a<br>$40,000,000 General Aggregate in excess of Primary |
| Allied World National Assurance Company<br>Policy No.: On File with Company<br>01/01/2015 - 01/01/2016 | Excess | $10,000,000 Each Occurrence<br>$10,000,000 General Aggregate in excess of $40,000,000 |
| Great American Assurance Company<br>Policy No.: On File with Company<br>01/01/2015 - 01/01/2016 | Excess | $25,000,000 Each Occurrence<br>$25,000,000 General Aggregate in excess of $50,000,000 |
| Westchester Fire Insurance Company<br>Policy No.: On File with Company<br>01/01/2015 – 01/01/2016 | Excess | $10,000,000 Aggregate for all loss<br>$10,000,000 Maximum Aggregate Excess of $1,000,000 |
| RSUI<br>Policy No.: On File with Company<br>01/01/2015 – 01/01/2016 | Excess | $10,000,000 Aggregate Limit of Liability<br>Excess of $10,000,000 |

Endurance Risk Solutions Assurance Co.                                        EXL 0102 0110

# ABSOLUTE ASBESTOS EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.

This insurance does not apply to:

Any liability, including, but not limited to "property damage", "bodily injury", settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or related in any way, either directly or indirectly, to:

1. asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust, including, but not limited to, manufacture, mining, use, sale, installation, removal, or distribution activities;

2. exposure to, testing for, monitoring of, cleaning up, removing, containing or treating of asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust; or

3. any obligation to investigate, settle or defend, or indemnify any person against any claim or "suit" arising out of or related in any way, either directly or indirectly, to asbestos, asbestos products, asbestos-containing materials or products, asbestos fibers or asbestos dust.

This endorsement does not change any other provision of the policy.

# NUCLEAR ENERGY LIABILITY EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.**

This policy does not apply to:

A. Any liability, injury or damage:

    1. with respect to which any insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its Limits of Insurance; or

    2. resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) a person or organization is required to maintain financial protection pursuant to the Atomic energy Act of 1954, or any law amendatory thereof, or (b) any insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Any injury or "nuclear property damage" resulting from the "hazardous properties" of "nuclear material", if:

    1. the "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, any insured or (b) has been discharged or dispersed therefrom;

    2. the "nuclear material" is contained in "spent fuel" or "nuclear waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of any insured; or

    3. the injury or "nuclear property damage" arises out of the furnishing by any insured of services, materials, parts of equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion C.3. applies only to "nuclear property damage" to such "nuclear facility" and any property therein.

C. As used in this exclusion:

    1. "Hazardous properties" includes radioactive, toxic or explosive properties.

    2. "Nuclear facility" means:

        (a) any "nuclear reactor";

(b) any equipment or device designed or used for:

    (1) separating the isotopes of uranium or plutonium;

    (2) processing or utilizing "spent fuel"; or

    (3) handling processing or packaging "nuclear waste";

(c) any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of any insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of, "nuclear waste", and includes the site on which any of the foregoing is located, all operations considered on such site and all premises used for such operations.

3. "Nuclear material" means "source material", "special nuclear material" or by-product material.

4. "Nuclear property damage" includes all forms of radioactive contamination of property.

5. "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

6. "Nuclear waste" means any "nuclear waste" material (a) containing "by-product material" other than the tailings of "nuclear waste" produced by the extraction or concentration of uranium or thorium from any ore    processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included within the definition of "nuclear facility" under Paragraph C.2.

7. "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

8. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor."

This endorsement does not change any other provision of the policy.

# EXCLUSION-VIOLATION OF INFORMATION STATUTES

**This endorsement changes the policy, please read it carefully.**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Bodily injury" or "property damage" or "personal and advertising injury" arising directly or indirectly out of any act or omission that violates or is alleged to violate:

A. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

B. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

C. The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

D. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

This endorsement does not change any other provision of the policy.

Includes copyrighted material of Insurance Services Office, Inc. with its permission

# WAR LIABILITY EXCLUSION

**This endorsement changes the policy, please read it carefully.**

This insurance does not apply to any liability arising out of any war, invasion, acts of foreign or domestic enemies, hostilities, (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property including loss of access, by or under the order of any government, local authority or risks of contraband, illegal transportation or trade.

This endorsement does not change any other provisions of the policy.

Endurance Risk Solutions Assurance Co.                                    EXL 0562 0110

# FOLLOWING FORM POLLUTION EXCLUSION

### THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.

The following is added to the policy and supersedes anything to the contrary:

This policy does not apply to any liability, including, but not limited to "bodily injury", "property damage", "loss" settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants arising out of or in any way related to:

    A. The actual, alleged or threatened presence, discharge, dispersal, seepage, migration, release or escape of "pollutants", however caused.

    B. Any request, demand, or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of "pollutants". This includes demands, directives, complaints, suits, orders or requests brought by any governmental entity or by any person or group of persons.

    C. Steps taken or amount incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or assess the effects of "pollutants".

This exclusion will apply to any liability, costs, charges or expenses, or any judgments or settlements, arising directly or indirectly out of pollution whether or not the pollution was sudden, accidental, gradual, intended, expected, unexpected, preventable or not preventable.

As used in this exclusion "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

Endurance Risk Solutions Assurance Co.

EXL 0538 0813

Case 5:20-cv-00672-BO   Document 1-1   Filed 12/14/20   Page 95 of 111

However, if insurance for such "bodily injury" "property damage", "loss" settlements, judgments, costs, charges, expenses, costs of investigations, or the fees of attorneys, experts, or consultants is provided by the "underlying insurance":

    A.  This exclusion shall not apply; and

    B.  The insurance provided by our policy will not be broader than the insurance coverage provided by the "underlying insurance".

This endorsement does not change any other provision of the policy.

Endurance Risk Solutions Assurance Co.

EXL 0538 0813

# LEAD EXCLUSION

**This endorsement changes the policy, please read it carefully.**

This insurance does not apply to

A. "bodily injury", "property damage", "personal and advertising injury" arising out of the actual, alleged or threatened;

    1. absorption, ingestion or inhalation of lead in any form by any person; or

    2. existence of lead in any form.

B. any "loss", cost or expense arising out of any request, demand, order or statutory or regulatory requirement

    3. that any Insured or others;

        a. test for, monitor, clean up, remove, contain, treat, detoxify or neutralize lead in any form;

        b. respond to, or assess, in any way the effects of lead in any form.

Because lead, and any other such irritant or contaminant, are pollutants, this exclusion applies in addition to any of the following exclusion that apply:

A. the pollution exclusion in this policy; or

B. any other pollution-related exclusion made part of this policy.

This endorsement does not change any other provision of the policy.

Endurance Risk Solutions Assurance Co.                EXL 0513 0110

# EXCLUSION FOR MOLD AND OTHER NATURALLY-OCCURRING CONTAMINANTS

**This endorsement changes the policy, please read it carefully.**

It is agreed that the insurance afforded by this policy shall not apply to any demand, claim, "occurrence", "bodily injury", "property damage", "loss", cost, "suit" or expense of any nature whatsoever, including but not limited to any other claims, caused by, arising out of or relating in any way directly, indirectly, in concurrence or in any sequence, with a cause for which coverage may be afforded under this coverage part, based upon or arising out of mold, mildew, "fungi", spores, viruses, bacteria, or any of their byproducts, or any other biological, etiological or other naturally occurring contaminant, or any of their byproducts.

This exclusion excludes, by way of example and not limitation:

A. any duty to defend or other defense obligation associated with such mold, mildew, "fungi", spores, viruses, bacteria, or any of their byproducts, or any other biological, etiological or other naturally occurring contaminant, or any of their byproducts;

B. any damages, obligations, claim, injury or expense associated with a request, demand or order from any body or individual, including but not limited to, any governmental body or actor, that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any mold, mildew, "fungi", spores, viruses, bacterial, or any of their byproducts, or any other biological, etiological or other naturally occurring contaminant, or any of their byproducts;

C. any damages, obligations, claim or injury associated with any material, products, building component, building or structure that contain, harbors, nurtures or acts as a medium for any such mold, mildew, "fungi", spores, viruses, bacteria, or any of their byproducts, or any other biological, etiological or other naturally occurring contaminant, or any of their by products, regardless of any other cause, event, material, product or building component that contributed directly, indirectly, concurrently or in any sequence to the damages obligations, claim, injury or expense.

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by "fungi".

This endorsement does not change any other provision of the policy.

# SILICA, SILICA-RELATED OR MIXED DUST EXCLUSION

## THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.

This insurance does not apply to any "loss", liability, "bodily injury", "property damage", expense or other form of damages and costs arising, in whole or in part, arising out of or involving "mixed dust", "silica", "silica-related dust", or any product containing "silica" or "silica-related dust".

It is further agreed that this insurance does not apply to:

A.  Any "loss", cost or expense, arising in whole or in part, out of the abating, testing, monitoring, remediating, neutralizing, removing or cleaning up of "mixed dust", "silica", "silica-related dust" or products and materials containing "silica" or "silica-related dust" by any insured or by any other person or entity;

B.  The cost of such actions as may be necessary to monitor, assess and evaluate the release or threat of "mixed dust", "silica", "silica-related dust" or products and materials containing "silica" or "silica-related dust";

C.  The cost of disposal of "silica" substances or taking of such other action as may be necessary to temporarily or permanently prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result by any insured or by any other person or entity; or

D.  The cost of compliance with any law or regulation regarding "mixed dust", "silica" or "silica-related dust".

"Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), "silica" particles, "silica-related dust" or silica compounds.

"Silica-related dust" means a mixture or combination of "silica" and other dust or particles.

"Mixed dust" means inorganic or organic dusts that have harmful effects on natural persons.

This endorsement does not change any other provision of the policy.

# SUB-LIMITED COVERAGE EXCLUSION

**This endorsement changes the policy, please read it carefully.**

It is agreed that this insurance policy shall not apply in excess of any "sub-limited" coverage(s) that are included within, or are a part of, any "underlying insurance" scheduled in this policy. "Sub-limited" coverage(s) are defined as any coverage(s) having limits of insurance less than the limit(s) of any "underlying insurance" included in the schedule of underlying policies.

This endorsement does not change any other provision of the policy.

Endurance Risk Solutions Assurance Co.                    EXL 1323 0610

# UNINSURED / UNDERINSURED MOTORIST EXCLUSION

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.**

This insurance does not apply to any obligation of the insured under a No Fault, Uninsured Motorist or Supplementary Uninsured/Underinsured Motorist Law, or under any similar law, regulation or ordinance.

This endorsement does not change any other provision of the policy.

Endurance Risk Solutions Assurance Co.                           EXL 0537 0110

# NORTH CAROLINA CHANGES

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Under **SECTION VI. CONDITIONS**, item **Changes** is deleted and replaced by the following:

**Changes**

This policy contains all the agreements between you and us concerning the insurance afforded.  The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

This endorsement does not change any other provision of this policy.

Includes copyrighted material of Insurance Services Office, Inc. with its permission

Endurance Risk Solutions Assurance Co.                                 EXL 1121 0710

# NORTH CAROLINA CHANGES – CANCELLATION AND NONRENEWAL

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The following is added to the policy:

A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. Policies In Effect Less Than 60 Days

   a. If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

      (1) 15 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      (2) 30 days before the effective date of cancellation if we cancel for any other reason.

   b. Policies In Effect More Than 60 Days

      If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy prior to the:

      (1) Expiration of the policy term; or

      (2) Anniversary date,

      stated in the policy only for one or more of the following reasons:

      (a) Nonpayment of premium;

      (b) An act or omission by the insured or his or her representative that constitutes material misrepresentation or nondisclosure of a material fact in obtaining this policy, continuing this policy or presenting a claim under this policy;

      (c) Increased hazard or material change in the risk assumed that could not have been reasonably contemplated by the parties at the time of assumption of the risk;

      (d) Substantial breach of contractual duties, conditions or warranties that materially affects the insurability of the risk;

      (e) A fraudulent act against us by the insured or his or her representative that materially affects the insurability of the risk;

      (f) Willful failure by the insured or his or her representative to institute reasonable loss control measures that materially affect the insurability of the risk after written notice by us;

      (g) Loss of or substantial changes in applicable reinsurance as provided in G.S. 58- 41-30;

      (h) Conviction of the insured of a crime arising out of acts that materially affect the insurability of the risk;

      (i) A determination by the Commissioner of Insurance that the continuation of the policy would place us in violation of the laws of North Carolina; or

      (j) You fail to meet the requirements contained in our corporate charter, articles of incorporation or by-laws when we are a company organized for the sole purpose of providing members of an organization with insurance coverage in North Carolina.

      We will mail or deliver written notice of cancellation to the first Named Insured at least:

      (i) 15 days before the effective date of cancellation if we cancel for nonpayment of premium; or

      (ii) 30 days before the effective date of cancellation if we cancel for any other reason.

    c. Cancellation for nonpayment of premium will not become effective if you pay the premium amount due before the effective date of cancellation.

    d. We may also cancel this policy for any reason not stated above provided we obtain your prior written consent.

  3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

  4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

  5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

  6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. When The Insurer Does Not Renew

  1. If we elect not to renew this policy, we will mail or deliver to the first Named Insured shown in the Declarations written notice of nonrenewal at least 45 days prior to the:

    a. Expiration of the policy if this policy has been written for one year or less; or

    b. Anniversary date of the policy if this policy has been written for more than one year or for an indefinite term.

    We need not mail or deliver the notice of nonrenewal if you have:

      (1) Insured property covered under this policy, under any other insurance policy;

      (2) Accepted replacement coverage; or

      (3) Requested or agreed to nonrenewal of this policy.

    c. If notice is mailed, proof of mailing will be sufficient proof of notice.

  2. The written notice of cancellation or nonrenewal will:

    a. Be mailed or delivered to the first Named Insured and any designated mortgagee or loss payee at their addresses shown in the policy, or if not indicated in the policy, at their last known addresses; and

    b. State the reason or reasons for cancellation or nonrenewal

This endorsement does not change any other provision of the policy.

Includes copyrighted material of Insurance Services Office, Inc. with its permission

| Named Insured: | University of Southern California | Endorsement No.: | |
|---|---|---|---|
| Policy No.: | Duke University – 440 | Effective Date of Endorsement: | 01/01/2015 |
| Issued By: | Endurance Risk Solutions Assurance Co. | | |

**This endorsement changes the policy, please read it carefully.**

### CLAIMS MADE COVERAGE ENDORSEMENT
### (AS RESPECTS EDUCATORS LEGAL LIABILITY)

**I. COVERAGE - CLAIMS MADE**

It is agreed that the insurance afforded by this policy is subject to the same terms, conditions, definitions, exclusions and warranties as contained in the claims made policy (ies) described in the Schedule of Underlying Insurance and/or Item III below.

The foregoing shall not apply to:

1. The Retroactive Date of the underlying claims made policy(ies).

2. The Extended Reporting Period of the underlying claims made policy(ies).

**II. RETROACTIVE DATE**

The Retroactive Date for this Policy is January 01, 2015
(In the absence of an entry, the **Retroactive Date** will be the date this policy takes effect.)

This Insurance does not apply to any Loss resulting from a Wrongful Act which occurs before the Retroactive Date or after the end of the policy period.

**III. CLAIMS MADE CLAUSE**

This policy shall apply to Claims first made against you and reported to us during the policy period for which coverage is provided for in the following described underlying claims made policy(ies):

| **INSURANCE COMPANY** | **POLICY NUMBER** |
|---|---|
| Westchester Fire Insurance Company | Policy Number On File with Company |

All Claims for Damages resulting from a Wrongful Act which are alleged by the same person or organization, including Damages claimed by any person or organization for Loss resulting at any time from a Wrongful Act, will be deemed to have been made at the time the first of those Claims is made against any insured.

**IV. EXTENDED REPORTING PERIODS**

1. We will provide one or more Extended Reporting Periods, as described below, if:

(a) this policy is cancelled or not renewed; or

EXL 1001 0606

1

(b) we renew or replace this policy with insurance that;

    (1) has a Retroactive Date later than the date stated above in this Endorsement; or

    (2) does not apply to Damages resulting from a Wrongful Act on a claims made basis.

The quotation of a different premium and/or Limit of insurance does not constitute a cancellation or refusal to renew for the purpose of this provision.

2.    Extended Reporting Periods do not extend the policy period, increase the Limits of Insurance or change the scope of coverage provided. They apply only to Claims that are made against you before the end of the policy period but not before the Retroactive date.

    Once in effect, Extended Reporting Periods may not be cancelled

3.    Sixty (60) Day Automatic Extended Reporting Period:

A Sixty (60) Day Extended Reporting Period is automatically provided without additional charge. This period starts with the end of the policy period or the effective date of any cancellation and lasts for sixty (60) days.

This period does not apply to Claims that are covered under any subsequent insurance you purchase or that would be covered but for the exhaustion of the amount of insurance applicable to such claims.

4.    Optional Extended Reporting Period:

The above Sixty (60) Day Extended Reporting Period may be substituted by an Extended Reporting Period Endorsement for a period of thirty-six (36) months from the end of the policy period or the effective date of any cancellation, if you make a written request for an Extended Reporting Period within sixty (60) days after the end of the policy period or the effective date of any cancellation and pays the additional premium of TBD%of the one year premium hereunder within said sixty (60) days. If such request and premium payment are not so given to us, you shall not at a later date be able to exercise such right.

The insurance provided by the Extended Reporting Period shall be excess over any other valid and collectible insurance available to you whether primary, excess, contingent, or on any other basis, whose policy period begins or continues after the Extended Reporting Period Coverage provided hereunder takes effect.

The premium for the Extended Reporting Period endorsement will be fully earned when the endorsement takes effect.

As a condition precedent to your right to purchase the Extended Reporting Period Coverage, the full policy premium (including any additional premiums) of this policy must have been paid.

## V.  **DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT**

You shall give prompt written notice to us of any Wrongful Act which may result in a Claim under this policy. Such notice shall contain the fullest information obtainable at the time.

If a Claim is made or suit is brought against any insured, you shall give prompt written notice of the Claim or suit and forward every demand, notice, summons or other process received.

If during the Extended Reporting Period (if purchased by you in accordance with the terms of this Endorsement), you shall become aware of any occurrence or offense caused by a Wrongful Act which might result in a Claim against you under this policy, then you shall give prompt written notice to us, together with the fullest information obtainable.

Any Claim that subsequently may be made against you arising out of such occurrences or offenses, caused by a Wrongful Act, shall, for the purposes of this insurance, be deemed to have been made on the last date of the policy period or date of cancellation; provided that the Claim is for Damages caused by a Wrongful Act that occurred before the end of the policy period or date of cancellation but not before the Retroactive Date.

Notice of the foregoing shall be given by you or your authorized representatives, to us at our Home Office.

## VI. DEFENSE EXPENSES

Notwithstanding anything contained in this policy to the contrary, and irrespective of the coverage afforded by the policy (ies) of the primary and/or underlying insurers, it is agreed that all expenses we incur in the investigation, settlement of any claim or defense of any suit are included within our Limits of Insurance.

## VII. APPLICATION

By acceptance of this policy, you agree that the statements in the application are your representations and that this policy embodies all agreements existing between you and us relating to this insurance.

_Joseph Rem_

_____
Authorized Representative

# EXCESS LIABILITY COVERAGE FOLLOW FORM
# (SHORT FORM)

Read the entire policy carefully to determine rights, duties and what is and is not covered. Throughout this policy the words "you" and "your" refer to the Named Insured. The words "we", "us" and "our" refer to the Company providing this insurance. The word "insured" means any person or organization qualifying as such in the "first underlying insurance" which is the controlling policy listed in Item 5 of the Declarations, unless designated otherwise in the Declarations. Other words and phrases that appear in quotation marks have special meaning and can be found in the **DEFINITIONS** Section or the specific policy provision where they appear.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations, we agree with you to provide coverage as follows:

## INSURING AGREEMENTS

**I. COVERAGE**

We will pay on behalf of the insured the amount of "loss" covered by this insurance in excess of the "underlying limits of insurance" subject to the **LIMITS OF INSURANCE** Section. This policy will follow form to the terms, conditions, definitions, and exclusions of the "first underlying insurance" in effect the first day of the Policy Period, <u>except</u> to the extent that the terms, conditions, definitions, and exclusions of this policy differ from the "first underlying insurance." In no event shall this policy provide broader coverage than is provided by any policy in the "underlying insurance" shown in Item 5. of the Declarations, except if specifically provided otherwise by endorsement.

**II. LIMITS OF INSURANCE**

A. The Each Occurrence limit stated in Item 4. of the Declarations is the most we will pay for all "loss" arising out of any one occurrence to which this policy applies.

B. The aggregate limit shown in Item 4. of the Declarations is the most we will pay for all "loss" that is subject to an aggregate limit provided by the "first underlying insurance" and shall apply in the same manner as the aggregate limits provided by the "first underlying insurance".

C. This policy applies only in excess of the "underlying limits of insurance" and only after the "underlying limits of insurance" have been exhausted.

**III. DEFENSE**

We will follow the Defense provisions of the "first underlying insurance". In the event there are no Defense provisions contained in the "first underlying insurance", we will have the right, but not the duty to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability to our policy for "loss." If we exercise such right, we will do so at our own expense, but we will have no such expense obligation or liability once the Limits of Insurance are exhausted.

**IV. PREMIUM**

If any additional premium charge is made to the "underlying insurance" during the Policy Period or if there is an increase in the risk assumed by us, our premium may be adjusted.

**V. DEFINITIONS**

A. "Loss" means those sums actually paid in the settlement or satisfaction of a claim which you are legally obligated to pay as damages, including but not limited to "bodily injury" and "property damage", after making proper deductions for all recoveries and salvage.

B. "Underlying limits of insurance" means the sum of the limits of all applicable "underlying insurance" listed in Item 5. of the Declarations, including self-insured retentions (SIRs),

deductibles or other forms of insurance or self-insurance applicable to a given claim or occurrence.

## VI. CONDITIONS

### A. Changes

This policy can only be changed by a written endorsement signed by one of our authorized representatives that becomes a part of this policy.

### B. First Named Insured Duties

The person or organization first named in Item 1. of the Declarations is responsible for the payment of all premiums. The first Named Insured will act on behalf of all other Named Insureds for the giving and receiving of notice of cancellation or the receipt of any return premium that become payable.

### C. Maintenance of "Underlying Insurance"

During the period of this policy, you agree to keep all "underlying insurance" in full force and effect and that the "underlying limits of insurance" will be maintained, except to the extent such limits may be reduced or exhausted by payment for "loss" covered by "underlying insurance." If you fail to comply with these requirements, we will only be liable to the same extent that we would have been had you fully complied with these requirements.

### D. Notice of Occurrence

You must see to it that we are notified as soon as practicable of an occurrence which may result in a claim or suit which may involve this policy. If a claim or suit against any insured is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

If the "underlying limits of insurance" are exhausted solely by payment of "loss", no insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our written consent.

### E. Other Insurance

If other insurance applies to a "loss" that is also covered by this policy, this policy will apply excess of the other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy. Other insurance includes any type of self-insurance or other mechanism by which an insured arranges for funding of legal liabilities.

### F. Conformity to Statute

Any terms of this policy which are in conflict with the terms of any applicable law or regulation governing this policy are hereby amended to conform to such laws and regulations.

### G. When "Loss" is Payable

Coverage under this policy will not apply unless and until the insured or the insured's "underlying insurance" is obligated to pay the full amount of the "underlying limits of insurance."

When the amount of "loss" has finally been determined, we will promptly pay on behalf of the insured the amount of "loss" falling within the terms of this policy.

If the insured has rights to recover all or part of any payment we have made under this policy, then those rights are transferred to us and the insured must do nothing to impair those rights. At our request the insured will bring suit or transfer those rights to us to enforce them.



# Endurance Risk Solutions Assurance Co.
## 750 3rd Avenue
## New York, NY 10017

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Senior Vice President and countersigned where required by law on the Declarations page by its duly authorized representative.

**Senior Vice President**                    **President**

# U. S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
## NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;

- Front organizations;

- Terrorists;

- Terrorist organizations; and

- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's website – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

Endurance Risk Solutions Assurance Co.                                    PN-0001 0407