IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| DUKE UNIVERSITY<br><br>    Plaintiff,<br><br>    v.<br><br>ENDURANCE RISK SOLUTIONS<br>ASSURANCE COMPANY<br><br>    Defendant. | Case No. 5:20-cv-00672-BO |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell F. Dolin*
mdolin@cov.com
Benjamin J. Razi*
brazi@cov.com
Jad H. Khazem*
jkhazem@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

James P. Cooney, III
Jim.Cooney@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
Facsimile: (704) 331-4955
N.C. State Bar No. 12140

*By Special Appearance

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

STATEMENT OF RELEVANT FACTS ...............................................................................2

    A.    Duke's 2015 Insurance Program ....................................................................2

    B.    The *Seaman* Lawsuit....................................................................................4

    C.    Endurance Initially Agreed to Provide Coverage for *Seaman* .....................5

    D.    The *Binotti* Lawsuit ....................................................................................6

    E.    Endurance's Refusal to Pay Covered *Seaman* or *Binotti* Loss .....................8

    F.    Procedural History .......................................................................................8

LEGAL STANDARD ...........................................................................................................9

ARGUMENT ......................................................................................................................10

I.    THE $55 MILLION IN POLICY LIMITS UNDERLYING THE ENDURANCE POLICY HAVE BEEN FULLY EXHAUSTED ...................................................10

    A.    The Carriers Under Endurance's Layer Have Fully Paid Out Their Limits ....................10

    B.    Endurance Cannot Second-Guess the Underlying Carriers' Payments ..........................11

II.    *SEAMAN* AND *BINOTTI* ARE COVERED UNDER DUKE'S 2015 D&O INSURANCE PROGRAM ...........................................................................14

    A.    Duke's Loss Falls Squarely Within the Coverage Grants ..............................14

    B.    The Primary Policy's Relation-Back Clause Applies and Relates *Binotti* Back to the 2015 *Seaman* Claim ........................................................15

        1.    Endurance Follows Form to the Primary Policy's Relation-Back Clause...........15

        2.    Endurance's New Relation-Back Arguments Ignore the Policy Language.........17

    C.    Endurance's Preferred Relation-Back Clause Also Relates *Binotti* Back to the 2015 *Seaman* Claim ........................................................18

III.    THE RETROACTIVE DATE EXCLUSION IS INAPPLICABLE ON THE UNDISPUTED FACTS HERE .....................................................................21

    A.    *Seaman* and *Binotti* Result from Wrongful Acts Occurring Within 2015 .......................22

    B.    The Retroactive Date Exclusion, By Its Plain Terms and In Light of Black-Letter Interpretive Rules, Does Not Apply to *Seaman* or *Binotti* .........................................23

C.     The Interlocutory Order in *Binotti* Precluding Liability for Pre-2016 Damages Does Not Bar Coverage for *Binotti* ...............................................................................25

D.     Endurance's Course of Dealing Further Confirms the Inapplicability of the Retroactive Date Exclusion ...............................................................................26

E.     Given that the Retroactive Date Applies on an All-or-Nothing Basis, There Is No Basis for Endurance's New Fallback Allocation Argument.........................................28

CONCLUSION ............................................................................................................................30

Case 5:20-cv-00672-BO     Document 73     Filed 01/07/22     Page 3 of 37

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re "Agent Orange" Prod. Liab. Litig.*,
800 F.2d 14 (2d Cir. 1986) ...................................................................................... 21

*ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*,
2008 WL 5973220 (W.D. Tex. Aug. 25, 2008) ...................................................... 12

*Atain Spec. Ins. Co. v. Luxury Auctions Mktg., Inc.*,
2017 WL 6503647 (W.D.N.C. Dec. 19, 2017) ...................................................... 24

*AXIS Reins. Co. v. Northrop Grumman Corp.*,
975 F.3d 840 (9th Cir. 2020) ...........................................................................12, 13

*Axis Surplus Ins. Co. v. Innisfree Hotels, Inc.*,
2006 WL 2882373 (S.D. Ala. Oct. 6, 2006) ......................................................... 13

*Bell v. Brockett*,
922 F.3d 502 (4th Cir. 2019) ............................................................................... 20

*Binotti v. Duke Univ.*,
M.D.N.C. No. 1:20-cv-470 ............................................................................. *passim*

*Building Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
472 F.3d 99 (4th Cir. 2006) ................................................................................. 22

*Campbell v. First Baptist Church of City of Durham*,
298 N.C. 476 (1979) ............................................................................................ 16

*Carolina Materials, LLC v. Cont. Cas. Co./CNA Ins. Cos.*,
2009 WL 1346121 (W.D.N.C. May 12, 2009) ..................................................... 24

*CertainTeed Gypsum NC, Inc. v. Duke Energy Progress, LLC*,
2018 WL 4199077 (N.C. Super. Ct. Aug. 28, 2018) ............................................ 30

*Colony Tire Corp. v. Fed. Ins. Co.*,
217 F. Supp. 3d 860 (E.D.N.C. 2016)................................................................... 10

*Davis v. McRee*,
299 N.C. 498 (1980) .........................................................................................27, 28

*Edward E. Gillen Co. v. Ins. Co. of the State of Pa.*,
2011 WL 1694431 (E.D. Wis. May 3, 2011)......................................................... 12

*Endurance Am. Spec'y Ins. Co. v. WFP Sec. Corp.*,
2012 WL 7808097 (S.D. Cal. Sep. 28, 2012) ...................................................... 24

*Eubank v. Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014) ...........................................................................................20

*Foster v. Summit Med. Sys., Inc.*,
  610 N.W.2d 350 (Minn. App. 2000).......................................................................24, 25, 29

*Guessford v. Penn. Nat'l Mut. Cas. Ins. Co.*,
  983 F. Supp. 2d 652 (M.D.N.C. 2013)...............................................................................9

*Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*,
  90 F. Supp. 3d 526 (E.D.N.C. 2015) ...........................................................................22, 26

*Harleysville Mut. Ins. Co. v. Reliance Nat'l Ins. Co.*,
  256 F. Supp. 2d 413 (M.D.N.C. 2002)...........................................................................17

*Heater v. Heater*,
  53 N.C. App. 101 (1981)...................................................................................................27

*Indem. Ins. Co. of N. Am. v. W&T Offshore, Inc.*,
  756 F.3d 347 (5th Cir. 2014) ...........................................................................................13

*Ins. Co. of N. Am. v. Kayser-Roth Corp.*,
  770 A.2d 403 (R.I. 2001) .................................................................................................12

*Levine v. Lumbermen's Mut. Cas. Co.*,
  147 A.D.2d 423 (1st Dep't 1989).................................................................................25, 29

*McGladrey, Hendrickson & Pullen v. Syntek Fin. Corp.*,
  98 N.C. App. 151 (1990)...................................................................................................20

*Minn. Lawyers Mut., Ins. Co. v. Protostorm, LLC*,
  197 F. Supp. 3d 876, *aff'd*, 703 F. App'x 208 (4th Cir. 2017) .......................................25

*Mut. Fire Marine & Inland Ins. Co. v. Vollmer*,
  306 Md. 243 (1986).....................................................................................................25, 29

*N.C. Farm Bureau Mut. Ins. Co. v. Stox*,
  330 N.C. 697 (1992) .............................................................................................10, 21, 24

*Rouse v. Williams Realty Bldg. Co., Inc.*,
  143 N.C. App. 67 (2001)...................................................................................................18

*S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*,
  353 F.3d 367 (4th Cir. 2003) .............................................................................................9

*Safety Nat'l Cas. Corp. v. Garlock Sealing Tech. LLC*,
  2018 WL 9850040 (W.D.N.C. Aug. 20, 2018) ...............................................................16

*Seaman v. Duke Univ., et al.*,
  M.D.N.C. No. 1:15-cv-462 .......................................................................................*passim*

*St. Paul Fire & Marine Ins. Co. v. Am. Int'l Spec. Lines Ins. Co.*,
365 F.3d 263 (4th Cir. 2004) ...................................................................................22

*State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*,
343 F.3d 249 (4th Cir. 2003) .....................................................................................9

*State v. Zurich Spec. London Ltd.*,
2003 WL 1824966 (Wash. App. Apr. 7, 2003)........................................................29

*Strates Shows, Inc. v. Amusements of Am., Inc.*,
184 N.C. App. 455 (2007) ........................................................................................23

*Strickland v. State Farm Mut. Auto. Ins. Co.*,
133 N.C. App. 71 (1999)......................................................................................12, 29

*UNR Indus., Inc. v. Cont'l Ins. Co.*,
1988 WL 121574 (N.D. Ill. Nov. 9, 1988), *amended*, 1989 WL 265493 (N.D. Ill. Jan.
11, 1989)....................................................................................................................12

*Westchester Fire Ins. Co. v. Stewart & Stevenson Servs., Inc.*,
31 S.W.3d 654 (Tex. App. 2000) ..............................................................................13

**Other Authorities**

Allan D. Windt, *Insurance Claims and Disputes* § 6:45A (6th ed. 2018)...............................12

*Black's Law Dictionary* 234 (8th ed. 2004)...........................................................................23

Fed. R. Civ. P. 11(a) ...............................................................................................................20

Fed. R. Civ. P. 56(a) .................................................................................................................9

Knepper & Bailey, 2 *Liability of Corporate Officers and Directors* § 26.02.........................13

4 New Appleman on Insurance Law § 28.03 (2021) ...............................................................24

<u>**INTRODUCTION**</u>

This lawsuit arises out of Endurance's change of course and refusal to provide coverage for two related antitrust class action lawsuits filed against Duke—*Seaman v. Duke Univ., et al.*, M.D.N.C. No. 1:15-cv-462 and *Binotti v. Duke Univ.,* M.D.N.C. No. 1:20-cv-470. By this motion, Duke seeks summary judgment as to three legal issues concerning the application of Duke's insurance contracts to the underlying antitrust lawsuits, two of which were previously considered by this Court on Endurance's motion to dismiss.

*First*, Duke asks the Court to hold that it has satisfied the underlying exhaustion requirement necessary to trigger coverage under Endurance's excess policy. All four insurers underlying Endurance's coverage layer exhausted their $55 million in policy limits through coverage payments in connection with *Seaman*. Endurance has nonetheless refused to recognize these payments by asserting a right to second-guess certain costs approved and funded by the underlying carriers. Nothing in the Endurance policy or applicable case law, however, permits Endurance to collaterally attack the payment decisions of the underlying carriers.

*Second*, Duke asks the Court to hold that *Seaman* and *Binotti* are covered under the 2015 claims-made insurance program. There is no dispute that *Seaman* falls within the scope of coverage—antitrust claims like *Seaman* are expressly insured, and the *Seaman* lawsuit was filed against Duke during the 2015 policy year. And *Binotti*, though threatened in 2019 and filed in 2020, is deemed under the relevant policy language to have been made in 2015 for two independently sufficient reasons: (i) the 2015 *Seaman* suit and *Binotti* are both based on the same alleged conspiracy; and (ii) *Seaman* and *Binotti* were both alleged by the same "person or organization" inasmuch as the same class-action law firm served as plaintiffs' class counsel in both cases and predicated *Binotti* on the evidence it uncovered in *Seaman*.

*Third*, Duke asks the Court to hold that Endurance's 2015 retroactive date exclusion does not apply because both *Seaman* and *Binotti* have a clear nexus to the 2015 policy year. Relevant here, Endurance argues that its 2015 retroactive date exclusion bars coverage because the *Seaman* and *Binotti* complaints allege some pre-2015 anticompetitive acts. But the key alleged wrongful acts and the

1

discovery of the alleged no-poach conspiracy, but for which *Seaman* and *Binotti* would not have been filed, occurred in 2015, and the text of the exclusion does not bar coverage so long as any of the alleged wrongful conduct occurred in 2015. Endurance also argues that the 2015 retroactive date exclusion bars coverage in that the *Binotti* court, in an interlocutory ruling, dismissed claims seeking pre-2016 damages. Endurance's argument misapprehends the policy language, which as this Court has recognized does not purport to exclude claims based on *damages* after the policy period, but at most addresses claims that are based solely on *acts* after the policy period. In any event, Endurance's retroactive date arguments are refuted by the uncontradicted evidence of its years-long course of accepting coverage in *Seaman*, reinforcing that the exclusion cannot be read to bar coverage for Duke's claim.

Thus, Duke's partial summary judgment motion should be granted, and this case should proceed to trial only on (1) the amount of Duke's contract damages and (2) Duke's extra-contractual claims.

## STATEMENT OF RELEVANT FACTS[1]

### A. Duke's 2015 Insurance Program

To guard against serious financial loss, Duke purchased a management liability insurance program, with $80 million in limits, for the policy period of January 1, 2015 to January 1, 2016. *See* 56.1(a) ¶ 3. This insurance program is designed to provide defense and indemnity coverage for claims against Duke first made, or deemed to have been made, during the policy period. *Id*.

Duke's 2015 coverage program is written in five layers. *Id*. ¶ 4. Westchester Fire sold Duke the primary-layer policy, which provides $10 million in coverage, in excess of a $1 million self-insured retention. *Id*. ¶ 5. Three additional insurers issued excess policies that collectively provide a further $45 million in limits. *Id*. ¶ 6. Endurance sold Duke the top-layer excess policy, which covers a final $25 million above the $55 million in underlying insurance limits. *Id*. ¶ 7. The four excess policies "follow form" to the Westchester Fire primary policy, meaning they afford coverage under the same terms as the

---

[1] Pursuant to Local Rule 56.1(a), Duke encloses a Statement of Undisputed Material Facts ("56.1(a)") and accompanying Appendix of Exhibits that includes two supporting declarations, the subject insurance policies, *Seaman* and *Binotti* court papers, and key coverage correspondence.

2

primary policy unless otherwise expressly specified.  *Id.* ¶ 8.

The primary policy includes both "Employment Practices Liability" and "Insured Persons and Organization" ("D&O") coverage sections.  Appendix Exhibit ("AE") 1 at 3223-34 (Item C).[2]  There is no dispute that the *Seaman* and *Binotti* claims at issue are governed by the D&O section.  56.1(a) ¶ 10.

Under the primary policy, an insured "Loss" includes "damages, judgments, [and] settlements," as well as "reasonable and necessary legal costs."  AE 1 at 3243-44, §§ B.4, B.11.  By endorsement to the D&O section, "Anti-Trust Claim" is expressly defined and covered, albeit with a requirement that "after" the $1 million retention is satisfied, "the Insureds shall bear uninsured and at their own risk 20% of all Loss incurred in a Claim alleging or arising out of an Anti-Trust Claim," thus making the insurer liable only for "the remaining 80% of such Loss."  *Id.* at 3276-77, End. 18 §§ A.5 & A.7.

Although the primary policy generally requires that a claim be "first made ... during the Policy Period," the policy batches into a single claim all successive claims arising out of the same or interrelated wrongful acts, broadly providing that "[a]ll Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at ... the time at which the earliest Claim ... is first made."  *Id.* at 3250, § D.3.a.  The primary policy defines "Interrelated Wrongful Acts" as "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes."  *Id.* at 3244, § B.10.

The Endurance policy is a follow-form excess policy with a "Claims Made Coverage Endorsement" that applies to liability claims made against Duke and reported to Endurance during the 2015 policy period.  AE 5 at 4588.  That Endorsement's follow-form clause "subject[s]" Endurance's claims-made obligations "to the same terms, conditions, definitions, exclusions and warranties as contained in the claims made policy(ies) described in the Schedule of Underlying Insurance and/or Item

---

[2] All page references are to the non-zero terminal digits of the corresponding Bates number, unless indicated otherwise. All references to policy provisions also include the identifying item or section number for the relevant policy provisions.

III below;" Item III in turn identifies the "Westchester Fire" policy as the controlling underlying "claims made policy." *Id.*, §§ I, III.

The Endorsement further states that its follow-form rule "shall not apply" to two provisions in the Endurance policy—a "Retroactive Date" exclusion in Item II and an "Extended Reporting Period" clause in Item IV. *Id.*, §§ I, II, IV. The "Retroactive Date" clause purports to bar coverage for certain loss resulting "from a Wrongful Act that occurs before the Retroactive Date [January 1, 2015] or after the end of the policy period [January 1, 2016]." *Id.*, § II. Although there is another follow-form clause in the main body of the Endurance policy, *id.* at 4591, § I, the Endorsement containing the claims-made follow-form clause recites that it is to be "**read carefully**" because "**this endorsement changes the policy**," *id.* at 4588 (bold type in original).

### B. The *Seaman* Lawsuit

On June 9, 2015, Lieff Cabraser Heiman & Bernstein, LLP, led by antitrust litigator Dean M. Harvey, filed an antitrust class action lawsuit against Duke in the Middle District of North Carolina. 56.1(a) ¶ 33; AE 10. Dr. Danielle Seaman, a Duke faculty member in the Department of Radiology, was the named plaintiff. AE 10 ¶¶ 8-9. The complaint was brought on behalf of Dr. Seaman and all persons employed as a "faculty member, physician, nurse, or other skilled medical employee" by Duke and the University of North Carolina from 2012 through the present. *Id.* ¶ 18. Class counsel alleged that since at least 2012, Duke and UNC conspired to suppress wages by declining to compete for or "poach" each other's faculty. *Id.* ¶¶ 1-3, 67-82.

The complaint arose from alleged acts that took place in 2015. Per the complaint: In February 2015, Dr. Seaman contacted UNC's Chief of Cardiothoracic Imaging to express interest in a position. *Id.* ¶ 54. The chief replied the same month that he had "received confirmation today from the Dean's office that lateral moves of faculty between Duke and UNC are not permitted. There is reasoning for this 'guideline' which was agreed upon between the deans of UNC and Duke a few years back." *Id.* ¶ 55. Dr. Seaman then contacted a UNC Department of Radiology employee, who confirmed the existence of a no-poach arrangement. *Id.* ¶ 57. An antitrust class action suit against Duke followed on June 9, 2015. AE 10.

4

Duke and Lieff Cabraser thoroughly litigated the complex case, which included a motion to dismiss, class certification proceedings, two attempted interlocutory appeals, fact and expert discovery, summary judgment motions, and intervention by the U.S. Department of Justice. 56.1(a) ¶ 41. The parties participated in extensive mediation efforts, supervised by court-appointed mediator Jonathan Harkavy. *Id.* ¶ 44. During the litigation, experts for the *Seaman* class estimated damages ranging from $125 million to $315 million, not counting trebling or attorneys' fees. *Id.* ¶ 43.

In March 2019, Duke and Lieff Cabraser agreed to a $54.5 million settlement, subject to court approval. *Id.* ¶ 47. After preliminary approval proceedings and a fairness hearing, the *Seaman* court approved the $54.5 million settlement on September 24, 2019. *Id.* ¶ 48. The approved settlement class encompassed those employed by Duke and UNC from 2012 through 2019 "as a faculty member with an academic appointment at the Duke or UNC Schools of Medicine." *Id.* ¶ 50. The *Seaman* court awarded Lieff Cabraser and its co-counsel $18,166,666.67 in attorneys' fees and $3,320,066.35 for costs, both paid out of the $54.5 million settlement. *Id.* ¶¶ 51-52.

Duke incurred at least $15,360,258.17 in attorney's fees, costs, and expert expenses (after Duke billing cuts and write-downs) in its defense and resolution of *Seaman*. *Id.* ¶ 54.

**C.      Endurance Initially Agreed to Provide Coverage for *Seaman***

In June 2015, Duke timely reported the *Seaman* claim to its 2015 management liability insurers. *Id.* ¶ 63. Duke kept the primary insurer updated from the outset. *Id.* ¶ 42. Once the court's ruling on class certification was imminent in late 2017, Duke also began providing all five insurers (including Endurance) regular updates on the case, involving them in the case's defense and resolution, and seeking consent and funding from them prior to making settlement offers. *Id.* ¶ 45. When it first received notice in 2015, Endurance advised Duke's broker (but not Duke itself) that it was closing its file because it did not then appear that its excess layer would be reached. *Id.* ¶ 64. After class certification in early 2018, Endurance reopened its file and began communicating extensively with Duke and its counsel. *Id.* ¶ 65.

At no point while *Seaman* was pending or during the several months after it settled did Endurance contest coverage or reserve any specific defense to coverage for *Seaman* or the claimed no-poach

conspiracy, despite the fact that Endurance was fully apprised of the allegations that the claimed conspiracy had begun long before 2015 and that class members claimed damages incurred both before and after 2015. *Id.* ¶¶ 36, 45, 50, 66-68. Endurance's claims handler Robert Darish repeatedly consented to Duke settlement offers throughout the *Seaman* litigation, including the $54.5 million settlement amount. *Id.* ¶ 69. Also, in March 2019, Mr. Darish represented to Duke's Vice President and General Counsel, its Deputy General Counsel, and other Duke representatives that Endurance would pay *Seaman* defense costs that ended up reaching its coverage layer, *id.* ¶ 70, and then reaffirmed that commitment in July 2019. *Id.* ¶ 71. Because the *Seaman* settlement was not approved until the fall of 2019, whether and the extent to which such costs would reach Endurance's layer remained unclear throughout 2019, but Duke continued to update Endurance on the status of the erosion of its underlying limits. *Id.* ¶ 73.

In February 2020, Duke notified Endurance that each of the underlying carriers had paid out its limits in full, and that, as previously advised, Endurance would have to pay residual *Seaman* defense costs, which Duke for the first time was able to estimate at "somewhere in the five figures." *Id.* ¶ 74. Although Endurance has never seriously disputed that the underlying carriers each paid out its limits collectively totaling $55 million, the evidence of record confirms those amounts. *Id.* ¶¶ 55-62. In May 2020, Endurance for the first time asked for copies of all *Seaman* defense invoices and was provided electronic access to copies a week later. *Id.* ¶¶ 75-76. The amount of *Seaman* costs reaching into Endurance's layer (after Duke cuts and write-downs) is $88,206.50. *Id.* ¶ 77.

### D. The *Binotti* Lawsuit

In December 2019, a few months after final approval of the *Seaman* settlement, Mr. Harvey of Lieff Cabraser orally advised Duke that he expected to bring another action against Duke on behalf of an unidentified client. *Id.* ¶ 78. On January 3, 2020, Mr. Harvey followed up by sending Duke a draft complaint and demand letter for a second antitrust class suit regarding the same alleged no-poach scheme, this time with UNC Professor Lucia Binotti as named plaintiff. *Id.* ¶ 79.

On May 27, 2020, class counsel at Lieff Cabraser filed suit in the Middle District of North Carolina on behalf of Professor Binotti. AE 25. The *Binotti* complaint included a proposed class of "[a]ll

6

natural persons employed" as "a faculty member" by Duke and UNC from the start of the no-poach conspiracy (dated at approximately 2001) through 2018. *Id.* ¶¶ 12, 39. In contrast to the *Seaman* settlement class, the proposed *Binotti* class was not limited to medical school faculty. *Id.* ¶ 12.

The *Binotti* complaint drew heavily on evidence that the 2015 *Seaman* suit uncovered. *Id.* ¶ 4. Indeed, the *Binotti* complaint alleged that "[b]ut for discovery made public from the *Seaman* case, Plaintiff would have remained unaware that the No-Poach Understanding occurred." *Id.* ¶ 37.

Lieff Cabraser sought to extend an applicable four-year statute of limitations on the theory that Duke and UNC had fraudulently concealed the conspiracy. Duke moved for judgment on the pleadings as to the fraudulent concealment claim. 56.1(a) ¶ 85. On November 9, 2020, the *Binotti* court granted partial judgment on the pleadings and dismissed as time-barred any claims for "damages for depressed wages paid before January 3, 2016," finding that the complaint did not adequately allege fraudulent concealment. AE 26 at 4267. But the *Binotti* court otherwise allowed the class's claims to proceed and did not prohibit the class from proving post-2015 damages based on pre-2016 acts. *Id.* at 4270-71.

Against the risk of further no-poach litigation—including the possibility that Lieff Cabraser would re-litigate the fraudulent concealment issue after discovery or appeal the trial court's ruling—Duke and Lieff Cabraser agreed in principle to settle all damages claims brought on behalf of the faculties of Duke and UNC that were not discharged in *Seaman.* 56.1(a) ¶¶ 89-90. While *Binotti* involved a larger number of settlement class members than were present in *Seaman*, Duke settled their claims for $19 million, well below the $54.5 million paid in *Seaman*. *Id.* ¶¶ 48-50, 91-92.

After preliminary approval proceedings and a fairness hearing, the *Binotti* court, on August 30, 2020, approved the $19 million settlement. *Id.* ¶ 91; AE 27 at 61174, 61180. The approved settlement class mirrored the alleged university-wide faculty class alleged in the complaint, except that the settlement class was defined to exclude "faculty with an academic appointment at the School of Medicine." AE 27 at 61167. In a companion ruling also issued on August 30, the *Binotti* court approved a $4.75 million attorney fee award for class counsel and $125,201.41 in reimbursement for costs, all to be paid out of the settlement fund. AE 28 at 61181. In so ruling, the *Binotti* court underscored that "[t]he

7

*Binotti* case built upon the work performed by the same attorneys in *Seaman*[], and challenged the same conduct alleged in *Seaman*." *Id.*

### E. Endurance's Refusal to Pay Covered *Seaman* or *Binotti* Loss

On January 9, 2020, having warned Endurance the prior month about the litigation threat by Mr. Harvey, Duke provided copies of the draft *Binotti* complaint to Endurance. 56.1(a) ¶ 80. On March 3, 2020, Endurance, through its initial coverage counsel, sent Duke a letter reserving rights in regard to *Binotti*. *Id.* ¶ 102. In that letter, Endurance analyzed Duke's *Binotti* claim solely under the 2015 insurance program; it did not deny coverage or dispute that the *Binotti* claim would be deemed to relate back to *Seaman* and to have been "made" during the 2015 policy period. *Id.* ¶¶ 103-105; AE 33. Despite the fact that Endurance never mentioned its retroactive date provision in connection with *Seaman*, the March 3 letter cited that provision and argued that "no coverage would be available" under its policy if "the date of any 'wrongful act' was prior to the retroactive date." AE 30 at 60894.

On May 15, 2020, Endurance, through new counsel, refused to commit to funding for *Binotti*'s ongoing defense costs and, for the first time, suggested that even *Seaman* may not be covered. 56.1(a) ¶ 108. Then on May 21, 2020, Endurance stated that it "preliminar[ily]" believed that "no coverage for either Seaman or Binotti will be available." *Id.* ¶ 109. In light of Endurance's position, Duke was required to advance in full the $19 million *Binotti* settlement, as well as more than $500,000 in *Binotti* defense costs, and to continue to carry the *Seaman* defense cost receivable that Endurance never paid. *Id.* ¶ 111. Duke thus seeks coverage for the *Seaman* defense costs reaching into Endurance's layer, as well as coverage for 80% of the more than $19.5 million incurred by Duke in defending and resolving *Binotti*. *Id.* ¶ 101.

### F. Procedural History

On November 13, 2020, Duke filed this coverage lawsuit in state court seeking declaratory and monetary relief against Endurance. Endurance removed the case to this Court. Dkt. No. 1.

Duke's complaint asserts causes of action based on Endurance's breaches and other improper conduct. Specifically, Duke seeks: (1) a declaration that Endurance is contractually obligated to cover

8

Duke's unreimbursed *Seaman* and *Binotti* defense costs as well as the *Binotti* settlement; (2) damages for losses arising from Endurance's breach of its insurance policy; and (3) damages for Endurance's breach of its common law duty of good faith and its commission of unfair trade practices in its handling of *Seaman* and *Binotti*. Dkt. No. 1-1, Counts I-IV.

On December 16, 2020, Endurance filed a motion to dismiss, but only to the extent Duke's complaint pertained to *Binotti*. Dkt. No. 7. Endurance's motion pressed three arguments, asserting that: (1) despite their obvious interrelationship, the *Binotti* action should not be deemed to relate back to the 2015 *Seaman* suit; (2) despite the key 2015 events, the 2015 Endurance policy's retroactive date clause bars coverage for *Binotti* because certain acts allegedly occurred prior to 2015; and (3) despite the difference between acts and damages, there is no coverage because the underlying *Binotti* trial court dismissed claims for pre-2016 damages. Dkt. No. 9.

On June 8, 2021, after briefing and oral argument, this Court issued a detailed order rejecting each of these arguments and denying Endurance's motion to dismiss. Dkt. No. 34. Endurance then moved to certify the Court's order for immediate appeal, a motion this Court denied. Dkt. No. 60. On October 19, 2021, Endurance moved for reconsideration of the Court's June 8 motion to dismiss order, which has since been fully briefed. Dkt. No. 61.

## LEGAL STANDARD

"Parties may seek summary judgment on some of the claims or defenses at issue or just part of a claim or defense." *Guessford v. Penn. Nat'l Mut. Cas. Ins. Co.*, 983 F. Supp. 2d 652, 658 (M.D.N.C. 2013) (citing Fed. R. Civ. P. 56(a)). "Summary judgment is warranted when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367, 371 (4th Cir. 2003). "The non-moving party has the burden of showing that a genuine dispute exists." *Id.*

"Pursuant to North Carolina law, the interpretation of an insurance policy is a question of law that is appropriate for resolution on summary judgment." *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343 F.3d 249, 254 (4th Cir. 2003). Although the insured must in the first instance show that

there is coverage for the claimed loss, in North Carolina, clauses that "extend coverage to the insured must be construed liberally so as to afford coverage whenever possible by reasonable construction." *N.C. Farm Bureau Mut. Ins. Co. v. Stox*, 330 N.C. 697, 702 (1992). Conversely, "where an insurer seeks to rely on a provision excluding coverage, the burden is on the insurer to establish the exclusion." *Colony Tire Corp. v. Fed. Ins. Co.*, 217 F. Supp. 3d 860, 865 (E.D.N.C. 2016). Moreover, "exclusionary provisions are not favored" and are thus "strictly construed against the insurer." *Stox*, 330 N.C. at 702, 711. Finally, regardless of whether the text is in a coverage grant or an exclusion, "when ambiguity exists the policy shall be construed in favor of coverage and against the insurer who selected its language." *Id.* at 707.

## ARGUMENT

Duke's motion for partial summary judgment as to three discrete policy interpretation issues should be granted. *First*, Endurance's excess policy is plainly triggered inasmuch as there is no dispute that the carriers below Endurance's layer have paid out their $55 million in policy limits, and Endurance has no right under its contract or at law to question the payment decisions of those underlying carriers. *Second*, Duke's *Seaman* and *Binotti* loss is covered under the Endurance policy given that antitrust claims are expressly insured, *Seaman* was filed in 2015, and *Binotti* relates back to and is deemed to have been made during the 2015 policy year. *Third*, Endurance's 2015 retroactive date exclusion does not bar coverage for a loss, like Duke's, with an incontrovertible nexus to the 2015 policy year.

## I. THE $55 MILLION IN POLICY LIMITS UNDERLYING THE ENDURANCE POLICY HAVE BEEN FULLY EXHAUSTED

Because the $55 million in policy limits below Endurance's excess layer have been paid in full by the underlying insurers, Duke asks the Court to hold that Endurance's excess layer has attached.

### A. The Carriers Under Endurance's Layer Have Fully Paid Out Their Limits

Endurance's $25 million coverage layer "appl[ies] in excess of the 'underlying limits of insurance,'" AE 5 at 4569, Item 4—*i.e.*, limits that Endurance agrees total $55 million, *see* 56.1(a) ¶ 22. And the record is clear: Duke's *Seaman* loss and corresponding insurer coverage payments exhausted in full the $55 million in policy limits underlying Endurance's layer.

Duke's covered *Seaman* loss exceeds $55 million. It is undisputed that the *Seaman* settlement

10

totaled $54.5 million, of which 80% ($43.6 million) was subject to insurer funding. *Id.* ¶¶ 16, 48. Duke's incurred *Seaman* defense costs (after Duke cuts and write-downs) totaled $15,360,258.17. *Id.* ¶ 54. After subtracting the $1 million policy retention from the defense cost total, and the 20% antitrust co-payment requirement that applies only "[a]fter satisfaction of the applicable retention," *id.* ¶ 16, the insurers were responsible for 80% of the $14,360,258.17 million balance, which nets to $11,488,206.54. And $43,600,000 plus $11,488,206.54 totals $55,088,206.54. In other words, Duke tendered to the underlying carriers costs that were more than enough to deplete the $55 million in underlying limits and exceed Endurance's corresponding attachment point, even after application of the $1 million retention and 20% Duke co-pay for costs in excess of the retention.

And, dispositive for purposes of exhaustion, all four insurers underlying Endurance's $55 million layer have paid out their policy limits in full toward *Seaman*. The evidence of payment is uncontroverted. *See id.* ¶¶ 55-62. The first three insurers in Duke's coverage tower finished paying out their combined total of $30 million in limits in 2019 following the *Seaman* settlement. *Id.* ¶ 56-57.[3] And the fourth, Great American, has likewise paid out its $25 million in limits, as the un-contradicted testimonial and documentary evidence concerning Great American confirms. *See id.* ¶¶ 57, 60-62; Lott Decl. ¶¶ 17-18; AE 21 at 59:22-60:16; AE 35 (February 2020 Great American-Duke settlement agreement).

### B. Endurance Cannot Second-Guess the Underlying Carriers' Payments

Despite the absence of any dispute that the underlying carriers paid $55 million, Endurance has argued that those payments should not be credited because not all of the costs they paid were (in Endurance's hindsight-based view) necessarily covered by the Endurance policy. This "improper erosion" theory lacks any basis in the policy text and has been roundly rejected by courts.

The "weight of authority clearly" holds that an "excess insurer" in Endurance's position "may not second-guess the coverage determinations of the underlying insurers," absent "a showing of fraud or bad

---

[3] Notably, Duke's contribution of approximately $15 million toward the *Seaman* settlement and defense (as a result of its co-pay and retention obligations) was larger than the $10 million share paid by each of the first three underlying insurers.

11

faith, or the specific reservation of such a right in its contract with the insured." *AXIS Reins. Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 845–47 (9th Cir. 2020) (quotations marks and ellipses omitted).[4]

And there is good reason for this widely accepted rule. *First*, courts will not retroactively "insert" a limitation on coverage—such as a right to deny coverage based on "improper" underlying exhaustion—that the excess insurer failed to include in its insurance policy. *Id.* at 847; *see also Strickland v. State Farm Mut. Auto. Ins. Co.*, 133 N.C. App. 71, 75 (1999) (declining to "rewrite defendant's contract for insurance" so as to add exclusionary language the insurer omitted). *Second*, an excess insurer is not a party to the contract between the insured and an underlying carrier, *see* Windt, § 6:45A, so there is no basis for an excess insurer to collaterally attack payments made by an underlying insurer pursuant to that insurer's own distinct contract. *See Gillen*, 2011 WL 1694431, at *4 (each insurer in a multi-layer program "contracts with the insured individually to cover a particular portion of the risk," and so "an excess liability insurer cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance") (cite omitted). *Third*, there is no sound policy reason to infer a right for an excess insurer to second-guess underlying payments, because rare is the case "where an [underlying] insurance company will pay out claims—let alone its policy's limit—when it is not obligated to do so." *AXIS*, 975 F.3d at 846–47. And even if an underlying insurer may sometimes elect to pay out without an absolutely clear-cut obligation, an "excess insurer could request higher premiums to account for this contingency, or it could insert specific policy language reserving its right to contest 'improper erosion.'" *Id.*

With these principles in mind, Endurance has no basis to second-guess the $55 million in payments by the underlying carriers. Endurance does not and cannot suggest that the four different underlying insurers all paid out their limits fraudulently or in bad faith. And the Endurance "policy

---

[4] *Id.* at 846 n.6 (citing Allan D. Windt, *Insurance Claims and Disputes* § 6:45A (6th ed. 2018); *Edward E. Gillen Co. v. Ins. Co. of the State of Pa.*, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011); *ARM Props. Mgmt. Grp. v. RSUI Indem. Co.*, 2008 WL 5973220, at *5–7 (W.D. Tex. Aug. 25, 2008); *Ins. Co. of N. Am. v. Kayser-Roth Corp.*, 770 A.2d 403, 416-17 (R.I. 2001); *UNR Indus., Inc. v. Cont'l Ins. Co.*, 1988 WL 121574, at *16–17 (N.D. Ill. Nov. 9, 1988), *amended*, 1989 WL 265493 (N.D. Ill. Jan. 11, 1989)).

contains no language expressly providing [it] with the right to challenge the propriety of the underlying insurers' payments decisions." *Id.* at 848. Thus, even if Endurance genuinely believed, for example, that some of Duke's *Seaman* defense fees were higher than necessary or that the underlying carriers "could have avoided paying" some of them, Endurance "did not bargain" for the right to contest the payments of those carriers. Windt, § 6:45A.[5]

And while the Endurance policy states that it "applies only in excess of the 'underlying limits of insurance,'" AE 5 at 4569, nothing in the policy suggests that those underlying limits can be exhausted only by payments that Endurance says in hindsight are covered under *its own excess policy*. *See Indem. Ins. Co. of N. Am. v. W&T Offshore, Inc.*, 756 F.3d 347, 353 (5th Cir. 2014) (finding exhaustion even though umbrella policy did not cover underlying loss, because nothing in the umbrella policy conditioned erosion on "sums [being] covered by the Umbrella Policy"). By contrast, some excess policies do contain such a caveat, but Endurance's policy does not.[6] On the contrary, while Endurance itself agrees to "pay ... 'loss' covered by this policy" (*i.e.*, its own policy), AE 5 at 4591, § I, Endurance's policy expressly recognizes that the underlying insurers pay on their own policy terms, stating that underlying limits shall be "reduced or exhausted by *payment of 'loss' covered by 'underlying insurance.'*" *Id.* at 4592, § VI.C. (emphasis added); *accord id.* at 4592, § VI.G. (loss payable by Endurance once "the insured's 'underlying insurance' is obligated to pay the full amount" of underlying limits). Thus, Endurance is clearly precluded from invoking exclusions or limitations specific to its own policy to collaterally attack the

---

[5] Endurance not only declined to confer upon itself the contractual right to collaterally attack underlying carrier payments, it also failed during the multi-year pendency of *Seaman* to advise Duke that it believed it had any right to re-review reimbursed defense costs being paid by underlying insurers. 56.1(c) ¶ 68. In fact, when Endurance committed in March 2019 and again in July 2019 to reimburse *Seaman* defense fees above $55 million, it did not suggest that it had any right to second-guess co-carrier payments. *Id.* ¶ 69.

[6] *Cf., e.g.,* Knepper & Bailey, 2 *Liability of Corporate Officers and Directors* § 26.02 (noting that some excess policies expressly permit "ero[sion] only by 'loss covered *hereunder*,'" *i.e.*, by the subject excess policy); *Axis Surplus Ins. Co. v. Innisfree Hotels, Inc.*, 2006 WL 2882373, at *9 n.22 (S.D. Ala. Oct. 6, 2006) ("the Axis Excess Policy further states that amounts paid by underlying insurance for losses that would not have been payable under the Axis Excess Policy do not count towards the $10 million [attachment point]"); *Westchester Fire Ins. Co. v. Stewart & Stevenson Servs., Inc.*, 31 S.W.3d 654, 658 (Tex. App. 2000) (excess insurer's exhaustion clause stating that if the aggregate limit of the underlying policies was exhausted "by reason of payment of losses not covered by this [excess] policy," the excess insurer would apply its policy as if "such aggregate limit [had] not been reduced or exhausted.").

decisions of the underlying carriers to pay out under the terms of their own lower-layer policies.

Because Endurance cannot second-guess the underlying insurers' collective payments of $55 million toward *Seaman* costs, this Court should hold that the underlying limits have been exhausted and that Endurance's excess coverage layer is therefore triggered.

**II.** *SEAMAN* **AND** *BINOTTI* **ARE COVERED UNDER DUKE'S 2015 D&O INSURANCE PROGRAM**

The $55 million in underlying limits having been exhausted, Duke's claim for *Seaman* and *Binotti* loss falls squarely within the coverage provided in Endurance's layer of the 2015 D&O insurance program. The *Seaman* and *Binotti* antitrust lawsuits are of the type expressly insured under that program, and the *Seaman* claim was made against Duke and reported to its insurers during the 2015 policy year. Likewise, *Binotti*—which is premised on the same alleged conspiracy at issue in *Seaman*—relates back to *Seaman* and is deemed to have been made in 2015 pursuant to both (i) a relation-back clause in the primary Westchester Fire policy to which Endurance follows form and (ii) a separate relation-back clause set forth in an endorsement to the Endurance policy.

**A.** **Duke's Loss Falls Squarely Within the Coverage Grants**

The 2015 primary policy to which Endurance follows form insures against "the Loss of [Duke] which [Duke] becomes legally obligated to pay by reason of a Claim first made against [Duke] during the Policy Period" of January 1, 2015 to January 1, 2016. AE 1 at 3242, § A.3. Covered claims under the D&O section of the policy expressly include "Anti-Trust Claim[s]" subject to a 20% co-pay requirement once the $1 million self-insured retention has been satisfied. *Id.* at 3276-77, End. 18 §§ A.5 & A.7.

A straightforward application of the coverage terms compels a finding of coverage under the 2015 tower for both *Seaman* and *Binotti*. The *Seaman* and *Binotti* complaints, which allege restraints of trade, Sherman Act violations, and antitrust injury, *see* AE 10 ¶¶ 67-82; AE 11 ¶¶ 69-88; AE 25 ¶¶ 38-53, each qualifies as an "Anti-Trust Claim." And *Seaman*, which was filed against Duke and reported to Duke's carriers in June 2015, is agreed by all to be a claim made during the 2015 policy year. 56.1(a) ¶ 63.

Likewise, for two independently dispositive reasons detailed below, *Binotti* is deemed "made"

14

during the 2015 policy period. *First*, for reasons already addressed by this Court in its motion to dismiss ruling, the primary policy, to which Endurance follows form, includes a relation-back clause that dictates that claims based on the same or interrelated acts—which *Seaman* and *Binotti* indisputably are—"shall constitute a single Claim" and "shall be deemed" to relate back to the date of the earliest such claim (here, the 2015 *Seaman* suit). AE 1 at 3250, § D.3.a. *Second*, the Endurance policy includes a separate relation-back clause that relates "[a]ll Claims" made by "any" common "person or organization" for the same "Wrongful Act" back to the date of the earliest claim. AE 5 at 4588, § III. Because *Seaman* and *Binotti* were both brought by the same class counsel and law firm, and were both based on the same alleged no-poach conspiracy, this latter provision provides an alternative or supplemental basis for relating *Binotti* back to the 2015 *Seaman* filing.

**B.     The Primary Policy's Relation-Back Clause Applies and Relates *Binotti* Back to the 2015 *Seaman* Claim**

Pursuant to the operative policy language—as this Court held when it construed the same language at the pleadings stage—"the date of the *Binotti* claim relates back to the 2015 *Seaman* complaint." Dkt. No. 34 at 4. Neither the discovery record nor Endurance's evolving litigation positions since the motion to dismiss ruling can alter this outcome.

**1.     Endurance Follows Form to the Primary Policy's Relation-Back Clause**

The primary policy's relation-back clause dictates that "[a]ll Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at…the time at which the earliest Claim…is first made." AE 1 at 3250, § D.3.a. Endurance admits that *Binotti* alleges "the same or interrelated Wrongful Acts as, and shares a common nucleus of operative facts with, the prior reported *Seaman* Claim." Dkt. No. 9 at 6. Thus, there is no question that *Binotti* relates back to the 2015 *Seaman* suit under the primary policy's relation-back clause.

Unable to dispute that *Binotti* is a covered claim under the terms of the primary policy's relation-back clause, Endurance argues that its policy does not follow form to that clause. Dkt. No. 9 at 12. Yet this Court already rejected that textual argument at the pleadings stage. Dkt. No. 34 at 4-5.

15

After all, through its "Claims Made Coverage Endorsement," Endurance expressly and broadly agreed to follow form to the primary policy:

> "It is agreed that the insurance afforded by this policy is subject to the same terms, conditions, definitions, exclusions and warranties as contained in the claims made policy(ies) described in the Schedule of Underlying Insurance and/or Item III below.
>
> The foregoing shall not apply to:
>
> 1. The Retroactive Date of the underlying claims made policy(ies).
>
> 2. The Extended Reporting Period of the underlying claims made policy(ies)."

AE 5 at 4588, § I. Relevant here, "Item III" of the Endorsement expressly identifies the primary policy issued by Westchester Fire as the policy to which Endurance follows form. *Id.*, at § III.

The above follow-form clause incorporates all the "same terms" contained in the primary policy, with only two exceptions—*i.e.*, Retroactive Date (found in Item II of the Endorsement) and Extended Reporting (found in Item IV of the Endorsement). Neither of these two express exceptions pertains to relation-back. And having failed to require a third exception for relation-back, Endurance cannot now ask the Court to infer such an exception into its Endorsement in an effort to avoid coverage. *See Campbell v. First Baptist Church of City of Durham*, 298 N.C. 476, 482 (1979) ("the mention of specific exceptions implies the exclusion of others" not mentioned).

Because "neither of [the two express exceptions] control whether the *Binotti* claim relates back," as this Court's motion to dismiss ruling makes clear, the "Primary Policy provisions apply" and relate *Binotti* "back to the 2015 *Seaman* complaint." Dkt. No. 34 at 4. Critically, reading the Endurance policy in harmony with the primary policy's relation-back rule serves to advance "the purpose of follow-form policies, which [is to] allow policy holders with multiple insurers of the same risk to 'obtain uniform coverage.'" *Id.* at 5 (quoting *Safety Nat'l Cas. Corp. v. Garlock Sealing Tech. LLC*, 2018 WL 9850040, at *3 (W.D.N.C. Aug. 20, 2018)).

Yet Endurance resisted this commonsense reading in its December 2020 motion to dismiss, and argued that the follow-form analysis should be controlled by a follow-form clause found in the main body of its policy instead of the one in its Claims Made Coverage Endorsement. Dkt. No. 9 at 12. This other

16

follow-form clause, said Endurance, does *not* sweep in the primary policy's relation-back provision insofar as that provision "conflicts with" an ostensibly more restrictive relation-back provision set forth in the Endorsement. *Id.* But as noted in this Court's motion to dismiss ruling, Endurance's reliance on this other, general follow-form clause is misplaced. Dkt. 34 at 4-5. Endurance's Claims Made Coverage Endorsement begins by stating explicitly that it "**changes the policy**," AE 5 at 4588, and in fact does just that by, among other things, prescribing a broad follow-form clause (quoted above) that governs claims-made lawsuits like *Binotti*. *See Harleysville Mut. Ins. Co. v. Reliance Nat'l Ins. Co.*, 256 F. Supp. 2d 413, 419 (M.D.N.C. 2002) ("In the event of conflict with policy language, the language of an endorsement generally prevails."). Thus, the Endorsement's follow-form clause applies here and, as noted above, adopts the primary policy relation-back clause that relates *Binotti* back to the 2015 *Seaman* suit.[7]

### 2. Endurance's New Relation-Back Arguments Ignore the Policy Language

After failing to gain traction with its original position that the follow-form clause in the main body of its excess policy alone controls, Dkt. No. 9 at 11, Endurance has changed its tune in more recent filings. Specifically, Endurance now argues that if the claims-made follow-form clause in Item I of the Endorsement does apply, then that provision—through its "reference[ to] Item III"—sweeps in the relation-back clause set forth in the final sentence of Item III and preempts the relation-back clause of the primary policy. Dkt. Nos. 36 at 5-6 (motion for certification) & 62 at 7-8 (motion for reconsideration). For at least three reasons, Endurance's new argument is foreclosed by the policy text.

*First*, Endurance misreads Item I's follow-form clause. That clause does not purport to incorporate "the same terms" as contained in the entirety of "Item III," but rather incorporates "the same terms" as contained in "the *claims made policy(ies) described* in" Item III—and the only claims made policy described in Item III is the "Westchester Fire" policy. AE 5 at 4588, §§ I, III (emphasis added). Read in its entirety, the claims-made follow-form clause confirms that Endurance incorporates "the same"

---

[7] None of this should come as any surprise to Endurance, given that Endurance's March 3, 2020 reservation of rights letter expressly invoked and quoted the Endorsement's follow-form clause and analyzed coverage for *Binotti* solely under the 2015 coverage program. *See* AE at 60892-95.

relation-back clause used by Westchester Fire—just the opposite of what Endurance now argues.

*Second*, even if the claims-made follow-form clause in the Endorsement did incorporate Item III's relation-back passage, there is still nothing in either provision to suggest that Item III's relation-back clause was meant to *override* the primary policy's relation-back clause. Had Endurance intended that result, it would have said so expressly—just as it did in Item I when it made clear that the Endurance policy took exception to and did not follow form to the Retroactive Date and Extended Reporting clauses of "the underlying claims made policy(ies)." AE 5 at 4588, § I. Given Endurance's omission of any similar preemption language on the subject of relation-back, the Item III relation-back clause is best read to co-exist with, rather than displace, the primary policy relation-back clause. Harmonizing the two clauses in this manner is especially sensible, given that the two relation-back clauses do not contravene or clash with one another, but rather both aim to achieve the same goal of deeming subsequent claims to have been made on the date of the first-filed related claim.

*Finally*, although Duke respectfully submits that the policy text plainly supports its position, to the extent there is any ambiguity as to whether the primary policy's relation-back clause is to be given effect, any such ambiguity would have to be construed in favor of coverage. *Rouse v. Williams Realty Bldg. Co., Inc.*, 143 N.C. App. 67, 73-74 (2001).

### C. Endurance's Preferred Relation-Back Clause Also Relates *Binotti* Back to the 2015 *Seaman* Claim

Although the Court need not reach this issue, even assuming that Endurance's preferred relation-back clause applied and preempted the primary policy's relation-back clause, Endurance *still* could not escape responsibility for covering *Binotti*. The relation-back clause preferred by Endurance states that "[a]ll Claims for Damages resulting from a Wrongful Act which are alleged" by "any" common "person or organization" for "Loss resulting at any time from a Wrongful Act ... will be deemed to have been made" at the time of the earliest claim (here, the 2015 *Seaman* suit). AE 5 at 4588, § III. Although Endurance concedes that *Seaman* and *Binotti* both alleged the same "no-poach" wrongful act, Endurance has argued that this clause does not relate *Binotti* back to *Seaman* since the wrongful act was not "alleged

18

by the same person or organization" in both cases. Dkt. No. 9 at 11. In fact, it was: Both *Seaman* and *Binotti* were alleged and prosecuted by the same class counsel.

It is undisputed that both *Seaman* and *Binotti* were filed by the same person (Mr. Harvey) and the same organization (Lieff Cabraser), along with common co-counsel. 56.1(a) ¶¶ 33, 81; Dkt. No. 9 at 5. And class counsel had the chief role in managing and prosecuting these suits on behalf of both classes, which challenged the same alleged conspiracy. As the *Binotti* court observed in its order approving class counsel attorneys' fees, "[t]he *Binotti* case built upon the work performed by the same attorneys in *Seaman*[], and challenged the same conduct alleged in *Seaman*." AE 28 at 61181. The *Binotti* court, in a companion ruling appointing Lieff Cabraser as class counsel, went on to explain that counsel had (i) "successfully negotiated a settlement … in *Seaman*[], an action arising out of the same alleged no-poach agreement [as in *Binotti*];" (ii) "[t]hrough discovery in [*Seaman*]," obtained evidence central to *Binotti* suggesting that "the alleged agreement stretched beyond the medical schools;" and (iii) as in *Seaman*, "devoted ample resources to litigating [*Binotti*] and to negotiating the Settlement." AE 27 at 61172-61173. As class counsel aptly put it, once *Seaman* had concluded, "[n]o other plaintiff, and no other counsel, stepped forward to take on the challenge of pursuing damages claims for the remaining faculty." AE 29 at 19839. Given the lead (if not indispensable) role Dean Harvey and Lieff Cabraser played in litigating both cases, it would blink reality to contend that the no-poach wrongful acts alleged in *Seaman* and *Binotti* were not alleged by the "same person or organization."

The financial rewards flowing to class counsel further underscore common class counsel's central role. In *Seaman*, the court found that class counsel had "worked over 12,500 hours," and awarded class counsel approximately $21.5 million in fees and costs. AE 13 at 61237, 61245. That $21.5 million amount represented nearly 40% of the $54.5 million *Seaman* settlement, whereas the average class member received no more than $10,000, or .018% of the total settlement. *Id.* at 61242. Similarly, in *Binotti*, class counsel invested substantial time and expense and was awarded approximately $4.87 million in fees and costs. AE 28 at 61181. That award collectively represented nearly 26% of the $19 million *Binotti* settlement, whereas the average class member received $2,341.19, or .012% of the total

19

settlement. *Id*. at 61185. Given that class counsel was awarded fees orders of magnitude greater than the average class member's settlement share, it would, again, strain credulity to assert that *Seaman* and *Binotti* are not "Claims for Damages ... alleged by the same person or organization."

Notwithstanding the common and pivotal role of Dean Harvey and Lieff Cabraser in both cases, Endurance has argued that *Binotti* cannot relate back to *Seaman* because the cases ostensibly involved different "Plaintiffs" or "Claimants." Dkt. No. 9 at 10–11. But nothing in the subject clause requires a commonality of "plaintiffs" or "claimants." Rather, all it requires is a commonality of "*any* person or organization" alleging the two sets of claims. *See McGladrey, Hendrickson & Pullen v. Syntek Fin. Corp.*, 98 N.C. App. 151, 152 (1990) ("The word 'any' is ... [f]requently used in the sense of 'all' or 'every,' and when thus used it has a very comprehensive meaning.") (citation, ellipses, and brackets omitted). Common counsel that makes and signs class-wide allegations, acts in the overall interest of the class, and obtains a significant share of the claimed damages readily satisfies that expansive criteria. As drafter of the contract, Endurance could have tried to sell a policy saying "plaintiff" rather than "person or organization," but Endurance did not do so.

Endurance has also suggested that only plaintiffs make "allegations," whereas their attorneys do not. Dkt. No. 21 at 6 of 12. This purported distinction misses the mark because represented parties necessarily make their allegations by and through counsel. *See* Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name—or by a party personally if the party is unrepresented."). This is especially the case in the class action context, where class counsel are overseen by the court and carry out the most prominent role in driving the litigation and protecting class members' rights. Indeed, the Federal Rules of Civil Procedure "require[] a 'court that certifies a class' to 'appoint class counsel'" that will "fairly and adequately represent the interests of the class." *Bell v. Brockett*, 922 F.3d 502, 510–11 (4th Cir. 2019) (citations omitted). And it is well-recognized that "often 'only the attorneys who have represented the class, rather than any of the class members themselves, have substantial familiarity with [class] proceedings, the fruits of discovery, [and] the actual potential of the litigation.'" *Eubank v. Pella Corp.*, 753 F.3d 718, 722 (7th

20

Cir. 2014) (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 800 F.2d 14, 18-19 (2d Cir. 1986)).

Endurance has warned that if Duke's "same person or organization" position were accepted, "absurd" results would follow, in that "several entirely distinct claims" would be deemed related solely because "they were brought by the same law firm." Dkt. No. 21 at 6 of 12. This argument ignores key language in Endurance's own clause. The relation-back clause invoked by Endurance, by its own terms, applies only where the same "Wrongful Act" is alleged in both cases, meaning that a slip-and-fall claim and an unrelated antitrust lawsuit filed by the same attorney cannot be batched together. Here, of course, there can be no doubt that, in addition to involving common counsel, the same antitrust conspiracy has been alleged in both *Seaman* and *Binotti*. Given the identity of the conspiracies alleged in the two cases, Endurance's "absurd" label would more aptly apply to its own contention that *Seaman* and *Binotti*—two inextricably related claims that allege the same wrongful act—should not be deemed related.

Although relation-back is plainly required given the foregoing, at best for Endurance, the relevant clause is ambiguous as to whether "any person or organization" encompasses common class counsel— and in North Carolina ambiguity is resolved "in favor of coverage and against the insurer." *Stox*, 330 N.C. at 707. For this additional reason, *Binotti* relates back to *Seaman*.[8]

*   *   *   *

In short, regardless of whether the primary policy's batching clause applies, or Endurance's preferred relation-back clause applies, *Binotti* relates back to *Seaman* and the 2015 policy year.

## III.   THE RETROACTIVE DATE EXCLUSION IS INAPPLICABLE ON THE UNDISPUTED FACTS HERE

Endurance has separately argued that any coverage for *Seaman* and *Binotti* is vitiated by a retroactive date provision that purports to bar coverage for "any Loss resulting from a Wrongful Act which occurs before the Retroactive Date [January 1, 2015] or after the end of the policy period [January 1, 2016]." AE 5 at 4588, § II. While Endurance has raised various (and shifting) theories for application

---

[8] The foregoing arguments provide ample (and indeed independently dispositive) grounds to sustain relation-back as a matter of law. Duke nonetheless reserves the right to raise any and all additional arguments and facts in support of relation-back in opposition to any Endurance motion on this issue.

of the retroactive date exclusion, the provision's plain text and Endurance's prior course of dealing both confirm that the exclusion does not apply. Indeed, the Court already rejected Endurance's retroactive date argument in denying Endurance's motion to dismiss. And nothing has changed since then to preclude judgment as a matter of law in favor of Duke on this issue.

### A. *Seaman* and *Binotti* Result from Wrongful Acts Occurring Within 2015

The *Seaman* and *Binotti* litigation arise from alleged wrongs and events that occurred in 2015— namely, the refusal to hire Dr. Seaman, the purported anticompetitive basis for that refusal, and the resulting litigation filed that year. Although Endurance prefers to focus on the origins of the alleged no-poach agreement, the *Seaman* lawsuit would not have happened without the putative antitrust conspiracy being alive in 2015 and allegedly harming Dr. Seaman's employment prospects that same year.

The *Seaman* complaint details at length events that transpired against Dr. Seaman in 2015 that prompted her, through counsel, to file suit against Duke in June of that year.[9] As the *Seaman* complaint alleges, in February 2015, Dr. Seaman expressed interest in a position at UNC, but was rebuffed that same month by UNC's Chief of Cardiothoracic Imaging on the basis of a purported no-poach "guideline" —a guideline that was confirmed to her again shortly thereafter by a UNC Radiology employee. AE 10 ¶¶ 54-59; AE 11 ¶¶ 56-60. Dr. Seaman and her counsel then filed suit against Duke and UNC on June 9, 2015, challenging the alleged no-poach scheme. Thus, Duke's defense and settlement loss, as regards *Seaman*, directly results from a 2015 suit premised on alleged wrongful acts occurring in 2015 as part of a purported antitrust scheme initially discovered by the named plaintiff in 2015 and allegedly harming her in 2015.

*Binotti*—which Endurance admits alleges "the same or interrelated Wrongful Acts as, and shares

---

[9] Without admitting its allegations, Duke refers to the *Seaman* complaint because "where the underlying litigation settles prior to reaching trial, as here, '[a] judicial assessment of post-settlement coverage disputes generally turns on the types of the underlying claims that have been settled.'" *Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*, 90 F. Supp. 3d 526, 539-40 (E.D.N.C. 2015) (quoting *Building Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 120 n.29 (4th Cir. 2006) (N.C. law)); *accord St. Paul Fire & Marine Ins. Co. v. Am. Int'l Spec. Lines Ins. Co.*, 365 F.3d 263, 273 (4th Cir. 2004) (Va. law) (directing courts to "only look to the [underlying] plaintiff's lawsuit as it stood at the time of settlement," with a focus on the claims he "asserted, as represented in his final amended complaint").

a common nucleus of operative facts with, the prior reported *Seaman* Claim," Dkt. No. 9 at 6—also arises from 2015 conduct. The *Binotti* complaint says exactly that: "But for discovery made public from the [2015] *Seaman* case, Plaintiff would have remained unaware that the No-Poach Understanding occurred." AE 25 ¶ 37. The *Binotti* court has similarly stated that *Binotti* "challenged the same conduct alleged in *Seaman*" and "built upon the work performed" in the 2015 *Seaman* suit, *see* AE 28 at 61181, including "[t]hrough discovery" in *Seaman* as to the extent of the alleged no-poach agreement, *see* AE 27 at 61172. Thus, the 2015 acts against Dr. Seaman and the 2015 *Seaman* litigation are the cause of *Binotti*, *i.e.*, the cause "without which [the claim] would not have occurred." *Strates Shows, Inc. v. Amusements of Am., Inc.*, 184 N.C. App. 455, 463 (2007) (quoting *Black's Law Dictionary* 234 (8th ed. 2004)).

In short, because Duke's *Seaman* and *Binotti* loss results from 2015 conduct, the retroactive date provision's bar on coverage for "loss resulting from a Wrongful Act which occurs" outside the 2015 policy period has no application here.

### B. The Retroactive Date Exclusion, By Its Plain Terms and In Light of Black-Letter Interpretive Rules, Does Not Apply to *Seaman* or *Binotti*

Even if Duke's *Seaman* and *Binotti* loss can be said to have resulted from a multi-year alleged conspiracy that occurred in part before and in part after the 2015 retroactive date, there is still no merit to Endurance's assertion that there is then "no coverage available for the *Binotti* Claim" or "for the *Seaman* Claim." Dkt. No. 9 at 13. Endurance's interpretation stretches the exclusionary language beyond its terms, conflicts with basic rules of insurance interpretation, and ignores pertinent case law.

*First*, as this Court observed in its June 8 ruling, "the Retroactive Date exclusion by its plain terms does not exclude coverage for a loss which occurred in part by acts occurring prior to 2015 and in part by acts which occurred during the policy period." Dkt. No. 34 at 6. Thus, Endurance's exclusion is most naturally read as barring only claims where all alleged misconduct falls outside 2015. In that regard, the exclusion merely says that coverage "does not apply to any Loss resulting from a Wrongful Act which occurs before the Retroactive Date," AE 5 at 4588, § II, and says nothing about also excluding loss that results from acts that straddle the retroactive date. Had Endurance intended its exclusion to address the

latter scenario, it could and should have used language to that effect in its exclusion. *Cf.* 4 New Appleman on Insurance Law § 28.03 (2021) ("Some policies expressly provide that a continuous course of conduct beginning before the retroactive date and continuing after that date will fall outside of the policy's coverage."). And yet, that is not the exclusion that Endurance wrote here.

*Second*, at a minimum, Endurance's exclusion is ambiguous as to whether it bars coverage from loss resulting from alleged misconduct that falls on both sides of the retroactive date. Any such ambiguity, as this Court has explained, "will be construed against the insurer and in favor of the insured." Dkt. No. 34 at 6. After all, it is well-settled that "when ambiguity exists the policy shall be construed in favor of coverage and against the insurer who selected its language." *Stox*, 412 S.E.2d at 325. This is especially true for "exclusionary provisions[, which] are strictly construed against the insurer," *id.* at 326, and given effect only "where the words of exclusion are clear, precise, and fit the circumstances presented," *Atain Spec. Ins. Co. v. Luxury Auctions Mktg., Inc.*, 2017 WL 6503647, at *4 (W.D.N.C. Dec. 19, 2017).[10] And since Endurance's retroactive date exclusion does not by its terms target the circumstance of a continuous, multi-year alleged conspiracy straddling the retroactive date, the exclusion cannot relieve Endurance of its coverage obligations here.

*Third*, instructive retroactive date case law from other jurisdictions confirms Duke's position. The Minnesota appellate decision in *Foster*, oft cited by Endurance (*see* Dkt. Nos. 9, 36, 62), enforced a broad retroactive date exclusion that barred coverage for any claim that "aris[es] out of, directly or indirectly result[s] from" or "in any way involv[es]" "any" pre-date act, including where any post-date act is "interrelated to" a pre-date act. *Foster v. Summit Med. Sys., Inc.*, 610 N.W.2d 350, 353 (Minn. App. 2000). Whereas the *Foster* clause epitomizes a retroactive date clause drafted broadly to exclude coverage for acts straddling the retroactive date, the clause used in Endurance's policy contains none of

---

[10] As a restriction on the scope of available coverage, the retroactive date clause here must be treated as an exclusion. *See Carolina Materials, LLC v. Cont. Cas. Co./CNA Ins. Cos.*, 2009 WL 1346121, at *3 (W.D.N.C. May 12, 2009) ("By definition, an exclusion limits the extent of the coverage set forth in an insurance policy."); *see also Endurance Am. Spec'y Ins. Co. v. WFP Sec. Corp.*, 2012 WL 7808097, at *10–11 (S.D. Cal. Sep. 28, 2012) (describing retroactive date clause in an Endurance policy as an exclusion).

24

this sweeping exclusionary language (*i.e.*, "indirectly," "in any way involves," post-date acts "interrelated to" pre-date acts) and is silent on what to do where some acts precede and some acts follow the retroactive date. Addressing language like Endurance's that is "silent" on what happens when alleged misconduct occurs "both before and after the retroactive date," Maryland's high court in *Vollmer* held that there is ambiguity, and thus ruled "in favor of coverage." *Mut. Fire Marine & Inland Ins. Co. v. Vollmer*, 306 Md. 243, 251 (1986).[11] Most recently, the Eastern District of Virginia in *Protostorm* cited both *Foster* and *Vollmer* and made clear that the different outcomes in the two cases are explained by the different policy language. *Minn. Lawyers Mut., Ins. Co. v. Protostorm, LLC*, 197 F. Supp. 3d 876, 885 n.12 (E.D. Va. 2016), *aff'd*, 703 F. App'x 208 (4th Cir. 2017). This difference dooms Endurance's no-coverage position, as Endurance's retroactive date clause lacks the broad exclusionary language addressed in *Foster* and is more akin to the limited exclusionary language used in *Vollmer*.[12]

### C. The Interlocutory Order in *Binotti* Precluding Liability for Pre-2016 Damages Does Not Bar Coverage for *Binotti*

After the *Binotti* trial court's November 9, 2020 order limited class recovery to damages incurred after January 3, 2016, Endurance posited in its 12(b)(6) motion that "all that remains at issue in the *Binotti* Claim" are "damages for post-policy period injuries" that are barred by the retroactive date clause. Dkt. No. 9 at 15. Endurance's arguments based on the November 9 order disregard the policy text, misconstrue the interlocutory order, and ignore the subsequent *Binotti* settlement that rendered that order moot.

As this Court's motion to dismiss ruling recognized, Endurance's interlocutory order excuse ignores the text of the retroactive date exclusion. Whereas the *Binotti* court's statute of limitations ruling limited recovery to claims for post-2015 *damages*, "the express language of the policy bars coverage for losses resulting from *acts* which occur outside the coverage period"—and "damages and wrongful acts

---

[11] *Accord Levine v. Lumbermen's Mut. Cas. Co.*, 147 A.D.2d 423, 425 (1st Dep't 1989) (ordering insurer to pay its full share of a malpractice settlement, despite "continuous nature of the [insured's] malpractice," because "nothing in the language of the [subject] policy mandate[d]" that the malpractice "take[s] place in its entirety during the effective date of the policy").

[12] To the extent Endurance has cited other out-of-state retroactive date cases in its prior filings, those cases (as Duke has previously explained) either have readily distinguishable policy language or facts, or actually resulted in rulings in favor of the *policyholder*. *See* Dkt. No. 16 at 23-24 of 30.

25

are not the same thing."  Dkt. No. 34 at 7.

In that regard, and as this Court rightly observed, "the *Binotti* court recognized that damages after January 3, 2016, may be the result of acts that took place during 2015." *Id.*  Indeed, the *Binotti* court's November 9 ruling expressly left open the possibility that "each payment of depressed wages restarts the statute of limitations" for the conspiracy, even where it could be argued that "the depressed wages are a result of past acts" (such as a prior year's decision not to hire or promote).  AE 26 at 4269.  That Duke could be liable for post-2015 damages resulting from 2015 acts even after the *Binotti* court's statute of limitations ruling alone disposes of Endurance's argument.

In any event, the *Binotti* court's interlocutory ruling at the pleadings stage is no longer relevant, because the parties in *Binotti* ultimately settled on a comprehensive basis that gave Duke (and Endurance) the benefit of a sweeping release by the class and did not limit recovery to those who allegedly incurred damages only after 2015.  Specifically, with certain class claims still pending, and the looming risk that the *Binotti* court's statute of limitations ruling could (by the Middle District's own telling) be revised through "reconsideration of the decision or an appeal," AE 27 at 61176, the parties agreed to a mediated and court-approved settlement that extinguished the entire *Binotti* class's claims—including the provisionally dismissed pre-2016 damages claims, *id.* at 61167.  Thus, even if the date of damages were the operative data point for Endurance's retroactive date exclusion (which it is not), the *Binotti* court's statute of limitations ruling still would not bar coverage, because that same court later approved a settlement that discharged 2015 damages claims.  *See Harleysville*, 90 F. Supp. 3d at 539–40 ("a judicial assessment of post-settlement coverage disputes generally turns on the types of the underlying claims that have been settled").

### D.     Endurance's Course of Dealing Further Confirms the Inapplicability of the Retroactive Date Exclusion

As detailed above, the text of the retroactive date exclusion and black-letter rules of insurance policy construction suffice to dispose of Endurance's retroactive date arguments.  Even so, Endurance's course of dealing with regard to the retroactive date exclusion during the claims handling process supplies

26

yet another ground for holding that the exclusion is inapplicable. This is so because discovery has confirmed that the key course-of-dealing facts as originally pled by Duke are not subject to dispute.

As this Court has explained, in North Carolina, courts "may consider [a party's] course of conduct in construing the terms of the contract." Dkt. No. 34 at 6. Thus, when "the parties have placed a particular interpretation on their contract after executing it, the courts ordinarily will not ignore that construction which the parties themselves have given it prior to the differences between them." *Davis v. McRee*, 299 N.C. 498, 502 (1980). Rather, the parties' initial construction is given "important," and even "controlling" weight in a court's analysis of a contract. *Heater v. Heater*, 53 N.C. App. 101, 104 (1981).

Here, it is undisputed that during the period of 2015 through 2019 (*i.e.*, the duration of *Seaman*), Endurance never once suggested that the retroactive date exclusion barred coverage in whole or in part for the alleged *Seaman* no-poach conspiracy. *See* AE 8 at 116:24-117:5 (Endurance claims handler admitting that he never advised Duke "there might not be coverage for the Seaman claim because of the retro date"). This silence is particularly telling because during *Seaman*, Duke faced nine-figure plaintiff damage estimates that would have completely depleted Endurance's layer. 56.1(a) ¶ 43. Moreover, the basis for Endurance's current reliance on the exclusion was present in *Seaman*, which from the start alleged a purported no-poach conspiracy that began before 2015 and which settled on a basis that allowed pre-2015 and post-2015 damages. *Id.* ¶¶ 36, 50. Endurance's admitted failure to contemporaneously invoke the retroactive date exclusion to the alleged multi-year *Seaman* conspiracy underscores the inapplicability of that exclusion to *Seaman* and the overlapping conspiracy alleged in *Binotti*.

Nor was Endurance's acquiescence to coverage merely passive. On the contrary, during the *Seaman* litigation, Endurance affirmatively consented to multiple Duke's settlement offers, including the final $54.5 million settlement. *Id.* ¶ 69. Endurance's claims handler also committed to Duke in March 2019 to fund any *Seaman* defense costs that ultimately reached into Endurance's layer and then reaffirmed that commitment in writing in July 2019. *Id.* ¶¶ 70-71. At that time, it was not clear how large that amount might be, as it was only several months later (in February 2020) that Duke was able to estimate that the amount reaching into Endurance's layer was only in the five figures. *Id.* ¶ 74. While

27

Endurance now pretends that it was merely making an *ex gratia* accommodation by agreeing in 2019 to make a five-figure payment, the undisputed facts are that (i) Endurance never once said or implied that its commitment was *ex gratia* and (ii) Endurance did not learn that the amount to be paid was only in the five-figure range until nearly a year after first making its open-ended commitment. *Id.* ¶¶ 70-74.

Endurance suddenly changed its tune starting in March 2020, when the *Binotti* action had surfaced (placing its $25 million limit at risk), and Endurance then saw fit to deny coverage for the *Seaman* and *Binotti* conspiracy based on the retroactive date exclusion. This Court should reject Endurance's self-serving about-face. Endurance for years declined to rely on the retroactive date exclusion as to what Endurance long knew to be a multi-year alleged no-poach conspiracy, instead acquiescing to coverage and promising Duke that it would reimburse costs arising from that alleged conspiracy. Thus Endurance cannot now plausibly contend that the exclusion unambiguously bars coverage for that conspiracy. Rather, the Court should give effect to the parties' prior course of dealing and hold that the retroactive date exclusion does not extend to the subject no-poach conspiracy. *See Davis*, 299 N.C. at 501-03 (affirming "the trial court's ruling as a matter of law" that the contract had the meaning that was reflected by "the conduct of the parties" prior to the litigation dispute).

### E. Given that the Retroactive Date Applies on an All-or-Nothing Basis, There Is No Basis for Endurance's New Fallback Allocation Argument

As detailed below, both parties have long handled and litigated the retroactive date exclusion as an all-or-nothing proposition for coverage. Yet after failing to convince the Court in its motion to dismiss and motion for certification that the exclusion barred coverage *in toto*, in October 2021, Endurance argued for the first time in a motion for reconsideration that the Court should at least allocate pro rata "between covered and uncovered loss"—by treating the *Seaman* and *Binotti* class periods as covered for the 2015 calendar year but "uncovered" for all other years. Dkt. No. 62 at 13. Endurance's belated allocation theory is belied by the policy language, pertinent case law, and Endurance's prior course of dealing.

Nothing in the text of the retroactive date exclusion hints at Endurance's proposed allocation scheme, whereby an otherwise covered loss is divvied up into covered portions (*i.e.*, payments made with

28

respect to 2015 acts or injuries) and non-covered portions (*i.e.*, payments made for non-2015 acts or injuries). On the contrary, as this Court previously recognized without qualification, "the Retroactive Date exclusion by its plain terms does not exclude coverage for a loss which occurred in part by acts occurring prior to 2015 and in part by acts which occurred during the policy period." Dkt. No. 34 at 6. And if the exclusion does not apply to the subject loss at all, there is no "uncovered" loss to exclude via a purported "allocation" scheme.

If Endurance "had wanted to provide for pro rata allocation for losses that straddle the retroactive date, [it] could have done so explicitly in the policy." *State v. Zurich Spec. London Ltd.*, 2003 WL 1824966, at *5 (Wash. App. Apr. 7, 2003). Yet Endurance did not do so in drafting its own retroactive date exclusion. And having failed to plainly exclude coverage, in whole or in part, for a loss resulting from acts that straddle the retroactive date, Endurance—after collecting Duke's premiums—cannot now ask this Court to "rewrite defendant's contract for insurance" so as to add in the exclusionary language that Endurance left out. *Strickland*, 133 N.C.App. at 75.

Indeed, the case law cited by both parties that involves alleged acts straddling the retroactive date confirms that such clauses apply on an all-or-nothing basis. Those cases either approve coverage in full, *see Vollmer*, 306 Md. at 251; *Levine*, 147 A.D.2d at 425; *Zurich*, 2003 WL 1824966, at *5-6, or—based on broader exclusionary text that Endurance failed to use here—entirely reject coverage, *see Foster*, 610 N.W.2d at 353-54. Thus, Endurance's new allocation theory is refuted by the relevant body of authority relied upon by both sides.

Finally, Endurance's course of dealing on the issue of retroactive date "allocation" further rules out any eleventh-hour allocation theory. Again, Endurance never suggested the possibility of retroactive date exclusion (much less allocation) during the pendency of Seaman between 2015 and 2019. And when the issue of allocation came up in passing during the *Binotti* claims process in May 2020, Endurance dismissed the notion of "allocation of loss between pre retro date (uncovered) and post retro date (covered) loss" as tantamount to a "redraft [of] the policy." 56.1(a) ¶ 110. Then after this coverage suit was filed, the parties in 2020 and most of 2021 litigated the retroactive date exclusion as an all-or-nothing

proposition—either the exclusion applies and bars coverage *in toto*, or it does not apply at all and thus does not limit coverage in whole or in part.[13] Indeed, Endurance never mentioned the terms "allocation" or "allocate" in its 57 pages of motion to dismiss and certification briefing or in its 40-page Answer, much less in the 35-page transcript of oral argument on the motion to dismiss. Dkt. Nos. 9, 21, 36, 37, 38, 40. It was only in a late 2021 motion for reconsideration—a year and a half after Endurance had mocked any allocation as a "redraft" of the policy—that Endurance backtracked and floated the possibility of allocation. Dkt. No. 62 at 13.

Endurance's recent change-of-heart on allocation must be rejected. "The conduct of the parties in dealing with the contract indicating the manner in which they themselves construe it is controlling;" the shifting positions of a single party after it loses a motion to dismiss are not. *CertainTeed Gypsum NC, Inc. v. Duke Energy Progress, LLC*, 2018 WL 4199077, at \*4 (N.C. Super. Ct. Aug. 28, 2018) (citation and ellipses omitted).

*     *     *     *

Thus, whether based on the policy language, the law governing interpretation of that language, or its prior course of dealing, Endurance's various retroactive date arguments (including its new allocation theory) all fall flat.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, Duke respectfully requests that this Court grant Duke's motion for partial summary judgment.

---

[13] *See, e.g.*, Dkt. No. 9 at 13 (motion to dismiss) (Endurance arguing that under its retroactive date exclusion, "there is no coverage available for the *Binotti* Claim" and that "[c]overage for the *Seaman* Claim in its entirety is also precluded on this basis"); Dkt. No. 36 at 14-15 (motion to certify) (Endurance arguing that "there is simply no coverage available for the *Binotti* Claim" in light of the retroactive date exclusion, and citing to case law that relied on such exclusions "to exclude claims in their entirety"); *see also* Dkt. No. 16 at 21-22 of 30 (response to motion to dismiss) (Duke rejecting Endurance's argument "that the exclusion bars coverage *in toto* for losses involving acts that straddle the retroactive date").

30

Respectfully submitted,

/s/ James P. Cooney, III

_____

Mitchell F. Dolin*  
mdolin@cov.com  
Benjamin J. Razi*  
brazi@cov.com  
Jad H. Khazem*  
jkhazem@cov.com  
COVINGTON & BURLING LLP  
One CityCenter  
850 Tenth Street, NW  
Washington, D.C. 20001  
Telephone: (202) 662-6000  
Facsimile: (202) 662-6291  

*By Special Appearance*

Dated: January 7, 2022

James P. Cooney, III  
Jim.Cooney@wbd-us.com  
WOMBLE BOND DICKINSON (US) LLP  
One Wells Fargo Center, Suite 3500  
301 South College Street  
Charlotte, North Carolina 28202  
Telephone: (704) 331-4900  
Facsimile: (704) 331-4955  
N.C. State Bar No. 12140  

*Attorneys for Plaintiff Duke University*

31