IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

DUKE UNIVERSITY

    Plaintiff,

    v.

ENDURANCE RISK SOLUTIONS
ASSURANCE COMPANY

    Defendant.

Case No. 5:20-cv-00672-BO

**PLAINTIFF'S RESPONSE TO DEFENDANT'S SEPARATE STATEMENT OF UNDISPUTED
MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Mitchell F. Dolin*
mdolin@cov.com
Benjamin J. Razi*
brazi@cov.com
Jad H. Khazem*
jkhazem@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*By Special Appearance

James P. Cooney, III
Jim.Cooney@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
Facsimile: (704) 331-4955
N.C. State Bar No. 12140

*Attorneys for Plaintiff Duke University*

Pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure and Rule 56.1(a) of the Local Rules of this Court, Plaintiff Duke University hereby submits this Response to Defendant's Rule 56.1 Separate Statement of Undisputed Material Facts, followed by a Statement of Additional Material Facts.

## RESPONSES TO DEFENDANT'S STATEMENT OF FACTS

1.     The 2015 Excess Policy provides claims-made coverage for claims first made during the Policy Period of January 1, 2015 to January 1, 2016, subject to (among other things): (a) limits of liability of $25 million excess of $55 million in underlying limits and a $1 million self-insured retention; and, (b) a 20% coinsurance obligation with respect to antitrust claims.  Darish Declaration, Ex. A, pages 7-32 [the "2015 Excess Policy"]; Ex. B, pages 33-93 [the "ACE Primary Policy"].

**Duke's Response**:  Generally undisputed so long as it is understood that (a) the coverage applies to claims first made or "deemed to have been made" during the policy period and (b) the 20% co-insurance obligation and the insurers' corresponding 80% obligation applies only to amounts that exceed the self-insured retention.

2.     The Seaman Action ("Seaman") was a Claim first made in 2015 by Ms. Seaman on behalf of a class of Duke and UNC medical faculty alleging salary suppression as a result of the No-Poach Understanding commencing in 1974 and allegedly reaffirmed and strengthened in 2012 after Duke poached UNC's bone marrow surgeons (the "No-Poach Agreement").  Darish Declaration, Ex. C, pages 94-120 [Seaman Second Amended Complaint]; Ex. D, pages 121-145 [Seaman Court Order Granting Class Certification].

**Duke's Response**:  Generally undisputed so long as it is understood that (a) the proposed class originally alleged in *Seaman* was comprised of "all natural persons employed" by Duke or Duke University Health System as a "faculty member, physician, nurse, or other skilled medical employee,"  Appendix Exhibit ("AE") 10 ¶ 18; AE 11 ¶ 20,[1] (b) neither citation supports the statement that the alleged No-Poach Agreement commenced in 1974, (c) Endurance is characterizing allegations made by Dr. Seaman and class counsel, allegations which Duke has denied.

3.     Duke settled Seaman by payment of a $54.5 million settlement sum allocated pro rata (in proportion to each plaintiff's respective share of total compensation paid to all class members during

---

[1] All references to "AE" refer to the exhibits Duke filed with the Court in connection with its Motion for Partial Summary Judgment.  *See* Dkt. Nos 75-1 through 75-37.

the class period) between medical faculty employed from January 1, 2012 to June 4, 2019.  Darish Declaration, Ex. E, page 147 [Seaman Settlement Plan of Allocation].

> **Duke's Response**:  Undisputed that Duke and its insurers agreed to settle *Seaman* and paid a lump sum of $54.5 million in settlement and that the final settlement documentation approved by the court included a plan of allocation to class members.  Disputed insofar as Endurance's statement does not account for attorney's fees, legal expenses, and other costs that were paid out of the $54.5 million settlement amount prior to distribution to participating class members.  Darish Declaration, Ex. E, at 153 and 166.  Disputed insofar as the *Seaman* Settlement Plan of Allocation was created and administered by class counsel, *see* Second Declaration of Christopher Lott (AE D) ¶ 5, and only applies to class members that did not opt-out of participating in the *Seaman* settlement, not all plaintiffs, *see* Darish Declaration, Ex. E, at 153, 166. Undisputed that the *Seaman* Settlement Plan of Allocation describes how payment will be distributed to participating class members, but the relevant allocation formula appears on pages 153 and 166 of the *Seaman* Settlement Plan of Allocation, not on page 147.  *See* Darish Declaration, Ex. E, at 153, 166.

4.      Duke irrevocably admits to having incurred in connection with the Seaman Action a total of $15,360,258.17 in defense fees and costs.  Darish Declaration, Ex. F, pages 189-190 [Expert Report of Keith Smith].

> **Duke's Response**:  Disputed as to the term "irrevocably admits" insofar as Duke's expert, Keith Smith, "reserve[d] the right to amend this report in the event that additional facts or materials become available."  Darish Declaration, Ex. F, at 190.  Undisputed insofar as the total defense fees and costs that Duke incurred in connection with the *Seaman* action, after the application of Duke's cuts and write-downs, has been calculated as $15,360,258.17.

5.      The total Loss from Seaman, irrespective of any coverage issues, is $69,860,258.17, of which only 80% (or $55,888,206.54) is potentially covered once the 20% coinsurance obligation is applied; then, since the first $1 million must be paid by Duke in satisfaction of the Self-Insured Retention, only $54,888,206.54 is payable against the $55 million limits of liability of underlying insurance, leaving $111,793.46 of underlying insurance remaining.  *Id*.; arithmetic.

**Duke's Response**: Disputed. As written in the controlling ACE Primary Policy (also referred to as the primary policy), "[t]he liability of the Insurer shall apply only to that part of Loss which is excess of the Retention amounts" and "[s]uch Retentions shall be borne uninsured by the Insureds and at their own risk." AE 1, at 3249. Thus, under the policy, the $1 million retention must be applied first and at Duke's own risk *before* the application of any co-insurance. Further, the applicable co-insurance clause in the ACE Primary Policy confirms the sequence in which the retention is applied, providing that the 80/20 split applies only "*[a]fter* satisfaction of the applicable retention." *Id*. at 3277 (emphasis added). Thus, the correct formula here is: ($69,860,258.17 *minus* $1,000,000) *times* 80%, which yields $55,088,206.54, or that portion of the *Seaman* loss for which Duke's insurers are liable. That amount exceeds Endurance's undisputed $55 million attachment point by $88,206.54. Dkt. No. 75-2, Declaration of Christopher A. Lott ("Lott Decl.") ¶ 19; Darish Declaration ¶ 2.

6. The 2015 Excess Policy provides claims-made coverage for claims first made during the Policy Period of January 1, 2015 to January 1, 2016. Darish Declaration, Ex. A, pages 7, 26-28 [the "2015 Excess Policy"]; Ex. B, pages 33-93 [the "ACE Primary Policy"].

**Duke's Response**: Undisputed, except that the 2015 Excess Policy also provides coverage for claims "deemed to have been made" during the 2015 policy period. AE 1, at 3250, § D.3.a; AE 5, at 4588, Item I; *id*. at 4588, Item III.

7. The 2015 Excess Policy is subject to (among other things) a special interrelated claims provision contained in the Claims-Made Endorsement and applicable only to Endurance's policy, which provides that multiple claims are related and deemed a single claim first made when the first is made only if both claims involve the same Wrongful Act "alleged by the same person or organization." Darish Declaration, Ex. A, pages 26-28 [the "2015 Excess Policy"]; Ex. B, pages 33-93 [the "ACE Primary Policy"].

**Duke's Response**: Disputed as to the unexplained word "special" and insofar as the statement suggests that the 2015 Excess Policy is not subject to an interrelated claims provision set forth in the ACE Primary Policy, to which Endurance (per its Claims-Made Endorsement) entirely follows form, with two exceptions not relevant here. AE 1, at 3250, § D.3.a; AE 5, at 4588, Item

4

I. Generally undisputed insofar as the last sentence of Item III of the Claims-Made Endorsement includes an interrelated claims provision that relates back claims based on a commonality of Wrongful Acts and alleging persons or organizations. AE 5, at 4588, Item III.

8. The Binotti Action was first filed in 2020. Darish Declaration, Ex. G, pages 369-386 [Binotti Complaint]; Ex. H, pages 387-400 [Binotti Order Approving Settlement and Settlement Class]; Ex. I, pages 401-406 [Binotti Settlement Plan of Allocation].

**Duke's Response**: Undisputed. Immaterial insofar as Duke is entitled to coverage irrespective of when the Binotti Action was first filed because the Binotti Action relates back to the 2015 Seaman Action under the interrelated claims provision in the ACE Primary Policy and under the interrelated claims provision in the 2015 Excess Policy.

9. While Ms. Binotti filed the Binotti Action on behalf of a class of Duke and UNC employees alleging salary suppression as a result of the same No-Poach Agreement alleged in Seaman, that class was later narrowed by the Court to include only nonmedical faculty. Darish Declaration, Ex. G, pages 369-386 [Binotti Complaint]; Ex. H, pages 387-400 [Binotti Order Approving Settlement and Settlement Class]; Ex. I, pages 401-406 [Binotti Settlement Plan of Allocation].

**Duke's Response**: Disputed insofar as Dr. Binotti filed the Binotti Action by and through her counsel. AE 10 at 4680; AE 11 at 17733.

10. The Binotti class never included because it could not include any of the Seaman plaintiff class members, as they had already released their claims in the Seaman settlement. Darish Declaration, Ex. E, pages 146-172 [Seaman Settlement Plan of Allocation].

**Duke's Response**: Disputed as unintelligible given that there appears to be a word or words missing after the word "included" or because certain included words were not intended to be included. Further disputed insofar as the proposed class in the *Binotti* complaint included "all natural persons employed by Duke University or the University of North Carolina, Chapel Hill, from the start of the No-Poach Understanding (to be determined from further discovery) through February 5, 2018, as a faculty member" with no carve-out for *Seaman* class members that participated in and released their claims in connection with the *Seaman* settlement. AE 25 ¶ 25.

5

11.     The Binotti Claim was not alleged by the same person or organization as the Seaman Claim and therefore does not relate back to 2015 under the terms of the Interrelated Claim Provision in the 2015 Excess Policy's Claims-Made Endorsement.  Facts 9 and 10, above.

**Duke's Response**:  Disputed.  The *Binotti* Claim was alleged by the same person (Dean Harvey, Esq.) and the same organization (Lieff Cabraser Heimann & Bernstein, LLP, along with common co-counsel) as the *Seaman* Claim.  *See* AE 10 at 4680; AE 11 at 17733; AE 25 at 4545.  Disputed insofar as *Seaman* and *Binotti* were both alleged by constituent parts of the same "organizations," namely, the Duke and UNC faculty bodies.

12.     The 2015 Excess Policy provides claims-made coverage for claims first made during the Policy Period of January 1, 2015 to January 1, 2016, subject to (among other things) a January 1, 2015 Retroactive Date (which provides that this "insurance does not apply to any Loss resulting from a Wrongful Act which occurs before the Retroactive Date or after the end of the policy").

**Duke's Response**:  Disputed insofar as the 2015 Excess Policy also provides claims-made coverage for claims "deemed to have been made" during the 2015 policy period.  Undisputed insofar as the above is what the 2015 Excess Policy says.

13.     The Seaman Action ("Seaman") was filed in 2015 by Ms. Seaman on behalf of a class of Duke and UNC medical faculty alleging salary suppression as a result of the No-Poach Understanding commencing at least as early as 1974 and allegedly reaffirmed and strengthened in 2012 after Duke poached UNC's bone marrow surgeons (the "No-Poach Agreement").  Darish Declaration, Ex. C, pages 94-120 [Seaman Second Amended Complaint]; Ex. D, pages 121-145 [Seaman Court Order Granting Class Certification]

**Duke's Response**: See response to No. 2 above.

14.     The Binotti Action was filed by Ms. Binotti on behalf of a class of Duke and UNC employees (later narrowed by the Court to include only nonmedical faculty) alleging salary suppression as a result of the same No-Poach Agreement.  Darish Declaration, Ex. G, pages 369-386 [Binotti Complaint]; Ex. H, pages 387-  400 [Binotti Order Approving Settlement and Settlement Class]; Ex. I, pages 401-406 [Binotti Settlement Plan of Allocation]; Ex. J, pages 407- 411 [Binotti Order on Motion for Judgment on the Pleadings].

**Duke's Response**:  See response to No. 9 above.

15.     The pre-Retroactive Date No-Poach Agreement was the common cause of all alleged Seaman and Binotti Loss and was the basis for the Court findings of commonality when approving the Seaman and Binotti settlement plaintiff classes.  Darish Declaration, Ex. C, pages 94-120 [Seaman Second Amended Complaint]; Ex. D, pages 121-145 [Seaman Court Order Granting Class Certification];

Ex. G, pages 369-386 [Binotti Complaint]; Ex. H, pages 387-400 [Binotti Order Approving Settlement and Settlement Class]; Ex. I, pages 401-406 [Binotti Settlement Plan of Allocation].

**Duke's Response**:   Disputed insofar as the relevant, causative wrongful acts under the alleged No-Poach Agreement, but for but for which *Seaman* and *Binotti* would not have been filed, occurred in 2015 and thus did not pre-date the retroactive date (*i.e.*, January 1, 2015). Specifically, the alleged wrongful acts carried out against Dr. Seaman occurred in 2015, and her discovery of an alleged no-poach conspiracy and ensuing lawsuit occurred in 2015.  AE 10 ¶¶ 54-59; AE 11 ¶¶ 56-61; AE 25 ¶ 37.  *Binotti*, in turn, built on discovery regarding the alleged no-poach conspiracy that was discovered in the 2015 *Seaman* Action.  AE 25 ¶ 37.  Otherwise undisputed insofar as the same No-Poach Agreement was commonly alleged and challenged in the *Seaman* and *Binotti* Actions.

16.     The ACE Primary Policy to which the 2015 Excess Policy follows form in pertinent part contains an allocation provision which (as amended by endorsement) provides: "If an Insured who is afforded coverage for a Claim includes both Loss that is covered under this Policy and loss that is not covered under this Policy, because the Claim includes both covered allegations and allegations that are not covered, the Insureds and the Insurer shall allocate such amount between covered Loss and loss that is not covered based upon the relative legal and financial exposures and the relative benefits obtained by the parties. The Insurer shall not be liable under this Policy for the portion of such amount allocated to non-covered Loss." Darish Declaration, Ex. B, page 52 [the "ACE Primary Policy"].

**Duke's Response**:  Disputed insofar as the 2015 Excess Policy does not follow form to the ACE Primary Policy for retroactive date purposes and thus would not follow form to the quoted allocation provision for purposes of any attempt by Endurance argue for an allocation based on the retroactive date exclusion in the 2015 Excess Policy.  AE 5, at 4588, Item I.  Undisputed insofar as the above is what one paragraph of the allocation provision added by endorsement to the ACE Primary Policy says, but the relevant text appears on page 77 of the ACE Primary Policy, not page 52.  Darish Declaration, Ex. B, at 77.

17.     Of the 2,711-day Seaman settlement class period (January 1, 2012 to June 4, 2019), only 365 days (or approximately 13.46%) fall within the allowable period for potentially-covered Wrongful Acts (January 1, 2015 to January 1, 2016).  Darish Declaration, Ex. E, page 147 [Seaman Settlement Plan of Allocation]; arithmetic.

**Duke's Response**: Disputed and misleading insofar as this statement is intended to assert or suggest that (i) Duke's loss from *Seaman* and *Binotti* is not predicated on 2015 acts—*viz.* the alleged wrongful acts carried out against Dr. Seaman in 2015 and the ensuing discovery of the alleged no-poach conspiracy and consequent litigation; (ii) the retroactive date exclusion authorizes a partial exclusion and allocation of loss to Duke; (iii) loss arising from a unitary, continuing alleged no-poach conspiracy can be rationally divided by year; (iv) a settlement plan of allocation can bear on the allocation of loss for coverage purposes; (v) the *Seaman* Settlement Plan of Allocation apportioned loss pro rata based on the applicable year, and not (as is in fact the case) pro rata based on each individual class member's total compensation across the respective class periods, Darish Declaration, Ex. E at 166, which would generally be higher in later years than in earlier years; (vi) a plan of allocation which is calculated based on the period of time a class member was compensated can have any bearing on the application of a retroactive date exclusion that depends on the date of wrongful acts, AE 5, at 4588, Item II; and (vii) any loss arising from *Seaman* is allocable so as to reduce coverage to Duke given the fact that the underlying insurers have already funded $55 million toward the *Seaman* settlement and defense fees on an un-allocated basis.

18.     Applying this percentage (13.46%) to the $54.5 million settlement yields a potentially-covered total of $7,335,700.00, and applying the 20% coinsurance to that remainder leaves an arguably payable sum of $5,868,560.00. Applying the same percentage (13.46%) to the $15,360,258.17 in defense fees and costs Duke claims to have incurred yields a potentially-covered total of $2,067,490.75, and applying the 20% coinsurance to that remainder leaves an arguably payable sum of $1,653,992.60. Thus, the total sum of arguably-payable Loss in Seaman is $7,522,552.60, the first $1 million of which must be borne uninsured by Duke in satisfaction of its self-insured retention. *Id.*; arithmetic.

**Duke's Response**: Disputed for the reasons set forth in response to No. 17 above. Further disputed insofar as Endurance erroneously first applies the 20% co-insurance against the entire allegedly insured loss and then subtracts the $1 million retention, rather than subtract the retention prior to application of the co-insurance. See response to No. 5 above.

19.     Of the 5,971-day *Binotti* settlement class period (October 1, 2001 to February 5, 2018), only 365 days (or approximately 6.11%) fall within the allowable period for potentially-covered Wrongful Acts (January 1, 2015 to January 1, 2016). That 2015 period is the only period for which coverage is available since all payments made during periods before January 1, 2015 or after January 1, 2016 would (according to this hypothesis) be pre-Retroactive Date or post-Policy Period Wrongful Acts and thus excluded from coverage. Darish Declaration, Ex. I, page 401 [Binotti Settlement Plan of Allocation]; arithmetic.

**Duke's Response**: Disputed for the reasons set forth in response to No. 17 above.

20.     Applying this percentage (6.11%) to the $19 million settlement yields a potentially-covered total of $1,160,900.00, and applying the 20% coinsurance to that remainder leaves an arguably payable sum of $928,720.00. Applying the same percentage (6.11%) to the $509,962.54 in defense fees and costs Duke claims to have incurred yields a potentially-covered total of $31,158.71, and applying the 20% coinsurance to that remainder leaves an arguably payable sum of $24,926.97. Thus, the total sum of arguably-payable Loss in Binotti is $953,646.96. Subtracting this from the $47,477,447.40 in unexhausted limits remaining after Seaman under the same theory would still leave another $46,523,800.44 of the underlying limits that would need to be exhausted before Endurance could be triggered. *Id.*; arithmetic.

**Duke's Response**: Disputed for the reasons set forth in response to No. 17 above. Further disputed insofar as Endurance erroneously first applies the 20% co-insurance against the entire allegedly insured loss and then subtracts the $1 million retention, rather than subtract the retention prior to application of the co-insurance. See response to No. 5 above.

21.     The Court, in granting in part Duke's Motion for Judgment on the Pleadings, ruled that all claims for injuries suffered prior to January 3, 2016 are barred by the applicable statute of limitations (a ruling neither appealed nor vacated by the Court in the order approving the Binotti settlement). Darish Declaration, Ex. J, page 411 [Order on Motion for Judgment on the Pleadings in Binotti].

**Duke's Response**: Disputed insofar as the *Binotti* court's ruling on Duke's Motion for Judgment on the Pleadings was a non-final, interlocutory ruling and thus remained, until the entry of a final judgment by the *Binotti* court, subject to reconsideration by the Court or challenge on appeal, as the *Binotti* court itself acknowledged. *See* AE 27, at 61176 ("Dr. Binotti could have sought reconsideration of the decision or an appeal, but there is no guarantee Dr. Binotti would have prevailed."). Disputed insofar as the statement incorrectly suggests that the *Binotti* court was asked to vacate or to reconsider its ruling on Duke's Motion for Judgment on the Pleadings in connection with the *Binotti* settlement (preliminarily or otherwise). Immaterial insofar as the

9

statute of limitations ruling only addressed the date of claimed damages, not the date of wrongful acts (which is what the retroactive date exclusion speaks to). *See* AE 26, at 4271 (granting motion "to the extent the plaintiff seeks damages for injuries before January 3, 2016") . Further immaterial insofar as the *Binotti* case settled on a basis that included 2015 damages claims. AE 27, at 61169-61170.

22.     Thus, the total sum of Loss potentially covered in Seaman and Binotti, after allocation based upon the retroactive date, and application of the 20% coinsurance obligation does not exceed the $1 million self-insured retention and $55 million in underlying limits. *Id*.; arithmetic.

**Duke's Response**:   Disputed.  *See* response to Nos. 2 and 17-20 above.  *See also* Lott Decl. ¶¶ 11-19.

23.     Duke cannot any demonstrate any breach of contract given the absence of any coverage under the 2015 Excess Policy for Seaman and Binotti. *Id*.; Duke Complaint, passim.

**Duke's Response**:  Disputed.  This statement calls for a legal conclusion, not material assertions of fact or proper expert opinion.  This statement is also false for the reasons set forth in Duke's Brief in Opposition to Defendant's Motion for Summary Judgment and this Court's previous ruling of June 8, 2021. Dkt. No. 34.

24.     Under the allocation provision added by Endorsement to the ACE Primary Policy, in the event of any disagreement as to coverage, Endurance may simply advance whatever amount (if any) it believes to be owed under the policy until a different amount is determined by a Court.  Darish Declaration, Ex. B, page 52 [the "ACE Primary Policy"].

**Duke's Response**:  Disputed and misleading insofar as the subject allocation provision does not apply to Duke's fully covered loss.  Disputed insofar as Endurance cannot rely on the ACE Primary Policy's allocation provision for a retroactive date allocation when Endurance expressly does not follow form to the primary policy for retroactive date purposes.  AE 5, at 4588, Item I ("the foregoing [follow-form provision in the Claims-Made Coverage Endorsement] shall not apply to: 1. The Retroactive Date of the underlying claims made policy(ies).").  Disputed and misleading insofar as the allocation provision permits judicial recourse but only in the event that there is "no agreement on allocation of" defense costs by the parties, not disagreement as to

coverage. Disputed insofar as Endurance expressly disavowed the possibility of allocation during the 2020 claims process. *See* Letter from M. Perlis to M. Dolin, dated May 21, 2020, END_004727, at 4728. In fact, Endurance owed Duke coverage amounts for both *Seaman* and *Binotti* long before Endurance first claimed to have an allocation defense in October 2021 and prior to then never purported to refuse to pay on account of an allocation dispute. Disputed insofar as Endurance implies that the allocation provision justifies, and immunizes Endurance from liability in regards to, Endurance's handling of the *Seaman* and/or *Binotti* portions of Duke's claim. Darish Declaration, Ex. B, at 77.

25. Under a provision added by Endorsement to the ACE Primary Policy, Endurance had no duty to defend. Darish Declaration, Ex. B, pages 76-77 [the "ACE Primary Policy"].

**Duke's Response**: Undisputed insofar as Duke's insurers did not have an operational duty to defend Duke's claim. Disputed insofar as the statement is intended to assert or suggest that Duke's insurers, including Endurance, had no obligation to reimburse Duke's covered defense costs. AE 1, at 3242, § A.3 (insuring agreement); *id*. 3243, § B.4 (defining "Costs, Charges, and Expenses"); *id*. 3276, End. 18, § A.5 (defining Anti-Trust Claim); AE 5, at 4588, Item I (Endurance policy's claims-made coverage follow-form clause). Further disputed insofar as Duke's insurers had the right to be consulted and were in fact consulted by Duke regarding the defense and settlement of the subject claim. Lott Decl. ¶¶ 6-8, 26-28.

26. Duke cannot demonstrate any "bad faith" refusal to pay given the absence of any coverage under the 2015 Excess Policy for Seaman and Binotti. *Id*.; Duke Complaint, passim.

**Duke's Response**: Disputed insofar as Duke can demonstrate coverage under the 2015 Excess Policy, and Endurance cannot demonstrate the absence of coverage thereunder as a matter of law. Disputed insofar as Duke's bad faith claims are not solely predicated on Endurance's refusal to pay any coverage under the 2015 Excess Policy for *Seaman* and *Binotti*. *See* Dkt. No. 1-1 ("Compl.") ¶¶ 95-103; Dkt. No. 34 at 7 (Court order holding Duke had sufficiently alleged its extracontractual claims" based on "aggravating circumstances."). Disputed insofar as, under

11

North Carolina law, "a bad faith claim may proceed even where it is determined that the underlying contract was not breached." *Robinson v. N.C. Farm Bureau Ins. Co.*, 86 N.C. App. 44, 49 (1987).

27.	Duke cannot demonstrate any "unfair or deceptive trade practices" given the absence of any coverage under the 2015 Excess Policy for Seaman and Binotti. *Id*.; Duke Complaint, passim.

**Duke's Response**:  Disputed insofar as Duke can demonstrate coverage under the 2015 Excess Policy, and Endurance cannot demonstrate the absence of coverage thereunder as a matter of law. Disputed insofar as Duke's unfair or deceptive trade practices claims are not solely predicated on Endurance's refusal to pay coverage under the 2015 Excess Policy for Seaman and Binotti. *See* Compl. ¶¶ 104-111; Dkt. No. 34 at 7.  Disputed insofar as, under North Carolina law, an unfair or deceptive trade practices claim may proceed even where it is determined that the underlying contract was not breached. *See Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 609 (2006) ("An action for unfair or deceptive practices is a creation of statute, and therefore *sui generis*, so the cause of action exists independently, regardless of whether a contract was breached.").

28.	Therefore, Endurance is not liable to Duke for any breach of contract.  *Id*.

**Duke's Response**:  Disputed. This statement calls for a legal conclusion, not material assertions of fact or proper expert opinion.  This statement is also false for the reasons set forth in Duke's Brief in Opposition to Defendant's Motion for Summary Judgment..

*    *    *    *

<u>**STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

Pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure and Rule 56.1(a)(2) of the Local Rules of this Court, Duke provides these additional facts that require the denial of Endurance's Motion for Summary Judgment. Further, Duke incorporates herein all facts set forth in its Rule 56.1 Statement of Undisputed Material Facts, Dkt. No. 74, which require the denial of Endurance's Motion for Summary Judgment.

**I.      Endurance Agreed to Coverage Before Changing Course**

1.       In June 2015, after Duke's broker reported the *Seaman* lawsuit to its 2015 management liability insurers, Endurance assigned the *Seaman* claim the claim number 00044457 and requested that Duke "refer to this claim number in all future correspondence relating to this matter." Email from S. Lefler to D. Summa, dated June 29, 2015, END_004520 (Appendix Exhibit ["AE"] 36) at 4520.[2]

2.       Over the course of *Seaman*, Endurance claims handlers inserted entries into a claims diary maintained by Endurance in the ordinary course of its business; claim number 00044457 appeared on the top left-hand corner of each page of that claims diary. AE 19 at 4910-4917.

3.       On March 19, 2020, Endurance claims handler Robert Darish made the following entry in the claims diary marked with claim number 00044457: "Matter reopened as plaintiff's counsel has initiated another class action for non-medical faculty." *Id*. at 4910.

4.       Beginning in May 2020, Endurance's coverage counsel captioned its letters to Duke regarding the *Binotti* claim as: "Binotti, Lucia v. Duke University Claim No. 00044457." *See* END_004721, at 4721; END_004725, at 4725; END_004727, at 4727.

5.       Endurance's May 2020 claims letters analyzed coverage under the 2015 policy, invoking that policy's "January 2015 retro date" provision. END_004725, at 4725-26; END_004727, at 4728.

6.       After Endurance committed in March 2019 that it would fund any *Seaman* defense costs that reached into its coverage layer, Duke decided to resolve *Seaman* at the $54.5 million settlement

---

[2] All page references are to the non-zero terminal digits of the corresponding Bates number, unless indicated otherwise.

amount.  Second Declaration of Christopher Lott (AE D) ("Second Lott Decl.") ¶ 2.

7.      Prior to this litigation, neither Mr. Darish nor any other Endurance agent suggested to Endurance that the funding commitment made in March 2019, and which Endurance reaffirmed to Duke's counsel in July 2019, was *ex gratia* or conditioned on the actual amount of loss being less than a particular sum.  AE 8, at 111:4-111:9; AE 22 (July 23, 2019 R. Darish email to M. Dolin), at 4780; AE B ("Lott Decl.") ¶ 8; Second Lott Decl. ¶ 4.

8.      During the pendency of *Seaman* from 2015 to 2019, Endurance did not reserve any specific defenses to coverage for *Seaman* or for the no-poach conspiracy alleged in *Seaman,* including the retroactive date exclusion or allocation (based on the retroactive date exclusion or otherwise), despite being aware that the 2015 *Seaman* complaint alleged a no-poach conspiracy that spanned multiple years, including some alleged acts occurring several years prior to January 1, 2015. Lott Decl. ¶ 7; Second Lott Decl. ¶ 3; AE 10 ¶¶ 48-59, 68; AE 11 ¶¶ 50-61, 70.

## II.     The Underlying Insurance Layers Are Exhausted

9.      Endurance's claims handling expert, Charles Ehrlich, testified that, in custom and practice, a policyholder must fully exhaust a retention before any insurer is obliged to provide coverage. Specifically, at his deposition, in response to the question: "[I]n common custom and practice with a retention, if there is a retention of 1 million, that's 100 percent Duke's [*i.e.*, the policyholder's] obligation, correct?," Mr. Ehrlich responded:  "Correct.  And since it's a retention rather than a deductible, Duke's -- it doesn't trigger anything at that point if you're still within the 1 million." Excerpt of Deposition Transcript of Charles Ehrlich, dated December 17, 2021 (AE 37), at 131:2-10.

10.     Mr. Ehrlich also testified that, as it pertained to the policies at issue in this litigation, Duke is to pay at its own risk 100 percent of the applicable retention.  Specifically, at his deposition, in response to the question:  "So again, from custom and practice standpoint, is it your understanding that Duke pays 100 percent of the first million of covered costs and then there's an 80/20 split for dollars above that first million?," Mr. Ehrlich responded "[F]or covered loss, yes." *Id*. at 131:14-23.

**III.** *Binotti* **Relates Back to the 2015** *Seaman* **Claim**

11. Duke's bylaws state:

> 1. The University Faculty shall be composed of the Officers of the University as elected by the Board of Trustees, all deans, professors, associate professors, and assistant professors, and all other full-time members of the instructional staff, Registrar, and the University Librarian, and such other persons as may be designated by the President and approved by the Executive Committee or the Board of Trustees
>
> 2. The University Faculty shall be responsible for the conduct of instruction and research in the various colleges and schools in the University. It may also consider and make recommendations to the President regarding any and all phases of education at the University.

Bylaws of Duke University, dated July 1, 2020 (AE 38), at Art. XXI.

12. The Faculty Code of University Government for the University of North Carolina at Chapel Hill states:

> **§ 1-1. Members.** The General Faculty consists of the President of The University of North Carolina, the Chancellor of The University of North Carolina at Chapel Hill; all persons holding faculty appointments to the ranks of professor, associate professor, assistant professor, instructor, lecturer, or any of the formally authorized lecturer-equivalent ranks; librarians holding the ranks of librarian, associate librarian, assistant librarian, and general librarian under procedures approved by the chancellor; the registrar; the director of the Office of Undergraduate Admissions; the director of the Office of Scholarships and Student Aid; and such other officers of administration having responsibility for educational policy as may be approved for ex officio non-voting membership by the Faculty Council.

The Faculty Code of University Government, University of North Carolina at Chapel Hill, dated June 28, 2021 (AE 39), § 1-1. The foregoing code also sets forth specific provisions for faculty "Organization" and "Powers." *Id.* at §§ 1-2, 1-6.

13. At her November 10, 2021 deposition, Endurance's underwriter for Endurance's 2015 policy and corporate designee in this matter for underwriting, Millajean Bradley, testified that she could not say "where the language [in the Endurance policy relation-back clause] came from," and when asked about the clause's purpose stated that she "can't interpret it." Excerpt of Deposition Transcript of Millajean Bradley, dated November 10, 2021 (AE 40), at 94:1-95:7.

15

## IV.  Endurance's Retroactive Date Allocation Theory Would Divide Loss Arbitrarily

14.    In both *Seaman* and *Binotti*, Duke and the class counsel in each case (in both, Lieff Cabraser) negotiated and agreed to a lump sum settlement amount of $54.5 million and $19 million, respectively.  Second Lott Decl. ¶ 5; AE 16 at 14961; *Binotti* Settlement Agreement, DUKE00020072 (AE 43) at 20085.  Class counsel devised and administered the plan of how to allocate or distribute those lump sum amounts among participating class members, net of court-approved attorney's fees, costs, and other expenses.   Second Lott Decl. ¶ 5.

## V.    Duke's Extra-Contractual Claims

15.    In connection with Duke's prosecution of this case, Duke engaged a claims handling expert, R. Bryan Tilden, a North Carolina-based expert who has over 47 years of experience in the insurance and risk management industry as an author, agent, broker, consultant, underwriter, drafter of policy forms and endorsements, teacher, historian, claim examiner, and consultant for both policyholders and insurers.  Declaration of R. Bryan Tilden (AE E) ("Tilden Decl.") ¶¶ 3-4.

16.    According to Mr. Tilden's review of Endurance's produced claim file, Endurance's as-produced claim file contained no documentation of a coverage determination and lacked any material coverage analysis as to either *Seaman* or *Binotti*.  *Id*. ¶ 5.  In addition, in his review of the produced claim file and claim letters exchanged between Endurance and Duke, Mr. Tilden observed several other factors exemplifying a departure by Endurance from commercially acceptable standards, custom, and practice for claims handling, including without limitation:  (i) shifting coverage positions reflecting a prejudicial pre-disposition to avoid payment rather than to find coverage where available; (ii) misstatements regarding applicable insurance policy provisions (including misstatements regarding the amount of underlying limits and the applicable coverage part of the policy applicable to *Seaman* and *Binotti*); (iii) deficient recordkeeping and apparent adjustment errors flowing from that deficient recordkeeping; (iv) improper and irrelevant references to the wealth of the policyholder; and (v) other conduct inconsistent with the best interests of the policyholder.  *Id*. ¶ 6.

17. On March 3, 2020, Endurance sent Duke a letter reserving rights in regard to *Binotti*. AE 33; Lott Decl. ¶ 26.

18. In the March 3, 2020 letter, Endurance asserted against Duke limitations specific to the employment practices liability (EPL) coverage section. AE 33 at 60893; Tilden Decl. ¶ 7. The March 3, 2020 letter analyzed coverage for *Binotti* solely under the "Endurance Policy" "effective January 1, 2015-January 1, 2016." AE 33 at 60892.

19. In the March 3, 2020 letter, Endurance asserted that "the scheduled policies provide a total of $95,000,000 of underlying coverage." AE 33 at 60894; Tilden Decl. ¶ 7.

20. In the March 3, 2020 letter, and in subsequent May 2020 claims letters to Duke, Endurance never suggested or implied that *Binotti* failed to relate back to the 2015 policy year. AE 33; Second Lott Decl. ¶ 6. In addition, the March and May 2020 claims letters analyzed coverage under the 2015 Endurance policy, relying heavily on that policy's retroactive date exclusion. Second Lott Decl. ¶ 6.

21. Endurance published its own Claims Manuals, which outline Endurance's "best practices" as relevant to its claims handlers' handling of insurance claims. *See* Endurance Claims Best Practices for U.S. and Bermuda (Excluding Workers Compensation), dated December 15, 2016, END_004996 (AE 41); Sompo Claims Best Practices for U.S. and Bermuda, dated July 1, 2017, END_004984 (AE 42).[3]

22. Both Claims Manuals explain that:

> All Claim Handlers are required to be familiar with the [Endurance or Sompo] Claim Department Best Practices. These are practices that we strive to achieve in the delivery of prompt, fair and professional claim handling services. We expect our Claim Handlers to be proactive in all aspects of their claim handling, to use independent judgement when considering the opinions of vendors, to manage all activities of the file, and to be accountable for an appropriate result in a manner that demonstrates adherence to the Sarbanes-Oxley Act of 2002 (SOX).

AE 41 at 4998; AE 42 at 4986.

---

[3] Sompo is the parent company of Endurance. *See* Dkt. No. 84 ¶ 1 (Endurance claims handler declaration describing "Sompo International" as "the parent company of Defendant Endurance Risk Solutions Assurance Company").

23.     The 2016 Claims Manual states that:

Coverage should be promptly and properly analyzed pursuant to the applicable laws and regulations but no later than 45 days from initial assignment.

AE 41 at 4999.  The 2017 Claims Manual likewise states:

On follow form policies, coverage should be analyzed pursuant to the applicable laws and regulations, but no later than 45 days from receipt of the applicable underlying carrier's coverage position.

AE 42 at 4987.

24.     Both Claims Manuals provide that: "The Claims Handler's coverage position should be clearly documented within the claim file."  AE 41 at 4988; AE 42 at 5000.

*     *     *     *

Respectfully submitted,

/s/ James P. Cooney, III

_____

Mitchell F. Dolin*
mdolin@cov.com
Benjamin J. Razi*
brazi@cov.com
Jad H. Khazem*
jkhazem@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*By Special Appearance

Dated: January 28, 2022

James P. Cooney, III
Jim.Cooney@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
Facsimile: (704) 331-4955
N.C. State Bar No. 12140

*Attorneys for Plaintiff Duke University*

18